# UNITED STATES COURT OF APPEALS
## *for the*
## FOR THE FIRST CIRCUIT

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellee

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### APPELLANT'S BRIEF

Respectfully submitted by the Plaintiff-Appellant

Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94702
Jonathan.Affleck@protonmail.com
(617) 276-5788
*pro se*
Signature: *Jonathan Affleck*
Dated:5/12/25

### STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. This case raises unresolved and significant questions at the intersection of contract law, common carriage doctrine, and constitutional enforcement in digital public spaces. Oral argument would assist the Court in clarifying these complex legal issues—particularly those involving digital

1

infrastructure that functions as a conduit for public speech. Because the questions presented may have implications for other courts or future higher-court review, live argument will aid the decisional process.

## Table of Contents

**APPELLANT'S BRIEF** ..................................................................................................... 1

**STATEMENT REGARDING ORAL ARGUMENT** .................................................... 1

**TABLE OF AUTHORITIES** ................................................................................... 4

CASES ........................................................................................................................ 4
CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES ........................................ 6
OTHER AUTHORITIES ............................................................................................. 7
GLOSSARY ................................................................................................................ 7

**JURISDICTIONAL STATEMENT** ......................................................................... 8

**PRELIMINARY STATEMENT** .............................................................................. 8

**STATEMENT OF ISSUES** ..................................................................................... 10

**SCOPE OF REVIEW** ............................................................................................. 11

**STATEMENT OF THE CASE** ................................................................................ 11

I. NATURE OF THE CASE ........................................................................................ 11
II. COURSE OF PROCEEDINGS ................................................................................ 12
III. PRIOR RELATED PROCEEDINGS ....................................................................... 12

**STATEMENT OF FACTS** ...................................................................................... 13

**SUMMARY OF THE ARGUMENT** ....................................................................... 15

**ARGUMENT** .......................................................................................................... 17

I. THE COMPLAINT ALLEGES A BREACH OF AN IMPLIED-IN-FACT CONTRACT FOR MESSAGE TRANSMISSION
.................................................................................................................................. 17
A. THE PLATFORM'S DESIGN AND OPERATION GAVE RISE TO CONTRACTUAL OBLIGATIONS .............................. 17

B. HARVARD CRIMSON BREACHED ITS DUTY BY ENGAGING IN VIEWPOINT DISCRIMINATION ............................ 19
C. SECTION 230 DOES NOT PREEMPT CONTRACT CLAIMS VOLUNTARILY UNDERTAKEN.................................... 19
**II. THE PLATFORM FUNCTIONS AS A COMMON CARRIER AND A TELEGRAPH SERVICE UNDER STATE AND
FEDERAL LAW ........................................................................................................................................ 20**
A. COMMON CARRIAGE OBLIGATIONS APPLY UNDER MASSACHUSETTS STATUTES AND COMMON LAW ........... 20
B. FEDERAL LAW SUPPORTS THE CLASSIFICATION OF AND FEDERAL JURISDICTION OVER THE PLATFORM AS A
COMMON CARRIER OF MESSAGES ........................................................................................................ 21
C. THE LEGAL FRAMEWORK IS UNSETTLED AND MUST BE DEVELOPED THROUGH FACTFINDING .................... 22
**III. THE PLATFORM IS A PUBLIC FACILITY IN A GOVERNMENT INSTITUTION OR IN A PLACE OF PUBLIC
ACCOMMODATION .................................................................................................................................. 23**
A. U.S. COMMON CARRIAGE AND PUBLIC FACILITY LAW SHARE A COMMON LINEAGE ...................................... 23
B. THE PLATFORM FUNCTIONS AS A PUBLIC FACILITY EMBEDDED IN GOVERNMENTAL AND PUBLIC
INFRASTRUCTURE ................................................................................................................................... 25
**IV. NONFEASANCE AND TECHNOLOGICAL INTEGRATION CONNECT THE PLATFORM'S CONDUCT TO THE
STATE ....................................................................................................................................................... 28**
A. THE STATE'S REFUSAL TO ENFORCE DUTIES FACILITATES CONSTITUTIONAL VIOLATIONS ............................ 28
B. THE PLATFORM PERFORMS PUBLIC FUNCTIONS AND OPERATES AS A DIGITAL FORUM.................................. 29
C. THE PLATFORM IS LINKED WITH GOVERNMENT INFRASTRUCTURE AND PRACTICE......................................... 29
**V. HARVARD CRIMSON'S PLATFORM IS STATE-ENTWINED TO THE POINT OF STATE-ACTION ..................... 30**
A. HARVARD CRIMSON IS ROOTED IN A HIGHLY INTEGRATED STATE AND UNIVERSITY ECOSYSTEM. ................. 30
B. THE INTERNET IS FEDERALLY RECOGNIZED AS A PUBLIC FORUM AND IS HIGHLY SUPPORTED BY FEDERAL
AND STATE GOVERNMENT ...................................................................................................................... 31
C. THE CRIMSON'S PLATFORM FUNCTIONS AS A DIGITAL FACILITY EMBEDDED IN THE INTERNET..................... 33
D. GOVERNMENT INVOLVEMENT SUPPORTS APPLICATION OF CIVIL RIGHTS OBLIGATIONS................................. 33
E. DELEGATED BREACH: STATE INACTION ENABLES PLATFORM NONCOMPLIANCE WITH LAW ......................... 34
F. ENTWINEMENT AND ADVISORY INFLUENCE BY STATE OFFICIALS SUPPORT A FINDING OF STATE ACTION ...... 35
**VI. THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR RELIEF AND SHOULD PROCEED BEYOND THE
PLEADING STAGE .................................................................................................................................... 36**
A. THE FACTUAL ALLEGATIONS SATISFY RULE 8 AND SURVIVE TWOMBLY/IQBAL .............................................. 36
B. HARVARD CRIMSON'S CONDUCT IS A PROBABLE VIOLATION OF COMMON CARRIAGE LAW, TELEGRAPH LAW,
PUBLIC ACCOMMODATION LAW, AND OF CONTRACT LAW....................................................................... 37
C. VIEWPOINT DISCRIMINATION BY A STATE ACTOR IS CONSTITUTIONALLY PROHIBITED ................................. 37
D. SECTION 230 DOES NOT BAR RELIEF AT THIS STAGE ................................................................................. 37
**VII. THIS ACTION IS NOT BARRED BY PRECLUSION PRINCIPLES................................................................... 37**
**VIII. SECTION 230(C) IS AN AFFIRMATIVE DEFENSE THAT CANNOT SUPPORT DISMISSAL ON THE
PLEADINGS ............................................................................................................................................. 39**
A. AFFIRMATIVE DEFENSES REQUIRE UNDISPUTED FACTS NOT PRESENT HERE ............................................... 39
B. THE LEGAL FRAMEWORK SURROUNDING SECTION 230 IS UNSETTLED AND EVOLVING.................................. 40
C. DISMISSAL IS IMPROPER WHEN BASED ON A SECTION 230(C) AFFIRMATIVE DEFENSE TO AN ACCUSATION NOT
MADE.................................................................................................................................................... 40
D. FACTUAL DEVELOPMENT IS ESSENTIAL TO EVALUATING THE PLATFORM'S ROLE.......................................... 43
E. A PRIOR DISMISSAL UNDER 28 U.S.C. § 1915(E)(2) IS IN ERROR TREATED AS PRECLUSIVE.......................... 44

**CONCLUSION** ...................................................................................................................................... **45**

**ADDENDUM** ............................................................................................................................................ **I**

**ADD. ARTICLE XVI OF PART THE FIRST OF THE MASSACHUSETTS CONSTITUTION** .......................................... II
**ADD. 42 U.S. CODE § 1983 – CIVIL ACTION FOR DEPRIVATION OF RIGHTS** ........................................................ II
**ADD. 42 U.S. CODE § 2000A – PROHIBITION AGAINST DISCRIMINATION OR SEGREGATION IN PLACES OF
PUBLIC ACCOMMODATION**....................................................................................................................... II

ADD. 42 U.S. CODE § 2000B – CIVIL ACTIONS BY THE ATTORNEY GENERAL........................................IV
ADD. 42 U.S. CODE § 2000B-2 – PERSONAL SUITS FOR RELIEF AGAINST DISCRIMINATION IN PUBLIC
FACILITIES ..............................................................................................................................IV
ADD. 47 U.S. CODE § 153 – DEFINITIONS ...............................................................................IV
ADD. 47 U.S. CODE § 202 – DISCRIMINATIONS AND PREFERENCES ..........................................V
ADD. 47 U.S. CODE § 207 – RECOVERY OF DAMAGES ..............................................................VI
ADD. 47 U.S. CODE § 230 – PROTECTION FOR PRIVATE BLOCKING AND SCREENING OF OFFENSIVE MATERIAL
..............................................................................................................................................VI
ADD. ARTICLE I, SECTION 10, CLAUSE 1 (CONTRACTS CLAUSE) ...........................................IX
ADD. FIRST AMENDMENT OF THE US CONSTITUTION ...............................................................X
ADD. FOURTEENTH AMENDMENT OF THE US CONSTITUTION ....................................................X
ADD. M.G.L. CHAPTER 159: COMMON CARRIERS .................................................................XI
ADD. M.G.L. CHAPTER 166: TELEPHONE AND TELEGRAPH COMPANIES, AND LINES FOR THE
TRANSMISSION OF ELECTRICITY ..........................................................................................XI
ADD. REVISED LAWS CHAPTER 70: OF COMMON CARRIERS AND EXPRESS COMPANIES. ............XII
ADD. REVISED LAWS CHAPTER 122: OF COMPANIES ENGAGED IN THE TRANSMISSION OF ELECTRICITY.  XII
ADD. M.G.L. § 272 § 92A: ADVERTISEMENT, BOOK, NOTICE OR SIGN RELATIVE TO DISCRIMINATION;
DEFINITION OF PLACE OF PUBLIC ACCOMMODATION, RESORT OR AMUSEMENT............................XIII
ADD. N.Y. COMP. CODES R. & REGS. TIT. 20 § 527.2 – SALE OF UTILITY AND SIMILAR SERVICES ..............XIII
ADD. JUDGE KELLEY'S DISMISSAL OF THE INSTANT CASE (DOCUMENT 27 PAGE XVII) AND JUDGE
STEARNS'S DISMISSAL OF THE PREVIOUS CASE (DOCUMENT 4 PAGE XXV) .............................XVI

## TABLE OF AUTHORITIES

### *Cases*

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45 (1978)    34

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)    31

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)    36

*Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018)    11

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009)    19, 42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)    43, 36

*Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)    36, 37

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001)    36, 36, 31

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)    28, 31

*Catlette v. United States*, 132 F.2d 902 (4th Cir. 1943)    35

*Cellco P'ship v. FCC*, 700 F.3d 534, 546 (D.C. Cir. 2012)    41

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985)    31

*In re Curran*, 855 F.3d 19, 24 (1st Cir. 2017)    11

*Davis v. Pacific Teleph. & Teleg. Co.*, 127 Cal. 312, 316, 59 Pac. 698, per Henshaw, J. .......... 14, 14

*Denton v. Hernandez*, 504 U.S. 25, 34 (1992) .......... 13, 44, 38

*Matter of Easylink Servs. Intl., Inc. v. N.Y. State Tax Appeals Tribunal*, 101 A.D.3d 1180, 957 N.Y.S.2d 722 (3d Dep't 2012) .......... 18

*García-Catalán v. United States*, 734 F.3d 100, 103–04 (1st Cir. 2013) .......... 36

*Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) .......... 45

*Global Crossing Telecomms., Inc. v. Metrophones Telecom, Inc.*, 550 U.S. 45, 53–55 (2007) .......... 22

*Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir. 2005) .......... 38

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934) .......... 34

*Juárez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 276–77 (1st Cir. 2013) .......... 45

*Federal Trade Commission v. LeadClick Media*, LLC, 838 F.3d 158 (2d Cir. Sept. 23, 2016) .......... 42

*Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002) .......... 30

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) .......... 28, 34, 36, 31

*Marsh v. Alabama*, 326 U.S. 501 (1946) .......... 29

*FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979) .......... 21

*Murthy v. Missouri*, 144 S.Ct. 1972 (2024) .......... 22

*National Ass'n of Regulatory Utility Comm'rs v. FCC (NARUC I)*, 525 F.2d 630 (D.C. Cir. 1976) .......... 14, 24, 21, 21

*NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022) .......... 22

*NetChoice, LLC v. Paxton*, 49 F.4th 439, 446–49 (5th Cir. 2022) .......... 22, 22

*N.Y. State Telecomms. Ass'n v. James*, 101 F.4th 135, 144–45 (2d Cir. 2024) .......... 23

*Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) .......... 10

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983) .......... 26

*Primrose v. Western Union Telegraph Co.*, 154 U.S. 1, 14 (1894) .......... 24, 24, 24, 24

*Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004)     11, 39, 43, 44, 37, 39

*Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828–829 (1995)     37

*Shelley v. Kraemer*, 334 U.S. 1, 20 (1948)     35

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008)     11, 39

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007)     39

*Vermilye v. Postal Tel. Cable Co.*, 91 N.E. 904, 905–06 (Mass. 1910)     18, 18, 24

### Constitutional Provisions, Statutes, and Rules

42 U.S. Code § 1983     9, 35, add ii

42 U.S. Code § 2000a     24, 32, add ii

42 U.S. Code §§ 2000b and 2000b-2     24, 32, add iv, add iv

47 U.S. Code § 153     22, add iv

47 U.S.C. §§ 202 and 207     22, add v

47 U.S. Code § 230     9, 9, 10, 11, 16, 19, 39, 40, 41, 42, 31, 34, 37, 38, add vi

Article I, Section 10, Clause 1 (Contracts Clause)     34, 35, add ix

First Amendment of US Constitution     37, add x

Fourteenth Amendment of US Constitution     9, add x

M.G.L. c 159 §§ 1–2 and § 10     15, 18, 20, add xi

M.G.L. c 166 §§ 16–19     15, 18, 20, add xi

M.G.L. c 272 § 92A     24, 32, add xi

RL C 70 §§ 1–2     18, add xii

6

RL C 122 §§ 9–11                                                    18, add xii

Article XVI of Part the First of the Massachusetts              37, add ii
Constitution

N.Y. Comp. Codes R. & Regs. tit. 20 § 527.2(d)              xiii, add xiii

**Other Authorities**

William Blackstone, *Commentaries on the Laws of England*, vol. 3, at 165–66 (1768) 23

**Glossary**

| | |
|---|---|
| Add | Addendum. |
| App | Appendix. |
| Dkt | District Court Docket Document. |
| ICP | Internet Content Provider. |
| ICS | Interactive Computer Service. |
| IFP | *in forma pauperis*. |
| ISP | Internet Service Provider. |
| Jonathan Affleck | Jonathan Affleck is the plaintiff before the District Court. He is the Plaintiff-Appellant before the Court of Appeals. Joachim Martillo is the professional name of Jonathan Affleck. |
| Joachim Martillo | Joachim Martillo is the professional name of Jonathan Affleck, who is the Plaintiff-Appellant. Jonathan Affleck is a member of the Harvard Class of 1978. Under the name Joachim Martillo, Jonathan Affleck made substantial contribution to the technological field of cloud computing. |
| MCAD | Massachusetts Commission Against Discrimination. |

**JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's order entered on January 29, 2025, is a final decision that disposed of all claims in *Affleck v. The Harvard Crimson Inc.*, No. 1:24-cv-10802 (D. Mass.). The appeal is timely under Rule 4(a)(1) of the Federal Rules of Appellate Procedure because the Notice of Appeal was filed within 30 days of the final judgment.

**PRELIMINARY STATEMENT**

This case presents a question the courts have not yet resolved. When a digital platform operates without individualized terms of service, invites public participation, and benefits commercially from user interaction, does it assume nondiscrimination obligations under longstanding doctrines of common carriage and implied-in-fact contract?

This appeal arises from the dismissal of a complaint at the pleading stage on the basis of an affirmative defense even though important questions of law remain unsettled. The district court resolved significant constitutional and statutory questions—including the application of common carriage doctrine to social medium platforms[1] and the scope

_____

[1] In the complaint and subsequent pleadings, Appellant referred to a social medium platform. The federal government seems to prefer social media platform. Court rulings seem to prefer platform or Platform. Except for quotations from an authority,

of Section 230 immunity—without a developed factual record or adversarial testing. This approach undermines core values of procedural fairness and constitutional adjudication. That premature dismissal short-circuited proper judicial review and merits reversal.

The complaint alleges that the online platform of the Harvard Crimson (henceforth Platform) functions as a *de facto* common carrier under Massachusetts law by holding itself out as a neutral conduits for digital speech. By invoking editorial discretion to suppress lawful content in breach of its implied-in-fact contracts with users, the Platform violates its public-service obligations. When state officials refuse to enforce those obligations—and do so in a way that facilitates speech suppression based on viewpoint—the private actors become state actors[2] for constitutional purposes.

This case presents complex and important questions of law at the intersection of contract law, common carriage doctrine, Section 230(c) immunity, and the state action

---

this document refers to the Harvard Crimson's online digital platform as Platform. An authority uses *platform(s)* or to *Platform(s)* in a more generic sense.

[2]Pursuant to the Fourteenth Amendment, 42 U.S.C. § 1983 provides a cause of action for violations of constitutional rights under color of state law. This mechanism enables challenges to state-facilitated viewpoint discrimination [Dkt. 1, ¶ 4, at 1; App. 29].

9

doctrine. The Supreme Court has described social media as the "modern public square,"[3] but that description is meaningful only if both governmental and proxy censorship are constitutionally constrained. Because of the legal uncertainty and societal stakes, this Court should reverse and remand for further proceedings.

STATEMENT OF ISSUES

1. Whether the district court erred in dismissing the complaint at the pleading stage, where the claims rest on novel and unsettled legal questions involving social media platforms, contract law, and common carriage doctrine.

2. Whether Section 230(c) of the Communications Decency Act bars claims that are based on state common carriage and contract principles, when the Platform allegedly assumes quasi-public duties through implied-in-fact agreements.

3. Whether government officials' sustained failure to enforce speech-related duties against the Platform, combined with legal enforcement entanglement, constitutes state action sufficient to support a constitutional claim.

---

[3]*See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). As recognized in *Packingham*, digital platforms have become the primary venue for expressive activity, underscoring the importance of speech protections in such spaces.

## SCOPE OF REVIEW

This Court reviews a dismissal under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *In re Curran*, 855 F.3d 19, 24 (1st Cir. 2017). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018).

Dismissal based on an affirmative defense—such as immunity under 47 U.S.C. § 230(c)—is appropriate only if the defense is conclusively established by the complaint's allegations. *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004); *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008). Where factual development is required or legal questions remain unsettled, dismissal at the pleading stage is premature.

## STATEMENT OF THE CASE

### I. Nature of the Case

This case concerns the operation of an online comments service maintained by *The Harvard Crimson*, a student-run newspaper[4] on its Platform. Appellant alleges that the Platform provides public carriage of user-submitted electronic messages and operates without formal terms of service or individualized agreements. See Dkt. 14, at

---

[4]The Crimson is not merely a student club. The Crimson is a medium size business with at least $30 million in assets and an international readership.

5–6; App. 75–76. Appellant submitted multiple public comments, which were removed, and he was subsequently banned from further participation. He contends that Harvard Crimson's conduct gives rise to obligations under state common carriage doctrine, Massachusetts telegraph statutes, and applicable federal principles of common carriage and non-discrimination. The complaint also raises claims of unconstitutional speech suppression by a state actor.

## II. Course of Proceedings

Appellant filed the present complaint on March 28, 2024, asserting claims for breach of an implied-in-fact common carriage contract[5] and for unconstitutional censorship. Harvard Crimson moved to dismiss under Rule 12(b)(6). On January 29, 2025, the district court granted the motion, concluding that the complaint failed to state a claim upon which relief could be granted. The court did not grant leave to amend, and a pending Rule 12(c) motion—based in part on admissions made in Harvard Crimson's own motion to dismiss—was denied as moot. Appellant moved to alter or amend the judgment under Rule 59(e), but that motion was also denied. Appellant timely appeals both the Rule 12(b)(6) dismissal and the denial of leave to amend.

## III. Prior Related Proceedings

In November 2020, Appellant filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) concerning Harvard Crimson's conduct.

---

[5]See [Dkt. 1, ¶ 31, at 7; App. 35]; [Dkt. 14, at 6–7; App. 76–77].

After MCAD declined to act, Appellant initiated *Martillo v. Twitter et al.*, No. 1:21-cv-11119 (D. Mass.), which included Harvard Crimson as a defendant. That complaint, filed *in forma pauperis* (IFP), did not allege against Harvard Crimson the contract-based or common carriage theories advanced here. The district court dismissed that action *sua sponte* under 28 U.S.C. § 1915(e)(2) prior to service and without prejudice.[6] As the Supreme Court recognized in *Denton v. Hernandez*, 504 U.S. 25, 34 (1992), such dismissals do not preclude refiling of even identical claims in a paid complaint.

### STATEMENT OF FACTS

In February 2024, Appellant submitted public comments on articles published by Harvard Crimson using its online comments service. The Platform allowed the public to post messages without requiring assent to formal terms of service and operated pursuant only to a general posted comment policy. Appellant's comments were removed without notice, and he was banned from further commenting.[7]

Harvard Crimson commercially benefits from user engagement, including increased traffic that enhances advertising value. Appellant alleges that the Platform holds itself out as a neutral conduit for public speech and thereby undertakes obligations

---

[6]See [Dkt. 24, at 8 n.12; App. 107]; [Dkt. 30-1, ¶ 25, at 7; App. 141].

[7]See [Dkt. 1, ¶¶ 16–21, at 5–9; App. 33–34]; [Dkt. 30-1, ¶¶ 25–31, at 7–8; App. 141–142].

of common carriage under Massachusetts law and federal functional tests, including

those articulated in *National Ass'n of Regulatory Utility Comm'rs v. FCC (NARUC I)*,

525 F.2d 630 (D.C. Cir. 1976). The transmission of electronic messages over wire or

radio means also falls within the Massachusetts legal definition of a telegraph.[8] See

---

[8]The legal definition of 'telegraph' has always encompassed digital message transport

and has not changed since the earliest days of telegraph service because telegraph

transmission was a form of digital transmission since the start of US public telegraph

service on May 24, 1844. A telegraph is "any apparatus for transmitting messages by

means of electric currents and signals." *Davis v. Pacific Teleph. & Teleg. Co.*, 127

Cal. 312, 316, 59 Pac. 698, per Henshaw, J. *Davis* is an 1899 decision that cites much

earlier decisions for the legal definition of telegraph [Dkt. 14, at 17; App. 87]. A

similar definition of telegraph service is used to this day in NY State, which at least

in some situations considers transport by the Internet to constitute telegraph service.

See N.Y. Comp. Codes R. & Regs. tit. 20 § 527.2(d). Harvard Crimson's comments

section provides a telegraph service by federal and state law. A desktop computer,

which has downloaded frontend software from a social medium platform, differs far

less from a 19th century telegraph end station than a modern smartphone differs from

a 19th century telephone. The similarity is unacknowledged because a telegraph end

station was rarely present outside a business establishment. If a social medium app,

which could be an app like X/Twitter, WhatsApp, or Signal, is installed on a

14

M.G.L. c. 159, §§ 1–2; c. 166, § 16. Appellant contends that these features give rise to enforceable obligations under the doctrines of common carriage, telegraph regulation, and implied-in-fact contract.

In short, Harvard Crimson's comments service performs the functional role of a message carrier by transmitting user-generated content under general terms, regardless of Harvard Crimson's nominal identity as a student publication.

## SUMMARY OF THE ARGUMENT

This case calls for the application of settled legal principles to an evolving technological context. The complaint plausibly alleges that the Harvard Crimson operated its online comment service as a *de facto* message transmission service— functionally equivalent to a telegraph or public message board—by inviting the general public to submit content under uniform conditions and without individualized contracts. Under common law doctrines of *assumpsit* and common carriage, such conduct gives rise to an implied-in-fact obligation to transmit messages without unreasonable discrimination.

---

smartphone, the smartphone provides traditional telegraph short message transmission functionality and is reasonably considered a hybrid telephone-telegraph end station.

*Primrose v. Western Union Telegraph Co.*, **154 U.S. 1 (1894)**, recognizes that **certain stipulations by a common carrier—especially those that attempt to waive or limit its essential duties—are invalid** if they conflict with **public obligations implied by law**, such as the **duty to carry messages without unreasonable discrimination or delay**. "It is well settled that *a telegraph company, like a common carrier*, cannot *by any contract* exempt itself from liability for gross negligence, or from the consequences of its own fraud or willful wrong." *Primrose*, 154 U.S. at 14 (emphasis added)

In other words, **Section 230(c)**, like a contract disclaimer, **cannot automatically override** legal duties implied by common carriage and public-service law—especially when the Platform voluntarily holds itself out as a neutral conduit. This precedent reflects the common law's historic refusal to permit **self-serving immunity** in services that resemble common carriage, and supports the argument that **implied-in-fact carriage contracts**, such as those arising from Harvard Crimson's open comment policy, carry binding obligations. **What matters is the Platform's public function**, not its subjective intentions or the formal wording of Section 230 or its policy. That principle remains relevant in the digital age, where the function—rather than the medium—determines whether carriage duties attach. See *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC* (NARUC I), 525 F.2d 630, 641–42 (D.C. Cir. 1976) (common carrier status turns on whether the entity holds out its services to the public indifferently).

16

Dismissal was improper at this early stage because the legal characterization of the Platform—as a common carrier, telegraph service, or private publisher—raises mixed questions of law and fact. Further, the district court erred by resolving this dispute on the basis of an affirmative defense—Section 230(c) immunity—that cannot support dismissal unless its applicability is clear from the complaint itself. In this context, the applicability is not clear from the face of the complaint because the Platform voluntarily entered into an implied-in-fact contract that Section 230(c) does not negate. See *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009). Section 230(c) does not negate contract law and cannot override Constitutional law of contract. Because the Platform's legal status and its relationship to the state remain factually and doctrinally unsettled, the complaint states a plausible claim for relief and should proceed to further development.

A<span style="font-variant:small-caps">RGUMENT</span>

## I. The Complaint Alleges a Breach of an Implied-in-Fact Contract for Message Transmission

### A. The Platform's Design and Operation Gave Rise to Contractual Obligations

Harvard Crimson offers a publicly accessible online comment service through which users may transmit messages to one another. The Platform operates without requiring assent to individualized terms of service, inviting the public to engage under general conditions posted in a comment policy. It derives commercial benefit from user interaction, including through advertising and traffic-based revenue metrics.

17

Under the common law doctrine of *assumpsit*, a service provider that offers carriage to the public on general terms undertakes an implied-in-fact contract to serve each member of the public on equal terms.[9] See *Vermilye v. Postal Tel. Cable Co.*, 91 N.E. 904, 905–06 (Mass. 1910).[10] Harvard Crimson's comments service, which functions as a message carrier, meets the criteria for such a contract.

---

[9]Under the doctrine of *assumpsit*, a carrier, who holds itself out as ready to serve the public for a fee, is presumed to impliedly promise to carry all lawful traffic without unjust discrimination. This conduct gives rise to an **implied-in-fact contract**, enforceable in *assumpsit*, even if no express agreement exists between the parties. See discussion of the ***Primrose*** ruling above on p. 18.

[10]*Vermilye* uses the old statutory titles RL ℂ 70 §§ 1–2 and RL ℂ 122 §§ 9–11. The former corresponds M.G.L. c 159 §§ 1–2. The latter corresponds to M.G.L. c 166 §§ 16–19. Telegraph statutes continues to be applied throughout the country. See N.Y. Comp. Codes R. & Regs. tit. 20 § 527.2(d)(2) and Example 3 (add. 16). See also *Matter of Easylink Servs. Intl., Inc. v. N.Y. State Tax Appeals Tribunal,* 101 A.D.3d 1180, 957 N.Y.S.2d 722 (3d Dep't 2012). The decision refers to SMTP, which is an email messaging protocol used by the Internet.

18

**B. Harvard Crimson Breached Its Duty by Engaging in Viewpoint Discrimination**

The complaint alleges that Appellant submitted lawful public comments in February 2024, which were removed without explanation and followed by a ban on further participation. The basis for removal was the viewpoint expressed—namely, rejection of a religious and political ideology. Harvard Crimson thus denied service based on message content, violating its duty to transport lawful messages without unreasonable discrimination.

**C. Section 230 Does Not Preempt Contract Claims Voluntarily Undertaken**

Section 230 of the Communications Decency Act provides immunity for certain speaker or publisher-related liabilities, but it does not preempt contract law or obligations voluntarily assumed. See *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009). Any platform that undertakes contractual obligations—express or implied—is bound by them notwithstanding Section 230. Appellant's claim does not challenge editorial discretion *per se* but alleges breach of a contract to carry lawful public messages.

## II. The Platform Functions as a Common Carrier and a Telegraph Service Under State and Federal Law

### A. Common Carriage Obligations Apply Under Massachusetts Statutes and Common Law

Beyond contractual liability, Harvard Crimson's obligations also arise from its classification under longstanding statutory and common law common carriage frameworks. Massachusetts law imposes nondiscrimination duties on entities that provide message transmission to the public for compensation. See M.G.L. c. 159, §§ 1–2. The state also regulates telegraph services, requiring that dispatches be transmitted without unreasonable delay or discrimination. See M.G.L. c. 166, § 16, which uses the Massachusetts archaism *despatches*. These provisions remain in force and are not limited to any specific transmission technology.

An entity that offers to transmit messages for the public under general terms—without negotiating individualized service agreements—meets the functional definition of a common carrier under both statute and common law. Similarly, a "telegraph company" under Massachusetts law includes entities engaged in the electronic transmission of messages. Harvard Crimson's online comments service accepts public submissions under a general commenting policy, processes them for public display, and exercises only general moderation controls. Because it holds out this Platform to the public and facilitates message transmission without individualized agreements or

20

editorial development, its conduct falls within the scope of both common carriage and also telegraphic service as defined by Massachusetts law.

## B. Federal Law Supports the Classification of and Federal Jurisdiction over the Platform as a Common Carrier of Messages

Federal law supports the classification of the Harvard Crimson's online comments service as a common carrier of messages because it performs the core function of transmitting user-submitted content to the public without alteration or editorial discretion. The D.C. Circuit in *National Ass'n of Regulatory Util. Comm'rs v. FCC* ("*NARUC I*") held that an entity is a common carrier if it "holds itself out to serve indifferently all potential users" and "allows customers to transmit intelligence of their own design and choosing." 525 F.2d 630, 641 (D.C. Cir. 1976). This functional test focuses on the conduct of the service rather than its formal designation.

Harvard Crimson's comments service is open to the general public, accepts communications of the user's choosing, and applies only standard, preannounced rules—without engaging in individualized negotiation or prior content selection. As the Supreme Court explained, "What appears to be essential to the quasi-public character implicit in the common carrier concept is that the carrier 'undertakes to carry for all people indifferently…'" *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979). Because the Crimson performs this neutral, open-access function, it satisfies the federal standard for common carriage under *NARUC I* and *Midwest Video*.

Under 47 U.S.C. § 207, parties may bring suit against common carriers in federal court. The definition of "common carrier" in 47 U.S.C. § 153(11) encompasses entities that hold themselves out to serve the public. The Supreme Court has affirmed that parties may seek judicial relief under the Communications Act even when the FCC lacks regulatory authority. See *Global Crossing Telecomms., Inc. v. Metrophones Telecom, Inc.*, 550 U.S. 45, 53–55 (2007).

### C. The Legal Framework Is Unsettled and Must Be Developed Through Factfinding

Federal courts remain divided on whether social media platforms may be subject to common carriage obligations. The Eleventh Circuit has rejected the theory. See *NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022). The Fifth Circuit has upheld it—*NetChoice, LLC v. Paxton*, 49 F.4th 439, 446–49 (5th Cir. 2022).[11] The

---

[11]See *NetChoice, LLC v. Paxton*, 49 F.4th 439, 466 (5th Cir. 2022) (rejecting the argument that platforms may escape common carrier regulation by engaging in viewpoint-based discrimination, and stating that "[t]he Platforms appear to believe that any enterprise can avoid common carrier obligations by violating those same obligations," which "would rob the common carrier doctrine of any content"). Harvard Crimson's comments service does not serve as many users as the platforms, which the Court of Appeals for the Fifth Circuit discusses, but common carriage

Second Circuit has affirmed that state regulation may apply where the FCC lacks jurisdiction. See *N.Y. State Telecomms. Ass'n v. James*, 101 F.4th 135, 144–45 (2d Cir. 2024). Because no binding precedent governs the present facts, and classification raises mixed questions of law and fact, dismissal at the pleading stage was improper. See Dkt. 30, at 1–4; App. 123–126.

### III. The Platform is a Public Facility in a Government Institution or in a Place of Public Accommodation

A. U.S. Common Carriage and Public Facility Law Share a Common Lineage

The obligation to serve the public on equal terms is a foundational principle of Anglo-American law. In the English common law tradition, certain professions that "held themselves out" to serve the public—such as innkeepers, common carriers, bargemasters, and tradesmen—were understood to enter into a general, implied undertaking to provide nondiscriminatory service. As Blackstone[12] wrote:

> "[I]f an inn-keeper, or other victualer, hangs out a sign and opens his house for travelers, it is an implied engagement to entertain all persons who travel that way; and upon this universal assumpsit an action on the case will lie against

---

status does not depend on the size of the carrier. While *Paxton* points out the platforms function as common carriers of messages, *Paxton* is a case of alleged improper state regulation and does not address the violations, which Appellant has standing to address. See *Murthy v. Missouri*, 144 S.Ct. 1972 (2024).

[12]See dkt 14, pp. 6–7; app. 76–77.

him for damages, if he without good reason refuses to admit a traveler."
— *3 William Blackstone, Commentaries on the Laws of England* 165–66.

American courts adopted this principle under the doctrine of **assumpsit**, recognizing that those who offer essential services to the public incur duties that arise not from individualized agreement, but from the nature of the offering itself. This principle became embedded in **common carriage doctrine**, where entities offering to carry persons or messages were required to do so without unreasonable discrimination. See *Vermilye v. Postal Tel. Cable Co.*, 91 N.E. 904, 905–06 (Mass. 1910); *Primrose v. Western Union Telegraph Co.*, 154 U.S. 1, 14 (1894).

This common law tradition also laid the groundwork for the statutory law of **public accommodation**. Title II of the Civil Rights Act of 1964 and corresponding state laws—including Massachusetts's public accommodation statute, M.G.L. c. 272, §§ 92A and 98—codified the principle that places or services held out for general public use must operate without discrimination. Though framed as civil rights protections, these statutes reflect the same core idea: a service provider that invites public participation on general terms assumes a public-facing obligation.

This lineage directly supports the classification of digital platforms that function as public message conduits—such as the Platforms's comment service—as **public**

24

**facilities** or **places of public accommodation**.[13] Like the innkeeper or telegraph company, the platform offers communication services to the public under general conditions. It thereby inherits obligations to transmit messages without viewpoint-based exclusion, regardless of whether those obligations arise from statute, implied contract, or common law doctrine.

B. The Platform Functions as a Public Facility Embedded in Governmental and Public Infrastructure

The Platform's online comment service operates as a digital facility that is embedded in both public-serving infrastructure and a state-affiliated institutional environment. It invites the general public to submit content, transmits those messages through publicly accessible Internet infrastructure, and curates public-facing discourse related to government, education, and civic life. As a platform openly accessible to the

---

[13] The public facility of the Platform is found within the public facility of the Internet, which is found within almost every government institution and every place of public accommodation. If the government institution or the place of public accommodation does not have a cable modem wireless router that connects to the Internet, a connection via a metropolitan area network or a cellular network is almost certainly available.

public and structured to receive expressive contributions from members of the public, it functions as a **public facility** in both form and effect.

The Supreme Court has recognized that **public facilities** can arise in both physical and digital forms when their purpose, design, and use involve **ongoing public access and expressive activity**. In *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983), the Court treated a school district's internal mail system—used across multiple public institutions—as a unified communication facility, even though not open to the public at large. It held that the system was subject to constitutional scrutiny when its use was limited in a way that discriminated among speakers. Similarly, Harvard Crimson's Platform facilitates public communication across the Harvard Community, across departments and among users engaging with educational and governmental content, functioning as a **speech-enabling infrastructure** tied to public institutions and publicly relevant discourse.

Because Harvard Crimson's comment service operates within and relies upon the **publicly subsidized Internet**,[14] it occupies an expressive role similar to traditional message conduits—telegraph lines, post roads, or bulletin boards maintained for civic communication. Its use by government actors, its integration with a state-chartered educational institution, and its monetization of public participation underscore its

---

[14]See dkt 1, ¶ 12, pp. 2–3; app. 30–31.

**public-facing character**. In this context, the platform's moderation practices implicate the same kinds of **access and equality concerns** that animated both the common law doctrines discussed in § III.A and the statutory obligations imposed by public accommodation laws.

In sum, the Crimson's online comment service is not merely a private forum. It is a **digital public facility**, structured for expressive use by the general public, embedded in state-connected infrastructure, and subject to public obligations under both common law and modern statutory analogs. Its operation therefore must conform to the standards of nondiscrimination and viewpoint neutrality that apply to services held out for general public use.

The Harvard Crimson's platform thus functions not only as a public-facing message conduit but as a facility embedded within broader systems of publicly supported infrastructure and institutional governance. It serves the public, engages in expressive discourse on public matters, and operates within the digital and physical environment of a state-chartered university. These characteristics are not incidental. They bring the platform's operations into close and ongoing contact with state interests, state-supported systems, and state actors.

What remains is to show how that contact—through **regulatory nonfeasance**, **technological interdependence**, and **institutional alignment**—creates a legally cognizable connection between the Crimson's actions and the Commonwealth of

Massachusetts. That connection grounds constitutional scrutiny and transforms what might otherwise be a private platform into a forum subject to public norms. It is to that inquiry that the next section turns.

### IV. Nonfeasance and Technological Integration Connect the Platform's Conduct to the State

#### A. The State's Refusal to Enforce Duties Facilitates Constitutional Violations

When a state establishes public obligations—whether through contract law, common carriage doctrine, or public accommodation statutes—and then refuses to enforce those obligations against a favored actor, constitutional responsibility may attach. The Supreme Court has long recognized that **state inaction**, when deliberate and intertwined with the consequences of private conduct, can support a finding of **state action**. See *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (state action may be found when private conduct is enabled or encouraged by state decision-making).

In this case, the Commonwealth of Massachusetts has imposed nondiscrimination duties on entities providing public message transmission and public accommodations. But it has declined to enforce those obligations against Harvard Crimson, even as the Crimson restricts access to its public-facing comment platform based on viewpoint. The state's failure to act—when coupled with the platform's dependence on publicly supported digital infrastructure and its location within a state-chartered institution—

creates an **affirmative connection** between government and platform conduct. That connection is sufficient to invoke constitutional norms.[15]

### B. The Platform Performs Public Functions and Operates as a Digital Forum

Private entities performing public functions are subject to constitutional norms. See *Marsh v. Alabama*, 326 U.S. 501 (1946). Harvard Crimson's Platform facilitates public discourse, transmits government messages, and functions as a digital town square. This facilitation qualifies as a public function and connects the Platform to the state.

### C. The Platform Is Linked with Government Infrastructure and Practice

The state's failure to enforce public obligations—combined with the platform's integration into state-supported infrastructure—establishes a baseline constitutional connection between the Crimson's conduct and the Commonwealth. But the relationship does not end at passive tolerance or structural overlap. As the next section demonstrates, state actors do more than decline to intervene: they **interact with, advise, and reinforce** the platform's content moderation decisions in ways that reflect state preferences and goals. Where such entwinement and influence exist, private conduct can become indistinguishable from state action. It is this active partnership—one that enables and

---

[15]The state has frequently publicly asserted which messages a social medium platform like Harvard Crimson should not transport.

amplifies viewpoint-based exclusion—that triggers the full constitutional accountability discussed in Section V. See *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001). See also *Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002) (holding that private actors become state actors only if the state is sufficiently entwined in the challenged conduct or has delegated a public function).

## *V. Harvard Crimson's Platform Is State-Entwined to the Point of State-Action*

### A. Harvard Crimson Is Rooted in a Highly Integrated State and University Ecosystem.

Harvard Crimson is formally independent from Harvard University but operates within the university's infrastructure and enjoys the social, institutional, and reputational benefits of Harvard's status as a **state-chartered** and **publicly supported** private educational entity. Harvard Crimson's comment service is embedded in a broader environment where state actors—including public officials and regulatory authorities—**advise**, **pressure**, or **influence** operators of many platforms, including student-run media, regarding the moderation of content that the state disfavors. The complaint plausibly alleges that the state's **ongoing failure to enforce statutory and common law nondiscrimination duties**, combined with its **advisory relationships and regulatory posture**, reflects not neutrality but a pattern of **facilitation, ratification, and joint participation**.

30

These facts go beyond mere passive inaction. They establish a context in which state officials functionally influence private moderation decisions, and where those decisions result in the **exclusion of lawful public speech** from a forum held open to the general public. Under the framework set forth in *Brentwood*, *Lugar*, and consistent with the concerns raised in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), such conduct is fairly attributable to the state.

### B. The Internet Is Federally Recognized as a Public Forum and Is Highly Supported by Federal and State Government

In addition to state involvement, the nature of the Platform itself as a digital facility within the broader public infrastructure also supports heightened duties. The Communications Decency Act recognizes the Internet as a diverse forum for public discourse. See 47 U.S.C. § 230(a), (b),[16] which seem to make the Internet a government-

---

[16]Congress expressly recognized the Internet as a space for robust public discourse in 47 U.S.C. § 230(a), describing it as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." Section 230(b) further affirms that it is the policy of the United States "to promote the continued development of the Internet and other interactive computer services" and "to preserve the vibrant and competitive free market... unfettered by Federal or State regulation." Taken together, these provisions reflect **a**

designated public forum by statute. It is built on interconnected public and private infrastructure and regularly used for governmental communication. The Internet is a physical establishment or facility[17] in practically every place of public accommodation and every government institution. This qualifies it as a place of public accommodation and as a public facility. The Platform is a physical establishment or facility within the Internet. See 42 U.S.C. § 2000a(b); 42 U.S.C. §§ 2000b and 2000b-2; M.G.L. c. 272, §§ 92A, 98.[18]

———————————

**statutory designation of the Internet as a primary venue for public expression**. The Supreme Court has recognized that government policy or statute may create a designated public forum. See *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). When government or state-facilitated actors restrict access to such forums based on viewpoint, heightened constitutional scrutiny applies.

[17] See [Dkt. 1, ¶ 15, at 4; App. 32]; [Dkt. 30, ¶ 4, at 10; App. 132].

[18] M.G.L. c. 272, §§ 92A refers to "retail store or establishment." The Internet is the largest retail establishment in history. This statute seems to make unlawful discrimination by a mail-order retailer like Montgomery Ward, Spiegel, and JC Penny. The traditional Massachusetts treatment of a mail-order retail establishment

The state funds government or public networks, much of the communications infrastructure, government or public computers, and software or hardware R&D that makes it possible for the Platforms software to run in the Internet throughout the state. A web page is a program. The state facilitates the running of the Platform's software on computing devices throughout the state. Running the Platform's software on computing devices throughout the state generates revenue for Harvard Crimson. See Dkt. 1, ¶¶ 11–12, at 2–3; App. 30–31.

## C. The Crimson's Platform Functions as a Digital Facility Embedded in the Internet

Harvard Crimson's comment service invites public participation and monetizes user engagement. As such, it functions as a facility embedded in a public-serving communications infrastructure. Its exclusionary practices raise antidiscrimination concerns.

## D. Government Involvement Supports Application of Civil Rights Obligations

Massachusetts government actors use platforms like Harvard Crimson's Platform for communication and explicitly express at Harvard to the Harvard community and to

---

seems to apply naturally to a retail establishment like Harvard Crimson within the vast retail establishment of the Internet.

Harvard Crimson which speech the state wants to see curtailed on the Internet. Not only

does the state's failure to enforce antidiscrimination laws in addition to the state's

endorsement of viewpoint-based moderation (speech abridgment) through Section

230(e)(3) reliance support constitutional accountability, but the state has many legal

tools to punish the Platform. The state could have the Platform blocked in many

networks and thus from revenue if the Platform does not moderate as the state desires.

See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

### E. Delegated Breach: State Inaction Enables Platform Noncompliance with Law

The United States Constitution expressly forbids state governments from

impairing contractual obligations. Article I, Section 10, Clause 1—commonly known as

the Contracts Clause—provides that "No State shall... pass any... Law impairing the

Obligation of Contracts." This clause was designed to protect the integrity of private

agreements and to prevent states from enacting retroactive laws that disrupt established

contractual relationships. While the Supreme Court has held that the clause does not

prohibit all impairments, only those that are substantial and unjustified, it remains a vital

constitutional safeguard. See *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234,

244–45 (1978) (invalidating a state law that severely altered private pension

agreements); *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934)

(articulating the standard that substantial impairments may be permitted only where

reasonable and necessary to serve an important public purpose). In this case, Appellant

34

asserts that the state's failure to enforce implied-in-fact contract obligations—

particularly under longstanding Massachusetts carriage law—raises serious concerns

under the Contracts Clause. While state obligation to enforce contract is not absolute,[19]

the failure to enforce both an implied-in-fact contract to serve each member of the public

on equal terms or common carriage law pursuant either to Massachusetts common law

or to Massachusetts statutory telegraph law is at the acme of "deprivation of rights"

"under color of law" (42 U.S.C. § 1983). See *Catlette v. United States*, 132 F.2d 902 (4th

Cir. 1943).

## F. Entwinement and Advisory Influence by State Officials Support a Finding of State Action

While the state's failure to enforce nondiscrimination obligations does not

automatically convert a private actor into a state actor, the Supreme Court has

recognized that state action may be found where there is **entwinement**, **delegation**, or

---

[19]In *Shelley v. Kraemer*, 334 U.S. 1, 20 (1948), the Court held that judicial enforcement

of racially restrictive covenants constitutes state action subject to the Equal

Protection Clause. The Fourteenth Amendment also supports judicial non-

enforcement of racially restrictive covenants just as it supports non-discriminatory

enforcement of common carriage law and of an implied-in-fact contract with the

public.

**significant governmental encouragement**. See *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001) (state action exists when private conduct is "entwined with governmental policies" or where the state is "entwined with [the actor's] management or control"); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (state action exists when the government provides "significant encouragement" to the challenged conduct). Although *Blum v. Yaretsky*, 457 U.S. 991 (1982), held that regulatory oversight alone does not convert a private medical provider into a state actor, the Court emphasized that state action may be found where the state **encourages or approves** the private conduct. Id. at 1004.

### VI. The Complaint States a Plausible Claim for Relief and Should Proceed Beyond the Pleading Stage

#### A. The Factual Allegations Satisfy Rule 8 and Survive Twombly/Iqbal

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a plausible claim. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint satisfies this threshold. Under the First Circuit's two-step plausibility analysis, courts must first disregard conclusory legal statements and then determine whether factual allegations permit a reasonable inference of liability. *García-Catalán v. United States*, 734 F.3d 100, 103–04 (1st Cir. 2013).

**B. Harvard Crimson's Conduct Is a Probable Violation of Common Carriage Law, Telegraph Law, Public Accommodation Law, and of Contract Law**

The Platform accepted public messages under general terms, benefiting commercially, and then excluded content based on viewpoint. These acts violate nondiscrimination duties under common law, state statute, and implied-in-fact contract principles.

**C. Viewpoint Discrimination by a State Actor Is Constitutionally Prohibited**

Where state action exists, viewpoint discrimination violates the First Amendment of the US Constitution and Article XVI of Part the First of the Massachusetts Constitution. See *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828–829 (1995); *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

**D. Section 230 Does Not Bar Relief at This Stage**

Harvard Crimson's defense under Section 230(c) is not evident from the complaint and turns on unresolved factual and legal questions. See *Rodi*, 389 F.3d at 17. As such, dismissal was premature and improper.

**VII. This Action Is Not Barred by Preclusion Principles**

Although the district court referenced *Martillo v. Twitter*, No. 21-CV-11119-RGS, 2021 WL 8999587 (D. Mass. Oct. 15, 2021), that case does not preclude the present action.

First, *Martillo* was dismissed **without prejudice and without service** under 28 U.S.C. § 1915(e)(2), as an *in forma pauperis* (IFP) filing. As the Supreme Court held in *Denton v. Hernandez*, 504 U.S. 25, 34 (1992), such dismissals are not final adjudications on the merits and do **not foreclose refiling**, even of similar claims.

Second, the present action **relies on new legal theories**—especially breach of an implied-in-fact contract and the status of Harvard Crimson as a common carrier or public facility. These claims were **not pleaded or addressed in the earlier IFP action**. Claim preclusion requires that the earlier suit involved the *same cause of action*, which is not the case here. See *Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir. 2005) (applying four-factor test for issue preclusion: identity of issue, actual litigation, final judgment, and necessity to judgment).

Third, the factual context is different: this case arises from actions taken by Harvard Crimson in 2024 under an updated comment system, without formal terms of service, and in a rapidly evolving legal landscape regarding digital forums, common carriage, and Section 230. These are not duplicative claims, but **a legally distinct and factually updated challenge**.[20]

---

[20]The *Martillo* prior litigation in effect advised Harvard Crimson of some of its legal obligations just as Vermilye did during the period that preceded the *Vermilye* litigation.

38

Finally, even if there were overlap, denying leave to amend in this context undermines the judiciary's duty to permit litigants—particularly those without counsel—a meaningful opportunity to clarify evolving legal claims that may raise novel and consequential issues of public importance. See *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 19 (1st Cir. 2004).

### VIII. Section 230(c) Is an Affirmative Defense That Cannot Support Dismissal on the Pleadings

#### A. Affirmative Defenses Require Undisputed Facts Not Present Here

Given this unsettled legal landscape, the court's reliance on an affirmative defense—before factual development—was misplaced. Dismissal under Rule 12(b)(6) is warranted only when the complaint fails as a matter of law. Where an affirmative defense—such as Section 230(c) immunity—is raised, it must be apparent on the face of the complaint. See *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004). The burden is on the defendant to show its applicability. See *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008). See also *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007) (affirming dismissal under § 230 where complaint's own allegations clearly satisfied all statutory elements of immunity). The instant complaint's allegations do not satisfy all required statutory elements for immunity.

Harvard Crimson's Section 230(c) defense depends on disputed issues, including whether the Platform is an interactive computer service,[21] whether the conduct in question qualifies as editorial discretion, and whether the statute preempts duties voluntarily assumed. These are not purely legal questions and cannot justify dismissal.

### B. The Legal Framework Surrounding Section 230 Is Unsettled and Evolving

Courts have reached divergent conclusions about the scope of Section 230 and its interaction with state law claims. Some courts interpret it narrowly, others broadly. These issues remain unresolved in the First Circuit. Appellant's theory is not foreclosed by precedent and should be allowed to proceed.

### C. Dismissal Is Improper When Based on a Section 230(c) Affirmative Defense to an Accusation Not Made

Not even one of the counts of the instant complaint comes within the scope of the shield of Section 230(c). See Dkt. 1, ¶¶ 22–34, at 6–8; App. 34–36. Counts one and two are based in state-action. Count 3 is based in contract and common carriage law. And count 4 is based in public facility law both in a place of public accommodation and in a government institution. By invoking Section 230(c)(1), Harvard Crimson implies that the complaint puts Harvard Crimson in the role of speaker or publisher with respect to

---

[21] See [Dkt. 1, ¶ 13, at 3; App. 31]; [Dkt. 30-1, ¶ 17, at 5; App. 139].

the comments service, which it does not.

Section 230(c)(1) of the Communications Decency Act provides an affirmative defense for providers of interactive computer services when a complaint treats a platform in the role of "publisher or speaker" of information provided by another. See 47 U.S.C. § 230(c)(1). Since the instant complaint does not treat the Harvard Crimson Comments Sections as a "publisher or speaker", section 230(c)(1) does not apply. Section 230(c)(2) does not immunize conduct unrelated to editorial discretion.

Harvard Crimson's online comments service functions not as a speaker or publisher, but as a conduit for public communication—a role functionally equivalent to that of a common carrier. Courts have long held that entities providing message transmission to the public for compensation, without individualized control or negotiation, may be subject to nondiscrimination duties under common carriage law even if not formally designated as such. Such entities do not exercise editorial discretion in the traditional publishing sense and may be held to public service obligations.

An entity can offer both common carriage and non-common carriage services simultaneously. See *Cellco P'ship v. FCC*, 700 F.3d 534, 546 (D.C. Cir. 2012) (explaining that "the classification of one service as common carriage does not necessitate that all services provided by the same entity be subject to the same regulatory regime"). Harvard Crimson exercises editorial control over its *Letters to the Editor*

41

section,[22] which Harvard Crimson publishes in its online and print versions.  While Harvard Crimson describes itself nominally as a student newspaper and while some Harvard Crimson offerings are functionally journalistic, the comments service is separate from the *Letters to the Editor* and other Harvard Crimson offerings because as described above the comments section functionally meets the criteria that qualify the comments section to provide common carriage of messages.

In addition, Section 230(c) does not by its terms preempt claims arising from breach of an implied-in-fact contract or from state statutory duties applying to common carriers or telegraph services. In *Barnes v. Yahoo!*, the Ninth Circuit held that Section 230(c) does not bar promissory estoppel claims, because such claims do not treat the defendant as a publisher. Similarly, here, Harvard Crimson's duties arise not from its

---

[22]Under the cover of an alleged public discussion via a neutral conduit, Harvard Crimson with assistance of the state, which fails to enforce state law, may be marketing a plausibly false narrative.  See *Federal Trade Commission v. LeadClick Media*, LLC, 838 F.3d 158 (2d Cir. Sept. 23, 2016). Harvard Crimson cannot defend itself by asserting editorial discretion to slant the news because the Harvard Crimson's comment section claims to be a neutral conduit and does not provide news content that has been created by Harvard Crimson or by an agent of Harvard Crimson.

editorial role, but from its public solicitation of message submissions and its implied promise to transport those messages without discrimination.

Because the complaint alleges that Harvard Crimson acted as a message conduit, not as a speaker or editor, Section 230(c) does not shield its conduct from judicial review. At minimum, the applicability of Section 230 presents factual and legal questions inappropriate for resolution on a motion to dismiss.

### D. Factual Development Is Essential to Evaluating the Platform's Role

The complaint alleges specific, non-conclusory facts regarding the Platform's structure, operational design, public representations, and lack of individualized user agreements. These allegations directly bear on whether Harvard Crimson assumed legal obligations through implied-in-fact contract, operated as a functional common carrier, or qualifies for immunity under Section 230(c). Because these determinations involve mixed questions of law and fact, and because key issues—including the Platform's classification and the applicability of statutory defenses—cannot be resolved solely on the pleadings, dismissal at this early stage was improper. See *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004) (affirmative defenses are not grounds for dismissal unless established on the face of the complaint); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (plausible factual allegations must be credited and developed).

43

**E. A Prior Dismissal Under 28 U.S.C. § 1915(e)(2)  Is in Error Treated as Preclusive**

In denying Appellant's Rule 59(e) motion and request for leave to file an amended complaint, the district court reasoned that it had "already determined as a matter of law" that the Harvard Crimson was immune under Section 230(c) and not a common carrier. But this "determination" was not made after adversarial proceedings. It arose from an earlier *sua sponte* dismissal under 28 U.S.C. § 1915(e)(2), before service, briefing, or opportunity for amendment. That initial dismissal carries no preclusive effect and cannot properly be treated as a conclusive legal ruling. See *Denton v. Hernandez*, 504 U.S. 25, 34 (1992) ("Because a § 1915(d) dismissal is not a dismissal on the merits, but rather an exercise of the court's discretion... the dismissal does not prejudice the filing of a paid complaint making the same allegations.").

The district court erred by treating a preliminary, *ex parte* ruling from a prior IFP action as if it foreclosed amendment in a separately filed, fee-paid proceeding.[23] That approach short-circuits the liberal amendment standard of Rule 15(a)(2), which directs that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). The First Circuit has emphasized that amendment should be granted unless it would cause undue delay, be motivated by bad faith, or be clearly futile. See *Rodi v. S. New Eng. Sch.*

---

[23]See [Dkt. 30; App. 123]; [Dkt. 30-1; App. 135]; [Dkt. 36; App. 153–154].

*of Law*, 389 F.3d 5, 19 (1st Cir. 2004); *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996).

The proposed amendment introduced no new causes of action. It merely clarified and supported existing claims with important additional details of the factual allegations as well as refined legal theories—particularly concerning the implied-in-fact contract, public function analysis, and the digital infrastructure's relation to common carriage law. Courts are to err on the side of permitting amendment, especially in pro se cases where the amendment may render the claims legally viable. See *Juárez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 276–77 (1st Cir. 2013) (reversing denial of amendment where plaintiff sought to "clarify, not expand" claims). The denial here thus not only misapplied Rule 15(a)(2), but also denied Appellant the opportunity to frame complex and unsettled legal questions in a procedurally proper and factually developed posture.

CONCLUSION

This appeal raises novel and unresolved questions about how longstanding doctrines of common carriage, contract, and constitutional accountability apply to digital platforms that function as conduits for public speech. The district court erred in dismissing the complaint at the pleading stage, particularly by relying on an earlier *in forma pauperis* screening as if it were a merits ruling. That reliance foreclosed proper factual development and the opportunity to clarify claims of significant legal and societal consequence.

Appellant respectfully requests that this Court reverse the judgment of dismissal and remand for further proceedings. Appellant also asks that the Court direct the district court to grant leave to amend the complaint under Rule 15(a)(2), in the interest of justice and consistent with the liberal amendment standard.

Respectfully submitted by the Plaintiff-Appellant

Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94702
Jonathan.Affleck@protonmail.com
(617) 276-5788
*pro se*
Signature: *Jonathan Affleck*
Dated:5/12/25

**UNITED STATES COURT OF APPEALS**
*for the*
**FOR THE FIRST CIRCUIT**

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

# ADDENDUM

i

### *Add. Article XVI of Part the First of the Massachusetts Constitution*

Article XVI. The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged.

### *Add. 42 U.S. Code § 1983 – Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### *Add. 42 U.S. Code § 2000a – Prohibition against discrimination or segregation in places of public accommodation*

**(a)** EQUAL ACCESS
All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

**(b)** ESTABLISHMENTS AFFECTING INTERSTATE COMMERCE OR SUPPORTED IN THEIR ACTIVITIES BY STATE ACTION AS PLACES OF PUBLIC ACCOMMODATION; LODGINGS; FACILITIES PRINCIPALLY ENGAGED IN SELLING FOOD FOR CONSUMPTION ON THE PREMISES; GASOLINE STATIONS; PLACES OF EXHIBITION OR ENTERTAINMENT; OTHER COVERED ESTABLISHMENTS

Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

(1)
any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2)

any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(3)

any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4)

any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

**(c)** OPERATIONS AFFECTING COMMERCE; CRITERIA; "COMMERCE" DEFINED

The operations of an establishment affect commerce within the meaning of this subchapter if (1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers of a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b), it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

**(d)** SUPPORT BY STATE ACTION

Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

**(e)** PRIVATE ESTABLISHMENTS

The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b).

### Add. 42 U.S. Code § 2000b – Civil actions by the Attorney General

**(a) COMPLAINT; CERTIFICATION; INSTITUTION OF CIVIL ACTION; RELIEF REQUESTED; JURISDICTION; IMPLEADING ADDITIONAL PARTIES AS DEFENDANTS**

Whenever the Attorney General receives a complaint in writing signed by an individual to the effect that he is being deprived of or threatened with the loss of his right to the equal protection of the laws, on account of his race, color, religion, or national origin, by being denied equal utilization of any public facility which is owned, operated, or managed by or on behalf of any State or subdivision thereof, other than a public school or public college as defined in section 2000c of this title, and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly progress of desegregation in public facilities, the Attorney General is authorized to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section. The Attorney General may implead as defendants such additional parties as are or become necessary to the grant of effective relief hereunder.

**(b) PERSONS UNABLE TO INITIATE AND MAINTAIN LEGAL PROCEEDINGS**

The Attorney General may deem a person or persons unable to initiate and maintain appropriate legal proceedings within the meaning of subsection (a) of this section when such person or persons are unable, either directly or through other interested persons or organizations, to bear the expense of the litigation or to obtain effective legal representation; or whenever he is satisfied that the institution of such litigation would jeopardize the personal safety, employment, or economic standing of such person or persons, their families, or their property.

### Add. 42 U.S. Code § 2000b-2 – Personal suits for relief against discrimination in public facilities

Nothing in this subchapter shall affect adversely the right of any person to sue for or obtain relief in any court against discrimination in any facility covered by this subchapter.

### Add. 47 U.S. Code § 153 – Definitions

For the purposes of this chapter, unless the context otherwise requires—

…

**(11) Common carrier**

The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

…

**(24) Information service**

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

…

**(50) Telecommunications**

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

**(51) Telecommunications carrier**

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

**(52) Telecommunications equipment**

The term "telecommunications equipment" means equipment, other than customer premises equipment, used by a carrier to provide telecommunications services, and includes software integral to such equipment (including upgrades).

**(53)Telecommunications service**

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

…

*Add. 47 U.S. Code § 202 – Discriminations and preferences*

**(a) Charges, services, etc.**

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

**(b) Charges or services included**
Charges or services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

**(c) Penalty**
Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

### Add. 47 U.S. Code § 207 – Recovery of damages

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

### Add. 47 U.S. Code § 230 – Protection for private blocking and screening of offensive material

**(a) FINDINGS** The Congress finds the following:

**(1)**

The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)**

These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)**

The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)**

The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)**

Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) POLICY** It is the policy of the United States—

**(1)**

to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)**

to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)**

to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)**

to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)**

to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**

**(1) TREATMENT OF PUBLISHER OR SPEAKER**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) CIVIL LIABILITY** No provider or user of an interactive computer service shall be held liable on account of—

**(A)**

any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)**

any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d)** OBLIGATIONS OF INTERACTIVE COMPUTER SERVICE

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e)** EFFECT ON OTHER LAWS

**(1)** NO EFFECT ON CRIMINAL LAW

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2)** NO EFFECT ON INTELLECTUAL PROPERTY LAW

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3)** STATE LAW

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4)** NO EFFECT ON COMMUNICATIONS PRIVACY LAW

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5)** NO EFFECT ON SEX TRAFFICKING LAW

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

**(A)** any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f)** DEFINITIONS As used in this section:

**(1)** INTERNET

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2)** INTERACTIVE COMPUTER SERVICE

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3)** INFORMATION CONTENT PROVIDER

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4)** ACCESS SOFTWARE PROVIDER The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

**(A)** filter, screen, allow, or disallow content;

**(B)** pick, choose, analyze, or digest content; or

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

### *Add. Article I, Section 10, Clause 1 (Contracts Clause)*

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

### *Add. First Amendment of the US Constitution*

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

### *Add. Fourteenth Amendment of the US Constitution*

**Section 1.**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.**

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

**Section 3.**

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.**

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.**
The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

### *Add. M.G.L. Chapter 159: COMMON CARRIERS*

Section 1. Every common carrier of merchandise or other property shall receive, transport and forward all property offered for such purposes by other such carriers as promptly, faithfully and impartially, at as low rates of charge, and in a manner and on terms and conditions as favorable to the carrier offering such property, as he on the same day and at the same place receives, forwards and transports, in the ordinary course of business, property of a like description offered by persons other than such carriers. Such carrier shall not discriminate against any particular person or subject him to any undue or unreasonable prejudice or disadvantage. The supreme judicial or superior court shall have jurisdiction in equity to enforce this section.

Section 2. Every such carrier who wilfully neglects or refuses to comply with the preceding section shall forfeit not less than fifty nor more than five hundred dollars, to the person offering the property for transportation.

Section 10. The department of telecommunications and cable shall enforce this chapter to the extent that it relates to telecommunications. The department of public utilities shall enforce all other provisions.

### *Add. M.G.L. Chapter 166: TELEPHONE AND TELEGRAPH COMPANIES, AND LINES FOR THE TRANSMISSION OF ELECTRICITY*

Section 16. A telegraph company shall receive despatches from and for other telegraph companies and associations, and from and for any person; and, upon payment of the usual charges for transmitting despatches according to the regulations of the company, shall transmit them faithfully and impartially.

Section 17. A telegraph company shall receive, compute and transmit despatches received at its offices from another telegraph company or by mail, at the same rates of

charge as for despatches received for transmission from individuals on the same day and at the same place.

Section 18. A telegraph company which wilfully neglects or refuses to comply with any provision of the two preceding sections shall forfeit not more than one hundred dollars to the company or person who sends or desires to send the despatch.

Section 19. A telegraph company shall be liable for damages to the amount of one hundred dollars actually caused by its negligence, or that of its agents, in transmitting, receiving or delivering telegraphic messages, and any limit of such liability by contract or regulation shall apply only to the damages in each case in excess of one hundred dollars; but no action therefor shall be maintained unless a written claim is presented to such company or its agent within sixty days after such right of action accrues. This section shall not apply to negligence occurring in a telegraph office established for the convenience and safety of a railroad corporation in the running of its trains, and transacting a public telegraph business only as incidental thereto, nor to negligence in the delivery of messages received at such office.

### *Add. Revised Laws Chapter 70: Of Common Carriers and Express Companies.*

Section 1. Every common carrier of merchandise or other property shall receive, transport and forward all property offered for such purposes by other such carriers as promptly, faithfully and impartially, at as low rates of charge, and in a manner and on terms and conditions as favorable to the carrier offering such property, as he on the same day and at the same place receives, for wards and transports, in the ordinary course of business, property of a like description offered by persons other than such carriers. Such carrier shall not discriminate against any particular person or corporation or subject him or it to any undue or unreasonable prejudice or disadvantage. The supreme judicial court or the superior court shall have jurisdiction in equity to enforce the provisions of this section.

Section 2. Every such carrier who wilfully neglects or refuses to comply with the provisions of the preceding section shall forfeit for every offence not less than fifty nor more than five hundred dollars, to the person offering the property for transportation.

### *Add. Revised Laws Chapter 122: Of Companies Engaged in the Transmission of Electricity.*

Section 9. A telegraph company shall receive despatches from and for other telegraph companies and associations, and from and for any person; and, upon payment of the usual charges for transmitting despatches according to the regulations of the company, shall transmit them faithfully and impartially.

Section 10. A telegraph company shall receive, compute and transmit despatches which may be received at its offices from another telegraph company or by mail, at the same rates of charge as for despatches which may be received for transmission from individuals on the same day and at the same place. A telegraph company which wilfully neglects or refuses to comply with the provisions of this or the preceding section shall forfeit not more than one hundred dollars to the company or person who sends or desires to send the despatch.

Section 11. A telegraph company shall be liable for damages to the amount of one hundred dollars actually caused by its negligence, or that of its agents, in transmitting, receiving or delivering telegraphic messages, and any limit of such liability by contract or regulation shall apply only to the damages in each case in excess of one hundred dollars; but no action therefor shall be maintained 6 unless a claim is presented in ·writing to such company or its agent within sixty days after such right of action accrues. The provisions of this section shall not apply to negligence occurring in a telegraph office which is established for the convenience and safety of a railroad corporation in the running of its trains, and transacting a public telegraph business only as incidental thereto, nor to negligence in the delivery of messages received at such office.

### *Add. M.G.L. § 272 § 92A: Advertisement, book, notice or sign relative to discrimination; definition of place of public accommodation, resort or amusement*

...A place of public accommodation, resort or amusement within the meaning hereof shall be defined as and shall be deemed to include any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public and, without limiting the generality of this definition, whether or not it be... (2) a carrier, conveyance or elevator for the transportation of persons, whether operated on land, water or in the air, and the stations, terminals and facilities appurtenant thereto; (3) a gas station, garage, retail store or establishment, including those dispensing personal services...

### *Add. N.Y. Comp. Codes R. & Regs. Tit. 20 § 527.2 – Sale of utility and similar services*

…

**(d) Telephony and telegraphy; telephone and telegraph service.**
    (1) The provisions of section 1105 (b) of the Tax Law with respect to telephony and telegraphy and telephone and telegraph service impose a tax on receipts from

intrastate communication by means of devices employing the principles of telephony and telegraphy.

(2) The term telephony and telegraphy includes use or operation of any apparatus for transmission of sound, sound reproduction or coded or other signals.

**Example 1:**

Dispatch services, commonly used by taxicab companies, trucking firms and similar operations, which provide two-way voice communication between a base location and mobile units or between mobile units are considered telephony even though the base and mobile units are not interconnected with a telephone system.

**Example 2:**

Paging service which is a one-way transmission of communication by signal or voice or both signal and voice from a base unit to a mobile unit is considered telephony.

**Example 3:**

Message switching services, transmitted to a computer over lines leased from a communication carrier are telegraph services subject to the tax imposed under section 1105 (b) of the Tax Law.

**Example 4:**

Facsimile transmission services are telegraph services subject to the tax imposed under section 1105 (b) of the Tax Law.

**Example 5:**

The use of a teletypewriter is a telegraph service subject to tax imposed under section 1105 (b) of the Tax Law.

(3) The term telephony and telegraphy, as used in this Subchapter, does not include:

    (i) cable television service, which is the service of receiving and amplifying programs broadcast by television or radio stations or any other programs originated by a cable television company or by any other party, and distributing such programs by wire, cable, microwave or other similar means, whether such means are owned or leased, to persons who subscribe

to such service. See New York State Cable Television Association v. State Tax Commission, 59 AD 2d 81;

(ii) music service, which is the initiation of musical programs, and the distribution of such programs by wire, cable or other similar means, whether such means are owned or leased, to persons who subscribe to such service.

(4) A service is not considered telegraphy or telephony if either of these services is merely an incidental element of a different or other service purchased by the customer.

**Example 6:**

A company offers its customers a protective service using a central station alarm system, which transmits signals telegraphically. The customer is purchasing a protective service.

(5) The tax on utility services applies to every charge for any telephone and telegraph service. Among these charges are monthly message rate and intrastate toll charges and charges for special services, such as , change of location, conference connections, tie-lines, WATS lines and the furnishing of equipment. …

***Add. Judge Kelley's Dismissal of the Instant Case (Document 27 Page xvii) and Judge Stearns's Dismissal of the Previous Case (Document 4 Page xxv)***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| JONATHAN AFFLECK, ) | |
| ) | |
|        Plaintiff, ) | |
| ) | Civil Action No. 24-CV-10802-AK |
| v. ) | |
| ) | |
| THE HARVARD CRIMSON INC ) | |
| (HARVARD CRIMSON), ) | |
| ) | |
|        Defendant. ) | |
| _____) | |

**MEMORANDUM AND ORDER ON MOTION TO DISMISS**
**FOR FAILURE TO STATE A CLAIM**

**A. KELLEY, D.J.**

Plaintiff Jonathan Affleck ("Affleck") brings this action against Defendant The Harvard Crimson, Inc. ("the Crimson"). According to the Complaint, the Crimson, which publishes the Monday through Friday newspaper, *The Harvard Crimson*, deleted Affleck's comments on three articles on the Crimson's website and then suspended Affleck's ability to post. Affleck claims that the Crimson's actions violated the First Amendment of the United States Constitution, Article XVI of the Massachusetts Constitution, and finally, federal and state laws related to common carriage discrimination and public accommodation discrimination.

For the following reasons, the Crimson's Motion to Dismiss for Failure to State a Claim [Dkt. 11] is **GRANTED** and the action is **DISMISSED.**

**I.  BACKGROUND**

According to the Complaint, from February 7 to February 10, 2024, Affleck commented, under two different names, 38 times across three articles on the Crimson's website. [Dkt. 1 at 5]. The three articles focused on Palestine and the Palestinian people. Some time on February 10,

the Crimson deleted Affleck's comments from the comment section of the articles and suspended

Affleck's ability to author any additional posts. Subsequently, the Crimson removed its

comment section from articles altogether. [Dkt. 12 at 9].

Affleck alleges that, in removing his comments and disabling his account, the Crimson

violated his free speech rights guaranteed by the First Amendment of the U.S. Constitution.

[Dkt. 1 at 6]. He made the same claim under Article XVI of the Massachusetts Constitution.

Affleck made two additional claims under federal and state laws. The first argues that in

deleting his messages and preventing future posts, the Crimson conducted common carriage

discrimination, while the second claim alleges public accommodation discrimination.

In its Motion to Dismiss, the Crimson offers multiple defenses. [Dkt. 11]. The Crimson

asserts an affirmative defense that Section 230 of the Communications Decency Act ("CDA"),

47 U.S.C. § 230, bars all of Affleck's claims. The Crimson also argues that should this Court

find Section 230 inapplicable, the First Amendment actually operates to *protect* the Crimson's

actions in selecting, arranging, promoting, or removing third-party content. Finally, the Crimson

argues that Affleck fails to allege the essential elements in any of his claims.

As laid out in both the Crimson's initial Motion to Dismiss and its subsequent Reply, this

is not the first time Affleck has made nearly identical claims. [Dkts. 12; 18]. More specifically,

it is not the first time Affleck made nearly identical claims against the Crimson. Martillo v.

Twitter Inc., No. 21-CV-11119-RGS, 2021 WL 8999587 (D. Mass. Oct. 15, 2021), aff'd, 2022

WL 18862030 (1st Cir. Oct. 4, 2022), cert. denied, 143 S. Ct. 779 (2023). Although filed under

different names, both parties acknowledge that Plaintiffs Joachim Martillo and Jonathan Affleck

are the same person. [Dkt. 18] (writing in the Crimson's reply that "Affleck's reason for trying

to ignore Martillo probably stems from the fact that he is, in fact, plaintiff Joachim Martillo.");

[Dkt. 24] (writing in Affleck's sur-reply that "Affleck ha[s] the right to refile under either [] his legal name Affleck or his professional name Martillo[.]").[1]  In the earlier case, "Martillo [brought the] action against six private companies that operate social media platforms . . . . Martillo represent[ed] that each defendant disabled or suspended his account on their respective platforms because he posted content that each defendant deemed to be anti-Zionist."  Martillo, 2021 WL 8999587, at *1.  Among the six private companies, Martillo/Affleck sued the Crimson. In that case, the court conducted the analysis regarding Martillo/Affleck's common carriage and public accommodation discrimination claims, denying both because the companies are "not common carriers of 'merchandise or other property'" and are "not places of 'public accommodation,'" respectively, but the analysis did not end there.  Id. at *1, *2.  The court continued, "even if Martillo had stated a claim under [public accommodation law] or the state common carrier law, the defendants would be immune from such claims under the Communications Decency Act[], 47 U.S.C. § 230."  Id. at *2.  Nonetheless, Martillo/Affleck makes similar claims against the Crimson here, which this Court must address.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Similarly, and important to the matter at hand, courts have found that although preemption under Section 230 of the CDA is an affirmative

---

[1] The Court warns Plaintiff Affleck that the use of fictitious names is strongly disfavored and should only be used when given leave by the court.  Federal Rule of Civil Procedure 10(a) provides that "[t]he title of the complaint must name all the parties" and Federal Rule of Civil Procedure 17(a)(1) provides that "[a]n action must be prosecuted in the name of the real party in interest."  Although the use of pseudonyms may be allowed in "exceptional cases," Doe v. Mass. Inst. of Tech., 46 F.4th 61, 69-73 (1st Cir. 2022), there is a "strong presumption against the use of pseudonyms in civil litigation."  Does 1-3 v. Mills, 39 F.4th 20, 25 (1st Cir. 2022).

defense, "it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." Duffer v. Nextdoor, Inc., 701 F. Supp. 3d 86, 88 (D. Mass. 2023) (quoting Nat'l Ass'n of the Deaf v. Harvard Univ., 377 F. Supp. 3d 49, 68 (D. Mass. 2019)); see also Force v. Facebook, 934 F.3d 53, 63 n.15 (2d Cir. 2019) (finding that applying Section 230 at the pleadings stage was not premature).

Reading the complaint "as a whole," the court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id. A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). Second, the court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. 544 at 559).

Complaints brought by pro se litigants, as is the case with this action, are subjected to a lesser scrutiny than that of complaints drafted by attorneys. Ferranti v. Moran, 618 F.2d 888, 890 (1st Cir. 1980). Courts may "intuit the correct cause of action, even if [the complaint] was imperfectly pled," provided the complaint contains sufficient facts to do so. Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). However, while pro se litigants are afforded more latitude in this realm, this latitude "cannot be taken to mean that pro se complaints are held to no standard at all." Sergentakis v. Channell, 272 F. Supp. 3d 221, 224-25 (D. Mass. 2017) (internal

quotation marks and citation omitted).  In other words, "pro se status does not insulate a party from complying with procedural and substantive law."  Ahmed, 118 F.3d at 890.

## III.    DISCUSSION

As in Martillo, the Defendant is immune from all claims alleged by Affleck under the CDA.  The CDA provides in relevant part: "No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2).  This provision "'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content.'"  Green v. America Online (AOL), 318 F.3d 465, 471 (3d Cir. 2003) (quoting Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir.1997)).

"[C]ourts that have addressed these issues have generally interpreted Section 230 immunity broadly, so as to effectuate Congress's 'policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.'"  Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007) (quoting Zeran, 129 F.3d at 330-31).  Instead Congress' goal "was to encourage service providers to self-regulate the dissemination of offensive material over their services."  Zeran, 129 F.3d at 331.  Thus, Section 230 "allows website operators to engage in blocking and screening of third-party content, free from liability for such good-faith efforts."  Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 18 (1st Cir. 2016).

Under Section 230(c)(1), the Crimson is shielded from liability if: (1) the Crimson is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim would treat the Crimson as the publisher or speaker of that information. The First Circuit has made clear, "(1) web site operators . . . are 'provider[s] . . . of an interactive computer service'; (2) message board postings do not cease to be 'information provided by another information content provider' merely because the 'construct and operation' of the web site might have some influence on the content of the postings; and (3) immunity . . . cover[s] any claim that would treat [the website] 'as the publisher.'" Lycos, 478 F.3d at 419.

With this backdrop, as in Martillo in which this Plaintiff made nearly identical claims against the Crimson, among others, the deletion of content posted by Affleck and the disabling of his account are well within the Crimson's traditional editorial functions protected by the CDA. See, e.g., Duffer, 701 F. Supp. 3d at 88 (holding a website that hosts user comments immune, under the CDA, as "removal of content is a traditional editorial function"); Spreadbury v. Bitterroot Pub. Libr., 856 F. Supp. 2d 1195, 1198 (D. Mont. 2012) (holding that CDA immunity applies to comment sections on newspaper websites); Collins v. Purdue Univ., 703 F. Supp. 2d 862, 878-80 (N.D. Ind. 2010) (holding that a newspaper cannot be held liable for the publication of comments posted by third parties on its website); Miles v. Raycom Media, Inc., No. 09-CV-713-LG-RHW, 2010 WL 3419438, at *3 (S.D. Miss. Aug. 26, 2010) (holding "that the defendants are immune from liability for the allegedly defamatory third-party comments published on its website"); see also, e.g., Sikhs for Justice, Inc. v. Facebook, 697 Fed. App'x 526, 526 (9th Cir. 2017) (holding that, under the CDA, Facebook was immune from claim that it had wrongly blocked the plaintiff's online content); Langdon v. Google, Inc., 474 F. Supp. 2d,

622, 631 (D. Del. 2007) (holding that the CDA "provides Google, Yahoo, and Microsoft immunity for their editorial decisions regarding screening and deletion [of the plaintiff's advertisements] from their network") (footnote omitted). As Section 230's barrier to suit is evident from the face of Affleck's complaint, regardless of the content of his posts, the Crimson is immune from Affleck's state and federal constitutional claims, as well as claims under federal law. See Duffer, 701 F. Supp. 3d at 89 (citing Nat'l Ass'n of the Deaf, 377 F. Supp. 3d at 68).

Finally, the CDA provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). Section 230 expressly preempts state law claims that do not fall within the narrow exceptions identified in Section 230(e). None of those enumerated exceptions applies in this case. As a result, the Crimson is also immune from Affleck's state common carriage and public accommodation discrimination claims. Further, even if the Crimson was not immune, Affleck has failed to state a claim, as the Crimson is "not [a] common carrier[] of 'merchandise or other property'" and is "not [a] place[] of 'public accommodation,'" just as the court found in Martillo. 2021 WL 8999587 at *1, *2.

Because this Court finds that Section 230(c)(1) requires dismissal of all of Affleck's claims, it declines to consider the Crimson's arguments regarding the application of the First Amendment or Affleck's failure to state a viable claim under state or federal law.

## IV.    CONCLUSION

For the foregoing reasons, the Crimson's Motion to Dismiss for Failure to State a Claim

[Dkt. 11] is **GRANTED** and the action is **DISMISSED.**

**SO ORDERED.**

Dated: January 29, 2025                                      /s/ Angel Kelley
                                                           Hon. Angel Kelley
                                                           United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-11119-RGS

JOACHIM MARTILLO

v.

TWITTER INC., *et al.*

ORDER

October 15, 2021

STEARNS, D.J.

*Pro se* litigant Joachim Martillo brings this action in which he alleges that he has wrongfully been prohibited from making statements on certain social media platforms. Martillo has filed a motion for leave to proceed *in forma pauperis*. For the reasons set forth below, the court will grant the motion and dismiss this action.

I.      Motion for Leave to Proceed *in Forma Pauperis*

Upon review of Martillo's motion for leave to proceed *in forma pauperis*, the court concludes that he has adequately shown that he is unable to prepay the filing fee. Accordingly, the motion is GRANTED.

II.    Review of the Complaint

Because Martillo is proceeding *in forma pauperis*, his pleading is subject to screening under 28 U.S.C. § 1915(e)(2).  This statute authorizes federal courts to dismiss actions in which a plaintiff seeks to proceed without prepayment of fees if the action is malicious, frivolous, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915(e)(2).  In conducting this review, the court liberally construes Martillo's pleading because he is proceeding *pro se*.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

Martillo brings this action against six private companies that operate social media platforms.  Martillo, who self-identifies as a Diaspora Jew, claims that these companies discriminate against "Palestinians, Arabs, Muslims, and Diaspora Jews that reject Zionism."  Compl. ¶ 36.  Martillo represents that each defendant disabled or suspended his account on their respective platforms because he posted content that each defendant deemed to be anti-Zionist.  These alleged events occurred in 2019 and 2020.

Martillo asserts a claim under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a.  This statute provides, in relevant part, that "[a]ll persons [are] . . . entitled to the full and equal enjoyment of the goods, services,

facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). The following establishments are considered "a place of public accommodation" if it serves the public: inns, hotels, motels, any "other establishment which provides lodging to transient guests," restaurants, cafeterias lunchroom, lunch counters, soda fountains, any "other facility" selling food for consumptions on the "the premises, theaters, concert halls, sports arenas, stadiums, any "other place of exhibition or entertainment." 42 U.S.C. § 2000a(b)(1)-(3).[1] In addition, any establishment that is "physically located within the premises" of the above-enumerated establishments is covered by the statute. 42 U.S.C. § 2000a(b)(4).

Martillo has failed to state a claim under 42 U.S.C. § 2000a because the defendants' social media platforms are not places of "public accommodation." The statutory definition of a "public accommodation" cannot be interpreted to include a virtual meeting place. The definition enumerates only actual physical establishments and structures (*e.g.*, hotels, restaurants, movie theaters, stadiums) and establishments "physically

---

[1] In addition, the operations of the establishment must "affect commerce" or the discrimination must be "supported by State action." 42 U.S.C. § 2000a(b).

located" within the aforesaid.  Read in tandem with the enumerated "places of public accommodation," the statute's reference to any "other place of exhibition or entertainment," does not include a virtual meeting place.  *See, e.g.*, *Lewis v. Google LLC*, 851 App'x 723, 724 (9th Cir. 2021) (holding that YouTube websites are not a "place of public accommodation" within the meaning of 42 U.S.C. § 2000a); *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 541-42 (E.D. Va.) (holding that internet chat room was not a "public accommodation" within the meaning of 42 U.S.C. § 2000a(b) because places of "'public accommodation' are limited to actual physical places and structures, and thus cannot include chat rooms, which are not actual physical facilities but instead are virtual forms for communication") *see also Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016) (reiterating "the uncontroversial premise that, where feasible, 'a statute should be construed in a way that conforms to the plain meaning of its text'") (quoting *In re Jarvis*, 53 F.3d 416, 419 (1st Cir. 1995))).[2]

---

[2] Martillo's reliance on cases concerning the definition of a "public accommodation" in the context of the Americans with Disabilities Act is misplaced.  *See Lewis v. Google* LLC, 461 F. Supp. 3d 938, 957 (N.D. Cal. 2020) (stating that "the ADA has a more expansive definition of 'place of public accommodation' than the Civil Rights Act") (internal quotation marks and citation omitted).

Martillo also claims that the defendants violated a Massachusetts common carrier law which provides that "[e]very common carrier of merchandise or other property" "shall not discriminate against any particular person or subject him to any undue or unreasonable prejudice or disadvantage." M.G.L. ch. 159, § 1. The defendants are not common carriers of "merchandise or other property" for purposes of this 1869 law. *See Am. Tel. & Tel. Co. v. IMR Cap. Corp.*, 888 F. Supp. 221 (D. Mass. 1995) (noting year of enactment of M.G.L. ch. 159, § 1).

Further, even if Martillo had stated a claim under 42 U.S.C. § 2000a or the state common carrier law, the defendants would be immune from such claims under the Communications Decency Act ("CDA"), 47 U.S.C. § 230. The CDA provides in relevant part: "No provider or user of an interactive computer service shall be held liable on account of . . . any action taken to enable or make available to information content providers or others the technical means to restrict access to material" "that the provider or user considers to be lewd, lascivious, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2). This provision "'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its

exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content.'" *Green v. America Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir.1997)).  The defendants' alleged blocking of content posted by Martillo and disabling of his account are editorial decisions protected by the CDA.  *See, e.g.*, *Sikhs for Justice, Inc. v. Facebook*, 697 Fed. App'x 526, 526 (9th Cir. 2017) (holding that, under the CDA, Facebook was immune from claim that it had wrongly blocked the plaintiff's online content); *Langdon v. Google, Inc.*, 474 F. Supp. 2d, 622, 631 (D. Del. 2007) (holding that the CDA "provides Google, Yahoo, and Microsoft immunity for their editorial decisions regarding screening and deletion [of the plaintiff's advertisements] from their network") (footnote omitted).

## ORDER

In accordance with the foregoing, the motion for leave to proceed *in forma pauperis* is GRANTED and this action is DISMISSED for failure to state a claim upon which relief may be granted.

### SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-11119-RGS

JOACHIM MARTILLO

v.

TWITTER INC., *et al.*

**FINAL ORDER OF DISMISSAL**

In accordance with the Order dated October 15, 2021, dismissing this

action for the reasons stated therein, it is hereby ORDERED that the above-

captioned matter is dismissed in its entirety.

Date:  10/15/2021                     /s/ Richard G. Stearns
                                      _____
                                      UNITED STATES DISTRICT JUDGE

**UNITED STATES COURT OF APPEALS**
*for the*
**FOR THE FIRST CIRCUIT**

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) and the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).

1. **Type-Volume**: This brief contains **8,217 words**, including footnotes, as counted by a word processing system, excluding the parts of the brief exempted by Rule 32(f).

2. **Typeface and Style**: This brief has been prepared in a proportionally spaced typeface using **Microsoft Word** in **14-point Times New Roman** font.

Name: Jonathan Affleck
*Jonathan Affleck* pro
*se*
Dated:5/12/25_____

# UNITED STATES COURT OF APPEALS
### *for the*
## FOR THE FIRST CIRCUIT

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellees

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### Certificate of Service
(submitted _____)

I hereby certify that a copy of the *APPELLANT'S BRIEF FOR PLAINTIFF-APPELLANT JONATHAN AFFLECK* has been served in the above captioned proceeding on _____.

Dated: 5/12/25

Respectfully submitted by

*Jonathan Affleck*

Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94702
Jonathan.Affleck@protonmail.com
(617) 276-5788
*pro se*