No. 25-1223

# United States Court of Appeals
# For the First Circuit

JONATHAN AFFLECK,

*Plaintiff-Appellant,*

v.

THE HARVARD CRIMSON, INC.,

*Defendant-Appellee,*

**On Appeal from the United States District Court
for the District of Massachusetts**

## APPELLEE'S BRIEF

Rachel Strom (1st Cir. No. 1205682)
Alexandra Perloff-Giles (1st Cir. No. 1217191)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rachelstrom@dwt.com
alexandraperloffgiles@dwt.com

*Counsel for Appellee
The Harvard Crimson, Inc.*

June 16, 2025                                                                 .

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant The Harvard Crimson, Inc. states that it has no parent corporation and no publicly held corporation owns any interest in The Harvard Crimson, Inc.

# <u>TABLE OF CONTENTS</u>

**Page**

JURISDICTIONAL STATEMENT ........................................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED ..........................................1

PRELIMINARY STATEMENT .............................................................................2

FACTUAL BACKGROUND ..................................................................................4

SUMMARY OF THE ARGUMENT .......................................................................8

ARGUMENT .........................................................................................................10

I.     Standard of Review..................................................................................10

II.    The District Court Correctly Held That Section 230 Protects The
       Crimson's Right To Moderate Comments On Its Website ..........................12

       A.     Section 230(c)(1)............................................................................12

       B.     Section 230(c)(2)(a) .......................................................................15

III.   The First Amendment Also Protects The Crimson's Right To Moderate
       Comments On Its Website ............................................................................18

IV.    Plaintiff Has Not Plausibly Stated A Claim ...............................................21

       A.     Plaintiff Has Not Plausibly Alleged A Violation Of His Free
              Speech Rights Under The First Amendment Or Article XVI of
              The Massachusetts Constitution......................................................21

       B.     Plaintiff Has Not Plausibly Alleged A Violation Of Common
              Carriage Laws..................................................................................30

       C.     Plaintiff Has Not Plausibly Alleged A Violation Of Public
              Accommodations Laws ....................................................................32

CONCLUSION .....................................................................................................34

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affleck v. Harvard Crimson Inc.*,
   2025 WL 330577 (D. Mass. Jan. 29, 2025) ........................................................8

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ............................................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................10

*Ayyadurai v. Floor64, Inc.*,
   270 F. Supp. 3d 343 (D. Mass. 2017) ..............................................................14

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ....................................................................13, 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................10

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ..........................................................................................24

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) ....................................................................................22, 25

*Brunette v. Humane Soc'y of Ventura Cnty.*,
   294 F.3d 1205 (9th Cir. 2002) ..........................................................................28

*CBS v. Democratic Nat'l Comm.*,
   412 U.S. 94 (1973) ............................................................................................24

*Cent. Hardware Co. v. NLRB*,
   407 U.S. 539 (1972) ..........................................................................................28

*Collins v. Purdue Univ.*,
   703 F. Supp. 2d 862 (N.D. Ind. 2010) ............................................................14

*Commonwealth v. Noffke*,
376 Mass. 127 (1978) ......................................................................22

*Consortium for Indep. Journalism, Inc. v. United States*,
2025 WL 919504 (S.D.N.Y. Mar. 26, 2025)................................28, 29

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
518 U.S. 727 (1996)........................................................................18

*Doe v. Google LLC*,
2022 WL 17077497 (9th Cir. Nov. 18, 2022) ..................................25

*Doe v. Harvard Univ.*,
462 F. Supp. 3d 51 (D. Mass. 2020)..................................................26

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ...................................................11, 14

*Ebeid v. Facebook, Inc.*,
2019 WL 2059662 (N.D. Cal. May 9, 2019)......................................15

*Elansari v. Meta, Inc.*,
2024 WL 163080 (3d Cir. Jan. 16, 2024) ..........................................33

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
946 F.3d 1040 (9th Cir. 2019) .........................................................16

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ...................................................11, 12

*Fed. Agency of News LLC v. Facebook, Inc.*,
432 F. Supp. 3d 1107 (N.D. Cal. 2020)............................................15

*Garcia-Catalan v. United States*,
734 F.3d 100 (1st Cir. 2013)..............................................................10

*Guo v. Wang*,
2024 WL 2274610 (D. Mass. May 20, 2024)....................................11

*Hall v. Twitter*,
2024 WL 3386131 (1st Cir. May 28, 2024) .................................30, 33

*Hart v. Facebook, Inc.*,
   2024 WL 1693355 (9th Cir. Apr. 19, 2024) ..................................................25, 29

*Hudgens v. NLRB*,
   424 U.S. 507 (1976)...........................................................................................22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995)...........................................................................................18

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016)................................................. 10, 11, 12, 13, 14, 16

*Jian Zhang v. Baidu.com Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................................20

*Jones v. Dirty World Ent. Rec. LLC*,
   755 F.3d 398 (6th Cir. 2014) .............................................................................11

*Juarez v. Select Portfolio Servicing, Inc.*,
   708 F.3d 269 (1st Cir. 2013)..............................................................................10

*Kennedy v. Google LLC*,
   688 F. Supp. 3d 951 (N.D. Cal. 2023)..........................................................23, 25

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014).........................................................................11

*Krohn v. Harvard Law Sch.*,
   552 F.2d 21 (1st Cir. 1977)................................................................................26

*Kusi v. HSBC Bank USA, Nat'l Ass'n as Tr. for ACE Sec. Corp.*
   *Home Equity Loan Tr. Series 2006-FM1*,
   2023 WL 4014669 (D. Mass. Apr. 5, 2023).........................................................5

*La'Tiejira v. Facebook, Inc.*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017)................................................................20

*Langdon v. Google*,
   474 F. Supp. 2d 622 (D. Del. 2007)...................................................................16

*Lewis v. Google LLC*,
   461 F. Supp. 3d 938 (N.D. Cal. May 20, 2020) .................................................15

*Lewis v. Google LLC*,
  851 F. App'x 723 (9th Cir. 2021) ........................................................33

*Lloyd Corp. v. Tanner*,
  407 U.S. 551 (1972)............................................................................28

*Lugar v. Edmondson Oil Co., Inc.*,
  457 U.S. 922 (1982)......................................................................22, 24

*Manhattan Cmty. Access Corp. v. Halleck*,
  587 U.S. 802 (2019)......................................................................21, 27

*Marsh v. Alabama*,
  326 U.S. 501 (1946)............................................................................27

*Martillo v. Twitter, Inc.*,
  2021 WL 8999587 (D. Mass. Oct. 15, 2021) ....................6, 17, 31, 33

*Martillo v. Twitter, Inc.*,
  2022 WL 18862030 (1st Cir. 2022)................................ 2, 3, 6, 30, 31, 32, 33

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974)................................................................18, 28, 32

*Monsarrat v. Newman*,
  28 F.4th 314 (1st Cir. 2022)................................................................13

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)..................................................................19, 31, 32

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ..............................................................11

*NetChoice, LLC v. Attorney General of Florida*,
  34 F.4th 1196 (11th Cir. 2022) ...........................................................31

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ...............................................................31

*Noah v. AOL Time Warner, Inc.*,
  261 F. Supp. 2d 532 (E.D. Va. 2003),
  *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004)..............................33

*O'Handley v. Padilla,*
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) ............................... 20, 21, 23, 24, 25, 29

*O'Handley v. Weber,*
  62 F.4th 1145 (9th Cir. 2023) ....................................................20, 23, 24, 25, 29

*Perlman v. Vox Media, Inc.*,
  2020 WL 3474143 (Del. Super. Ct. June 24, 2020),
  *aff'd*, 249 A.3d 375 (Del. 2021) ........................................................................14

*Plotkin v. Astorian*,
  2021 WL 864946 (D. Or. Mar. 8, 2021)............................................................28

*Praeger Univ. v. Google LLC*,
  951 F.3d 991 (9th Cir. 2020) .............................................................................28

*Ramos v. White*,
  2020 WL 5240382 (Bankr. D. Mass. Sept. 2, 2020) ...........................................4

*Rendell-Baker v. Kohn*,
  457 U.S. 830 (1982)...........................................................................................22

*Republican Nat'l Comm. v. Google LLC*,
  742 F. Supp. 3d 1099 (E.D. Cal. 2024) .............................................................31

*Rogalinski v. Meta Platforms, Inc.*,
  2023 WL 7876519 (9th Cir. Nov. 16, 2023) ...............................................25, 29

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
  697 F. App'x 526 (9th Cir. 2017) ......................................................................15

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*,
  2010 WL 1799456 (D.N.J. May 4, 2010)...........................................................16

*TikTok Inc. v. Garland*,
  604 U.S. ---, 145 S. Ct. 57 (2025)......................................................................19

*U.S. Jaycees v. Mass. Comm'n Against Discrimination*,
  391 Mass. 594 (1984) ........................................................................................34

*U.S. Telecom Association v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016)...........................................................................32

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007) ............................................................9, 13

*Word of God Fellowship, Inc. v. Vimeo, Inc.*,
  205 A.D.3d 23 (N.Y. App. Div. 2022) ............................................16

*Yeo v. Town of Lexington*,
  131 F.3d 241 (1st Cir. 1997) .......................................................24, 26

*Zeran v. Am. Online, Inc*.,
  129 F.3d 327 (4th Cir. 1997) ......................................................12, 13

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1367 ...............................................................................1

42 U.S.C. § 1983 .......................................................1, 3, 20, 21, 22

42 U.S.C. § 2000a ..................................................................6, 33, 34

47 U.S.C. § 230 .............. 1, 2, 3, 6, 8, 9, 11, 12, 13, 14, 15, 16, 17, 21, 27

M.G.L. Chapter 159, § 1 ...............................................................30

M.G.L. Chapter 272, § 92A ..........................................................34

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ..................................30

Federal Rule of Civil Procedure 12(b)(6) ..............................10

Massachusetts State Constitution
  Article 16 .......................................................................7, 21, 22

United States Constitution
  First Amendment .................. 1, 3, 7, 9, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 31

United States Constitution
  Ninth Amendment...............................................................7

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and § 1367 because the claims at issue "aris[e] under" the Constitution or laws of the United States or "are so related to claims" that arise under federal law "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §§ 1331, 1367. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the district court's Memorandum and Order entered on January 29, 2025 is a final decision that disposed of all claims. *See* A. 10–17 (Memorandum and Order).

## COUNTER-STATEMENT OF ISSUES PRESENTED

1. Whether Plaintiff's claims are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1), as the district court held.

2. Whether Plaintiff's claims are also barred by the First Amendment.

3. Whether, in the alternative, Plaintiff's Section 1983 claims should be dismissed on the ground that Defendant is not a state actor.

4. Whether, in the alternative, Plaintiff's common carrier claim should be dismissed on the ground that Defendant is not a common carrier.

5. Whether, in the alternative, Plaintiff's discrimination in public accommodation claim should be dismissed on the ground that Defendant's website is not a public accommodation.

1

## PRELIMINARY STATEMENT

While Plaintiff-Appellant Jonathan Affleck ("Plaintiff" or "Affleck") works hard to frame this case as one involving "novel and unsettled legal questions" about "common carriage doctrine" and the assumption of "quasi-public duties through implied-in-fact agreements," Appellant's Br. 10, this case could not be more simple.

As the District Court found, and as this and *every* Circuit agree, Section 230 of the Communications Decency Act ("CDA") bars claims against websites for voluntarily removing or moderating third-party material they consider to be violent, harassing, or otherwise objectionable. *See* 47 U.S.C. § 230(c). Here, Affleck, using two different names, posted 38 comments in the comment section of three different articles about the conflict in Israel and Palestine on Defendant-Appellee The Harvard Crimson, Inc.'s ("The Crimson") website. The Crimson determined that the comments were vexatious and inappropriate, and removed them—a decision that Section 230 insulates from liability. Indeed, that is very purpose of the Section 230. And Affleck should have known better than anyone that his lawsuit, based on The Crimson's decision to remove his online comments, is meritless, because this Court already summarily affirmed dismissal of nearly identical claims brought by Affleck under a different name in *Martillo v. Twitter, Inc.*, 2022 WL 18862030, at *1 (1st Cir. 2022).

But, even if there were any question about the scope or application of Section 230 to online content moderation decisions, which there is not, the First Amendment independently protects The Crimson's right to edit and moderate third-party content on its news website.

Finally, even if there were no constitutional or statutory impediments to Affleck's claims, they still must be dismissed because Affleck fails to plead the basic elements of each claim. As to his Section 1983 claim, Affleck does not and cannot plausibly allege that the undergraduate student editors of The Harvard Crimson are state actors or that their editorial decisions are fairly attributable to the State. Likewise, as to his claim for common carriage discrimination, Affleck does not plausibly allege that The Crimson is a common carrier. The case law is clear that newspapers are not common carriers merely because they publish or transmit the communications of others alongside original content. Finally, as to his claim for public accommodation discrimination, only actual physical establishments are public accommodations; The Crimson's website is not, as *Martillo* already found.

Affleck is free to voice his opinions on what he calls the "Gaza Holocaust" in countless ways—by attending protests, writing blog posts, distributing leaflets, or submitting op-eds for consideration by news outlets including The Harvard Crimson. What he may not do is force The Crimson to host his comments on its website. The trial court's decision dismissing his claims with prejudice should be affirmed.

## FACTUAL BACKGROUND

The Harvard Crimson, Inc. is an independent, undergraduate student-run non-profit corporation, established in 1873 and incorporated in Massachusetts. *See* A. 30 (Compl. ¶ 10); *see also* Business Entity Summary, ID No. 042426396, Sec'y of the Commonwealth of Massachusetts, Corporations Division, https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=y 9l1BvWHVBrfH69RAGSPPTfYuWZ342GT7Ngr0EW3zaA-.[1]    The Crimson publishes its eponymous newspaper, *The Harvard Crimson*, both in print and online at www.thecrimson.com. Until relatively recently, readers could comment on articles that they read on The Crimson's website.

In the spring semester of 2024, tensions erupted at Harvard, as at many universities, over the Israel-Palestine conflict. The Crimson covered those tensions on campus, including in (1) a February 5, 2024 article titled *Harvard Kennedy School Distances Itself From Event Featuring Controversial Palestinian Professor*, (2) a February 7, 2024 article titled *Ed. Department Investigating Harvard After Anti-Palestinian Discrimination Complaint*, and (3) a February 10, 2024 article titled

---

[1] This Court can take judicial notice of The Crimson's filings with the Corporations Division of the Secretary of the Commonwealth of Massachusetts. *See, e.g.*, *Ramos v. White*, 2020 WL 5240382, at *2 n.6 (Bankr. D. Mass. Sept. 2, 2020) (taking judicial notice of a limited liability company's corporate filings in the Massachusetts Corporate Database).

*Pro-Palestine Groups Rally, Demand Harvard Divest Ties to Israel*. A. 33 (Compl. ¶ 17).

Jonathan Affleck—allegedly a Massachusetts citizen and Dorchester resident despite his California mailing address—purports to be knowledgeable about "the history of Zionism and . . . the history of Judaism" and "rejects the religious belief . . . that a Jew has a claim to Palestine on the basis of scripture." A. 33–34 (Compl. ¶¶ 17, 21). Affleck posts his views about these topics in the comments sections of social media and news websites—including through the use of different aliases—"to demonstrate the vacuousness of various assertions about Palestinians and about the ongoing Gaza Holocaust." A. 33 (Compl. ¶ 17). Affleck does not allege that he has any Harvard affiliation.

Under the alias Joachim Martillo, Affleck filed a lawsuit in 2021 against a host of organizations, including Twitter, Facebook, and The Crimson, alleging, as he does here, that those organization discriminated against him when they removed his posts and/or suspended or disabled his ability to post on their respective platforms. *See generally Martillo v. Twitter*, Case No. 21-cv-11119-RGS (D. Mass.), ECF No. 1 ("Martillo Compl.").[2] With respect to The Crimson in particular, he alleged that he posted multiple comments on September 25, 2020 on an article

---

[2] "[D]ocuments on file in federal . . . courts are proper subjects of judicial notice." *Kusi v. HSBC Bank USA, Nat'l Ass'n as Tr. for ACE Sec. Corp. Home Equity Loan Tr. Series 2006-FM1*, 2023 WL 4014669, at *3 (D. Mass. Apr. 5, 2023).

entitled *Erekat, HKS Fellow and Palestinian Negotiator, Criticizes Israeli Accords with Bahrain and United Arab Emirates. Id.* ¶ 76. In that complaint, brought under the name Joachim Martillo, he alleged that "[h]e is also known as John Fallick, Jon Fallick, Jon Falic, or Jonathan Fallick and as Jonathan Affleck or Atallah Aflaq." *Id.* ¶ 4.

There, as here, Affleck asserted claims for public accommodation discrimination under Title II of the Civil Rights Act of 1964 and for a violation of the Massachusetts common carrier law. *See id.* ¶¶ 78–82. And there, as here, the district court dismissed the claims, holding that the defendants neither provided places of "public accommodation" nor were common carriers under Massachusetts' 1869 common carrier law, and that, even if they were, Section 230 precludes liability for decisions about what content to allow or to block. *Martillo v. Twitter, Inc.*, 2021 WL 8999587, at *1–2 (D. Mass. Oct. 15, 2021). This Court summarily affirmed, *see Martillo v. Twitter, Inc.*, 2022 WL 18862030, at *1 (1st Cir. Oct. 4, 2022), and the Supreme Court denied Affleck's petition for certiorari, 143 S. Ct. 779 (Mem.) (2023).

A year later, in a three-day period, Affleck posted the more than three dozen comments on The Crimson's website at issue here. Specifically, from February 7 to February 10, 2024, Jonathan Affleck posted 18 times under the name Jonathan Affleck and an additional 20 times under the alias Atallah Aflaq in connection with

the three articles cited above. A. 33 (Compl. ¶¶ 18, 19). The Crimson determined that the volume, as well of the contents, of the comments were inappropriate and, on February 10, 2024, The Crimson took down Affleck's posts and suspended his ability to comment. *See id.* (Compl. ¶ 20). The Crimson has since removed its comment section from articles entirely.

Affleck filed this lawsuit against The Crimson on March 27, 2024. The lawsuit claims that The Crimson violated Affleck's rights under (1) the First Amendment to the U.S. Constitution and (2) Article XVI of the Massachusetts Constitution "[b]y removing [his] content . . . and by permanently disabling Affleck's account," A. 34 (Compl. ¶¶ 23, 26); (3) violated state and federal common carriage laws and the Ninth Amendment by "disabling [his] ability to request communications common carriage" and "refus[ing] to allow [him] to convey unpublished literary property to the public," A. 35 (Compl. ¶¶ 29, 31); and (4) caused him to "suffer[] public accommodation discrimination . . . on the ground of religion at least 260,000 times per day," A. 36 (Compl. ¶ 33). Affleck seeks damages on his common carriage law claim of "$13 million per day for refusal to accept a message from Affleck," A. 35 (Compl. ¶ 30), and, on his public accommodation discrimination claim, of "$78 million per day on which Harvard Crimson refuses to accept a post from Affleck," A. 36 (Compl. ¶ 34). He also seeks an injunction compelling The Crimson to "transport . . . approximately 13 messages per day to 20,000 unique readers of the

Harvard *Crimson*," A. 35 (Compl. ¶ 30), and to cease violating his federal and state constitutional rights, A. 34 (Compl. ¶¶ 23–24, 26–27).

Judge Angel Kelly granted The Crimson's motion to dismiss on January 29, 2025. Citing *Martillo*, the court held that The Crimson "is immune from all claims alleged by Affleck under the CDA," which "allows website operators to engage in blocking and screening of third-party content, free from liability for such good-faith efforts." *Affleck v. The Harvard Crimson, Inc.*, 2025 WL 330577, at *2–3 (D. Mass. Jan. 29, 2025) (citation omitted). As to the state and federal constitutional claims, the court held that "the deletion of content posted by Affleck and the disabling of his account are well within the Crimson's traditional editorial functions protected by the CDA." *Id.* at *3. As to the state common carriage and public accommodation discrimination claims, the court held that "Section 230 expressly preempts state law claims that do not fall within the narrow exceptions identified in Section 230(e)," and "[n]one of the those enumerated exceptions applies in this case." *Id.* Further, because "the Crimson is not a common carrier of merchandise or other property and is not a place of public accommodation," Affleck "failed to state a claim." *Id.* (internal quotations and alterations omitted). This appeal followed.

## SUMMARY OF THE ARGUMENT

Plaintiff's four claims all are premised on The Crimson's decisions to remove his comments from The Crimson's website and to restrict his ability to post in the

future. Those basic content moderation decisions, taken in good faith to ensure the civility of a school newspaper's comment section, are protected both by Section 230 and by the First Amendment.

Section 230(c)(1) immunizes computer service providers from liability for publishing information provided by a third party. Courts have consistently interpreted that provision broadly to protect decisions not to publish or to remove content from a third party. Section 230(c)(2) separately permits service providers to make good-faith decisions to restrict access to "harassing" or "otherwise objectionable" material. Both provisions therefore independently shield The Crimson's conduct, and "[n]o amount of artful pleading can avoid" Section 230. *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007).

The First Amendment also compels dismissal of all of Affleck's claims. The Crimson is an independent newspaper, free to make editorial judgments about what content to feature and what to ban on its website. No Court can require it to promote particular opinions or ideas.

Finally, Plaintiff's efforts to shoehorn his disappointment at being banned from posting on the Crimson's website into claims for violation of his free speech rights, violation of common carriage laws, and discrimination in a place of public accommodation all fail. The Crimson, a student-run newspaper, is not a state actor, a common carrier, or a physical public accommodation. In the end, Plaintiff's suit

amounts to nothing more than a frivolous and retaliatory campaign against a student-run organization for declining to platform his voluminous (and, in The Crimson's view, inappropriate) comments. This Court should affirm the decision below.

## ARGUMENT

### I.    Standard of Review

This Court reviews *de novo* a district court's decision granting a motion to dismiss, *Garcia-Catalan v. United States*, 734 F.3d 100, 102 (1st Cir. 2013), and "may affirm the dismissal on any ground apparent from the record," *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016) (citation omitted).

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see generally* Fed. R. Civ. P. 12(b)(6). While the Court must accept factual allegations and reasonable inferences in favor of a plaintiff, it must separate such allegations from "conclusory statements . . . to analyze whether the former, if taken as true, set forth a plausible, not merely a conceivable, case for relief." *Juarez v. Select Portfolio Servicing, Inc.,* 708 F.3d 269, 276 (1st Cir. 2013) (quotations omitted). And, although pro se complaints are entitled to a liberal reading of the allegations at issue, a pro se plaintiff "must still comply with the applicable

procedural and substantive rules of law." *Guo v. Wang*, 2024 WL 2274610, at *1 (D. Mass. May 20, 2024).

In this case, the Court should also consider the intent of Section 230 that claims against website operators based on third-party content should be dismissed "at the first logical point in the litigation process," to avoid "costly and protracted legal battles." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009). Section 230 "immunity is an *immunity from suit* rather than a mere defense to liability [and] is effectively lost if a case is erroneously permitted to go to trial." *Id.* (citation omitted). Thus, contrary to Plaintiff's suggestion that determining "the scope of Section 230 immunity" requires a "developed factual record," Appellant's Br. at 8–9, courts have held that "determinations of immunity under the CDA should be resolved at an earlier stage of litigation" to "prevent[] the speech-chilling threat of the heckler's veto." *Jones v. Dirty World Ent. Rec. LLC*, 755 F.3d 398, 417 (6th Cir. 2014). Any time "a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019). Courts in this Circuit and elsewhere routinely dismiss Section 230 claims on a motion to dismiss. *See, e.g.*, *Backpage.com, LLC*, 817 F.3d at 29; *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014).

## II. The District Court Correctly Held That Section 230 Protects The Crimson's Right To Moderate Comments On Its Website

Enacted to protect online intermediaries, Section 230 "allows website operators to engage in blocking and screening of third-party content, free from liability for such good-faith efforts." *Backpage.com*, 817 F.3d at 18; *see also Roommates.com, LLC*, 521 F.3d at 1163 (9th Cir. 2008) ("Congress sought to immunize the removal of user-generated content, not the creation of content."). Indeed, the very purpose of Section 230 "was to encourage service providers to self-regulate the dissemination of offensive material over their services." *Zeran v. Am. Online, Inc*., 129 F.3d 327, 331 (4th Cir. 1997). In enacting Section 230, "Congress sought to immunize the *removal* of user-generated content." *Roommates.com, LLC*, 521 F.3d at 1163 (citing H.R. Rep. No. 104-458 (1996) (Conf. Rep.)) (emphasis in original).

Two provisions of Section 230—Section 230(c)(1) and Section 230(c)(2)(a)—each independently immunize The Crimson's decision to remove objectionable posts or block serial posters.

### A. Section 230(c)(1)

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Put differently, the defendant is immunized if (1) the defendant provides an "interactive

computer service"[3] and (2) the plaintiff seeks to treat the defendant "as a publisher

or speaker" (3) "of information provided by another information content provider."

*Lycos*, 478 F.3d at 418 (quoting 47 U.S.C. § 230(c)(1)).

Those statutory requirements must be "broadly construed" in favor of

immunity. *Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022) (citing *Lycos*,

478 F.3d at 419); *see Backpage.com*, 817 F.3d at 18–19 (noting the "preference for

broad construction" and "near-universal agreement that section 230 should not be

construed grudgingly"). As this Court has recognized, Section 230(c)(1) has been

found to shield internet service providers against "a wide variety of causes of

action," from "housing discrimination" to "securities fraud." *Id.* at 19. Section

230(c)(1) protects websites from liability for "*all* publication decisions, whether to

edit, to remove, or to post, with respect to content generated entirely by third parties"

like Affleck. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (emphasis

added); *see Backpage.com*, 817 F.3d at 18 ("[L]awsuits seeking to hold a service

provider liable for its exercise of a publisher's traditional editorial functions—such

as deciding whether to publish, withdraw, postpone or alter content—are barred.")

(quoting *Zeran*, 129 F.3d at 330).

---

[3] An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

The requirements for Section 230(c)(1) immunity are readily satisfied here.

*First*, courts have repeatedly held that comment sections, like the ones that used to accompany articles on The Crimson's website, are the "prototypical" example of an "interactive computer service" entitled to immunity. *See Dyroff*, 934 F.3d at 1097; *Ayyadurai v. Floor64, Inc*., 270 F. Supp. 3d 343, 368 (D. Mass. 2017) ("website operator" taking a "user-submitted comment and re-post[ing] it, without modifying the content of the comment" protected by Section 230); *Perlman v. Vox Media, Inc.*, 2020 WL 3474143, at *2 (Del. Super. Ct. June 24, 2020) (applying Section 230 to the comment section of Defendant Vox Media, Inc.'s news website "The Verge"), *aff'd*, 249 A.3d 375 (Del. 2021); *see also Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 878–79 (N.D. Ind. 2010) (holding that a university newspaper's website is an interactive computer service).

*Second*, Affleck's claims seek to hold The Crimson liable as the "publisher or speaker" of third-party content. Affleck alleges that The Crimson violated his rights by "removing [his] content," "decreasing visibility of the content," "refus[ing] to allow Affleck to convey unpublished literary property," and "refus[ing] to accept a message from Affleck." A. 34–35 (Compl. ¶¶ 23, 26, 31, 33). But "choices about what content can appear on the website" and what should be removed "fall within the purview of traditional publisher functions." *Backpage.com, LLC*, 817 F.3d at 21. Indeed, courts have routinely held that decisions to remove a plaintiff's posts or not

to publish a plaintiff's content are protected under Section 230(c)(1). *See, e.g.*, *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *5 (N.D. Cal. May 9, 2019) (holding that "defendant's decision to remove plaintiff's posts undoubtedly falls under 'publisher' conduct" and collecting cases); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119–20 (N.D. Cal. 2020); *see also Lewis v. Google LLC*, 461 F. Supp. 3d 938, 955 (N.D. Cal. May 20, 2020) (Section 230 barred claim based on YouTube's alleged demonetization of plaintiff's videos containing political and anti-feminist content), *aff'd*, 851 F. App'x 723 (9th Cir. 2021), *cert denied*, 142 S. Ct. 434 (2021); *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) (Mem.) (holding that Facebook was immune from claim that it had wrongly blocked the plaintiff's online content).

*Third*, the content at issue was provided by a third-party: Affleck affirmatively alleges that he posted the content at issue on The Crimson's website. A. 33–34 (Compl. ¶¶ 17–20).

All three requirements for Section 230(c)(1) immunity are therefore readily satisfied, and The Crimson is "immune" from this suit.

### B. Section 230(c)(2)(a)

Section 230(c)(2) also independently bars Affleck's claims. Section 230(c)(2)(a) "provides an additional shield from liability," *Barnes*, 570 F.3d at 1105, for "any action voluntarily taken in good faith to restrict access to or availability of

material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A). In other words, Section 230(c)(2)(a) "allows website operators to engage in blocking and screening of third-party content, free from liability for such good-faith efforts." *Backpage.com, LLC*, 817 F.3d at 18.

Courts have interpreted "otherwise objectionable" broadly, deferring to the website operator's determination of what content is inappropriate on its website, so long as the website operator does not act for anticompetitive reasons. *See, e.g.*, *Word of God Fellowship, Inc. v. Vimeo, Inc.*, 205 A.D.3d 23, 27 (N.Y. App. Div. 2022) ("[C]ontent may be 'otherwise objectionable' without being obscene, excessively violent, harassing, or anything similar."), *leave to appeal denied*, 38 N.Y.3d 912 (2022); *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *6 (D.N.J. May 4, 2010) ("[N]othing about the context before or after [the phrase 'or otherwise objectionable'] limits it to just patently offensive items."); *Langdon v. Google*, 474 F. Supp. 2d 622, 631 (D. Del. 2007) (holding that Section 230(c)(2)'s reference to "otherwise objectionable" content immunized defendants "for their editorial decisions regarding screening and deletion [of the plaintiff's advertisements] from their network," even though the advertisements were not obscene or harassing); *see also Enigma Software Grp. USA, LLC v. Malwarebytes,*

*Inc.*, 946 F.3d 1040, 1051–52 (9th Cir. 2019) ("We cannot . . . ignore the breadth of the term 'objectionable' by construing it to cover only material that is sexual or violent in nature," but "§ 230 does not provide immunity for blocking a competitor's program for anticompetitive reasons"), *cert. denied*, 141 S. Ct. 13 (2020).

The Crimson determined that, during a time of heightened sensitivities over the complex Israeli-Palestinian conflict, both the volume of Affleck's commenting—38 posts on just three articles in three days, *see* A. 33 (Compl. ¶¶ 17, 19)—and the content—about what he calls the "Gaza Holocaust," *id.* (Compl. ¶ 17)—were "objectionable." Affleck does not allege that The Crimson acted for anticompetitive reasons, and, for this reason, Section 230(c)(2)(a) also fully protects The Crimson's decision to remove Affleck's comments.

\* \* \* \*

Before Affleck began his posting frenzy in February 2024, the district court for the District of Massachusetts already determined, and this Court affirmed, that a "defendants' alleged blocking of content posted by [Affleck] and disabling of his account are editorial decisions protected by the CDA." *Martillo*, 2021 WL 8999587, at \*2, *aff'd*, 2022 WL 18862030. Nothing has changed. Then, as now, the Crimson's removal of Affleck's comments and restriction on his ability to post are protected by Section 230(c)(1) and (c)(2) of the CDA, just as the district court held. This Court should uphold the district court's decision dismissing Affleck's claims.

### III.    The First Amendment Also Protects The Crimson's Right To Moderate Comments On Its Website

Although not reached by the district court, The Crimson's right to restrict third-party content is protected not only by statute but also by the Constitution. Affleck claims that he has a First Amendment right to post whatever he wants—no matter how offensive—on the comments section of The Crimson's website. In fact, the opposite is true: The Crimson is a private nonprofit corporation and an independent newspaper, with the First Amendment right to exercise editorial judgments about what content appears on its platform.

The Supreme Court has long recognized that "the choice of material" "constitute[s] the exercise of editorial control and judgment" and "[l]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 n.24 (1974); *see also, e.g.*, *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737–38 (1996) ("[T]he editorial function itself is an aspect of 'speech,' and a court's decision that a private party, say, the station owner, is a 'censor,' could itself interfere with that private 'censor's' freedom to speak as an editor.") (citation omitted). "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay,*

*Lesbian & Bisexual Grp. of Bos*., 515 U.S. 557, 573 (1995) (internal citations and quotations omitted).

The First Amendment's protection for editorial decision-making is of course not limited to print newspapers, as Affleck appears to suggest. *See* Appellant's Br. 41–42 (arguing that "the comments service" is somehow not subject to "editorial discretion" or "editorial control," unlike, for example, *Letters to the Editor*). The First Amendment applies with equal force to online speech and content moderation. As the Supreme Court held just last term, "[t]he principle" that editorial choices by publishers and editors are protected by the First Amendment "does not change because the curated compilation has gone from the physical to the virtual world." *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024). "The First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude," whether in print or online. *Id.* at 731. Indeed, as Justice Gorsuch explained in the context of a case involving a social media platform: "One man's 'covert content manipulation' is another's 'editorial discretion.' Journalists, publishers, and speakers of all kinds routinely make less-than-transparent judgments about what stories to tell and how to tell them. Without question, the First Amendment has much to say about the right to make those choices." *TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct. 57, 73 (2025) (Gorsuch, J., concurring).

19

Consistent with this principle, courts have routinely rejected claims that would interfere with an online publisher's editorial discretion. For example, in *O'Handley v. Padilla*, the court dismissed Section 1983 claims against Twitter for labeling the plaintiff's posts and then suspending the plaintiff's Twitter account, holding that Twitter has a First Amendment right to control the content posted on its platform. 579 F. Supp. 3d 1163, 1171 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2715 (2024). In *Jian Zhang v. Baidu.com Inc.*, the court dismissed claims against a search engine for allegedly blocking and censoring certain search results on the grounds that "[t]o allow such a suit would plainly violate the fundamental rule . . . that a speaker has autonomy to choose the content of his own message." 10 F. Supp. 3d 433, 440 (S.D.N.Y. 2014) (internal quotations and alterations omitted). And in *La'Tiejira v. Facebook, Inc.*, the court dismissed claims over Facebook's decision not to delete certain statements from its platform, holding that those claims "ar[o]se directly and exclusively from Facebook's First Amendment right to decide what to publish and what not to publish on its platform." 272 F. Supp. 3d 981, 991, 995 (S.D. Tex. 2017). If social media platforms' and search engines' often algorithmic content moderation decisions are protected by the First Amendment as editorial decisions, human-made judgments about what to exclude from a newspaper's website unquestionably are too.

Affleck's claims are predicated entirely on The Crimson's exercise of its right to decide what content to allow on its website. Those decisions about "what content to include, exclude, moderate, filter, label, restrict, or promote" "say[] something about what [The Crimson] represents." *O'Handley*, 579 F. Supp. 3d at 1186–87. The Crimson's "First Amendment rights . . . would be jeopardized by a Court order telling [The Crimson] what content-moderation policies to adopt and how to enforce those policies." *Id.* at 1188. The First Amendment thus protects The Crimson's decision to remove Affleck's posts and to ban him from posting, and offers an independent basis to affirm the dismissal of Affleck's claims.

## IV.    Plaintiff Has Not Plausibly Stated A Claim

Even if Affleck's claims were permissible under the First Amendment and Section 230—which they are not—Affleck has failed to plausibly allege the basic elements of each claim.

### A. Plaintiff Has Not Plausibly Alleged A Violation Of His Free Speech Rights Under The First Amendment Or Article XVI of The Massachusetts Constitution

Affleck's two claims brought under Section 1983—for violations of the First Amendment and of Article XVI of the Massachusetts Constitution ("Free Speech Claims")—fail for the simple reason that The Crimson is not a state actor.

The First Amendment "prohibits only governmental abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019) (emphasis

omitted). So too with Article XVI, which provides that "[t]he liberty of the press . . . ought not . . . to be restrained," Mass. Const. Pt. 1, Art. 16; like the First Amendment, Article XVI "do[es] not extend to the conduct" of private parties, *Commonwealth v. Noffke*, 376 Mass. 127, 134 (1978). Therefore, as Affleck concedes, *see, e.g.*, Appellant's Br. at 10, he must plausibly allege state action. *See, e.g.*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Hudgens v. NLRB*, 424 U.S. 507, 514–21 (1976). His failure to do so dooms his Free Speech Claims.

The "ultimate issue" in determining whether a private entity like The Crimson is subject to suit under Section 1983 is whether the alleged infringement of Affleck's free speech rights is "fairly attributable to the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). The Supreme Court has developed "a two-part approach to this question of 'fair attribution.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). "[S]tate action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the state, or by a rule of conduct imposed by the state, or by a person for whom the state is responsible,' and that 'the party charged with the deprivation . . . may fairly be said to be a state actor.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted).

Affleck makes no attempt to satisfy the first requirement—nor can he. Courts have recognized that websites do not "exercise a state-created right" when they remove posts or suspend accounts. For example, in *O'Handley*, the Ninth Circuit affirmed the dismissal of claims against Twitter and against California's Secretary of State for allegedly acting in concert to censor the plaintiff's speech on the platform. 62 F.4th at 1164. The plaintiff alleged that state officials flagged tweets with purportedly false or misleading information for Twitter's review and that Twitter responded by removing the posts in question and suspending the plaintiff's account. *Id.* at 1153. Despite these alleged interactions with state officials, the court held that the plaintiff's "claims falter at the first step," because Twitter's right to enact content moderation decisions was not derived "from any right conferred by the State." *Id.* at 1156. Likewise, in a case brought by Robert F. Kennedy, Jr. against Google and YouTube for allegedly violating his First Amendment rights when they removed two videos of him pursuant to their medical misinformation guidelines, the district court held that the "claim does not satisfy the first prong of the [state action] test"—even though Kennedy specifically alleged that "YouTube's policies are exclusively guided by local health authorities." *Kennedy v. Google LLC*, 688 F. Supp. 3d 951, 957 n.1 (N.D. Cal. 2023), *appeal dismissed*, 2023 WL 9843154 (9th Cir. Sept. 20, 2023). This case is even more straightforward: The Complaint does not even allege that The Crimson was acting at the suggestion of any government

23

authority. Because "no conferral of power by the State was necessary for [The Crimson] to take the actions challenged here," *O'Handley*, 62 F.4th at 1156, Affleck's Free Speech Claims fail the first step of the state action inquiry.

Affleck fares no better on the second step. His brief offers a smattering of arguments, largely untethered to allegations in his complaint, as to why The Crimson is purportedly a state actor. None is availing.

*First*, Affleck argues that Massachusetts' alleged failure to enforce The Crimson's nondiscrimination obligation, *see* Appellant's Br. at 28–29, 35–36, somehow creates state action. But the government has no "duty" under the First Amendment "to act where there is otherwise no state action." *Yeo v. Town of Lexington*, 131 F.3d 241, 253 (1st Cir. 1997) (en banc); *see CBS v. Democratic Nat'l Comm.*, 412 U.S. 94, 119 (1973) (plurality op.) ("The First Amendment does not reach acts of private parties in every instance where the [government] has merely permitted or failed to prohibit such acts.").

*Next*, Affleck argues that "state action may be found" where private conduct is "entwined with governmental policies," or where the government provides "significant encouragement" to the challenged conduct. Appellant's Br. 35–36.[4] But his complaint is devoid of any allegation that any government actor "encourage[d]"

---

[4] Affleck misattributes the source of the quoted language regarding "significant encouragement." In fact, that language does not appear in *Lugar*, *contra* Appellant's Br. at 36, but rather in *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

The Crimson to remove his posts or that the government is "entwine[d] in the management and control" of The Crimson, an independent news organization. *Brentwood Acad.*, 531 U.S. at 296–97 (cited in Appellant's Br. at 36).

Similar First Amendment claims against web service providers for taking down certain user content or terminating users have consistently been dismissed. *See, e.g.*, *Hart v. Facebook, Inc.*, 2024 WL 1693355, at *2 (9th Cir. Apr. 19, 2024) (affirming dismissal of First Amendment claims regarding content moderation decisions for failure to plausibly allege state action); *Rogalinski v. Meta Platforms, Inc.*, 2023 WL 7876519, at *1 (9th Cir. Nov. 16, 2023), *cert. denied*, 144 S. Ct. 1066 (2024) (same); *Doe v. Google LLC*, 2022 WL 17077497, at *2–3 (9th Cir. Nov. 18, 2022) (affirming denial of First Amendment claim brought by content creators whose YouTube channels were terminated or suspended on the grounds that they failed to "allege[] facts that suggest that the government compelled [YouTube's] actions" or that "the wrongdoer is clothed with the authority of state law") (citation omitted); *see also O'Handley*, 62 F.4th at 1157–60 (holding that plaintiff also failed the second step of the state action framework because he did not plausibly allege that the government "pressured Twitter into taking any action against him" or was a "joint participant in the challenged activity"); *Kennedy*, 688 F. Supp. at 959–60 (holding that Kennedy failed to show that any government official demanded Google

25

adopt a medical misinformation policy or communicated with Google regarding Kennedy).

*Third*, Affleck argues that The Crimson's "location within a state-chartered institution" supports a finding of state action. Appellant's Br. 28; *see also* Appellant's Br. 30 (arguing that The Crimson "enjoys the social, institutional, and reputational benefits of Harvard's status as a state-chartered and publicly supported private educational entity"). But The Crimson is not part of any state institution. Affleck concedes, as he must, that the "Harvard Crimson is formally independent from Harvard University." *Id.*; *see also* A. 30 (Compl. ¶ 10) (alleging that The Harvard Crimson, Inc. is an independently incorporated entity). And Harvard itself is, of course, "a private university," *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 65 (D. Mass. 2020), and also not a state actor, *see Krohn v. Harvard Law Sch.*, 552 F.2d 21, 24 (1st Cir. 1977) ("[T]he mere offering of an education, regulated by the State, does not . . . render [Harvard Law School's] activities governmental in nature."). Moreover, even if The Crimson *were* part of a state educational institution (which it is not), its decisions *still* would not constitute state action. As this Court held in a case involving the decision by two public high school student publications not to publish an advertisement promoting sexual abstinence, "student-controlled editorial decisions" even "in public institutions of higher education" are not state action attributable to the government. *Yeo*, 131 F.3d at 250.

*Fourth*, Affleck argues The Crimson performs a "public function" because it "functions as a digital town square" and is therefore a state actor. Appellant's Br. 28; *see also* Appellant's Br. 33 (arguing that The Crimson's "comment service invites public participation"); *id.* at 31–32 & n.16 (noting that Section 230 describes the Internet as "a forum for [e.g.,] political discourse" and arguing that the Internet is therefore a "designated public forum"). Affleck cites *Marsh v. Alabama*, 326 U.S. 501 (1946), in which the Court overturned a conviction for distributing religious materials on a town's sidewalk, holding that First Amendment protections could not be denied simply because the sidewalk was part of a privately-owned company town. But operating a company town is just one of two activities—along with running elections—that the Supreme Court has recognized as traditional, exclusive public functions that can qualify a private entity as a state actor. *See Halleck*, 587 U.S. at 809–10. And while sidewalks are traditional public fora, historically open to all, "[n]ewsgathering is the quintessential private activity, jealously guarded from impermissible government influence." *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1214 (9th Cir. 2002) (holding that a newspaper "was not liable as a state actor" under any of the plaintiff's state action theories), *as amended on denial of reh'g and reh'g en banc* (Aug. 23, 2002); *see also Halleck*, 587 U.S. at 802 (holding that a private nonprofit corporation that contracted with the City of New York to operate public cable channels was not a state actor despite being "heavily

regulate[d]"); *Plotkin v. Astorian*, 2021 WL 864946, at *3 (D. Or. Mar. 8, 2021) ("Like the public access television channel in Halleck, here a newspaper does not perform a traditional or exclusive government function."); *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *5–6 (S.D.N.Y. Mar. 26, 2025) (journalists not state actors even if they, like the government, perform "intelligence-gathering"). Affleck has his argument exactly backwards: The Supreme Court has consistently held that privately owned newspapers like The Crimson cannot be compelled to publish contributed content. *See Tornillo*, 418 U.S. at 258.

That the comment section—before it was removed by The Crimson—was generally open does not alter the analysis. "[P]rivate property does not 'lose its private character merely because the public is generally invited to use it for designated purposes.'" *Praeger Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972)). "Otherwise 'every retail and service establishment in the country' would be bound by constitutional norms." *Id.* at 998 (quoting *Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972)). Thus, even if The Crimson were a "public square on the Internet," "it is 'not transformed' into a state actor solely by 'provid[ing] a forum for speech." *Id.* at 997 (quoting *Halleck*, 587 U.S. at 812); *see generally id.* at 999 (dismissing First

Amendment claim and holding that "the state action doctrine precludes constitutional scrutiny of YouTube's content moderation").

*Finally*, Affleck argues that The Crimson's website is "linked with government infrastructure." Appellant's Br. 29. Because the government contributed money to the development of the Internet and continues to spend public money on government networks and technology, Affleck suggests, *see* A. 30–31 (Compl. ¶ 12), the state "facilitates the running of the [Crimson's] software on computing devices throughout the state," Appellant's Br. 33, transforming The Crimson into a state actor.[5] Of course, under Affleck's theory, any Internet user or website provider anywhere in the world would be a state actor merely because the United States government contributed to the development of the Internet. That is not the law. As noted, courts across the country routinely reject claims that actions by private interactive computer services—from social media platforms, *see, e.g.*, *O'Handley*, 62 F.4th at 1164; *Hart*, 2024 WL 1693355, at *2; *Rogalinski*, 2023 WL 7876519, at *1, to journalistic organizations, *see Consortium for Indep. Journalism*, 2025 WL 919504, at *5–6—are attributable to the state.[6]

---

[5] To be clear, The Crimson operates a website; it does not provide software that runs on computers.

[6] Even Affleck confusingly concedes elsewhere in his Complaint that at least some portions of the internet "belong[] to . . . private entities or individuals"—notwithstanding any governmental role in the development or infrastructure of Internet technology. A. 31–32 (Compl. ¶ 13).

This Court's decision in *Hall v. Twitter* is instructive. 2024 WL 3386131 (1st Cir. May 28, 2024). There, as here, the plaintiff brought state and federal constitutional claims, alleging that he was discriminated against when he was banned from posting on a private website after posting harassing comments. This Court affirmed the dismissal of the claims, holding that the plaintiff had failed to allege "that Twitter is a state actor for constitutional purposes." *Id.* at *1. So too The Crimson is a private company, not a state actor, and its content moderation decisions cannot support a claim for violation of Affleck's constitutional rights.

### B. Plaintiff Has Not Plausibly Alleged A Violation Of Common Carriage Laws

Affleck's third claim, for common carriage discrimination, fails for the simple reason that The Crimson is not a common carrier. Massachusetts' common carrier law provides that "[e]very common carrier of merchandise or other property" "shall not discriminate against any particular person or subject him to any undue or unreasonable prejudice or disadvantage." M.G.L. ch. 159, § 1; *see* Appellant's Br. 20–21; *see also, e.g.*, Black's Law Dictionary (12th ed. 2024) (defining a "common carrier" as "[a] commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee."). The Crimson, a student newspaper, is not a "common carrier of merchandise or other property"—as this Court has already effectively held. In *Martillo*, the lower court held that "defendants"—including The Harvard Crimson, Inc.—"are not common carriers of 'merchandise or other

property' for purposes of this 1869 law," 2021 WL 8999587, at *2 (citation omitted), and this Court affirmed, "essentially for the reasons discussed by the district court," 2022 WL 18862030, at *1 (1st Cir. Oct. 4, 2022).

Citing the Fifth Circuit's decision in *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022), and the Eleventh Circuit's decision in *NetChoice, LLC v. Attorney General of Florida*, 34 F.4th 1196 (11th Cir. 2022), Affleck argues that "[f]ederal courts remain divided on whether social media platforms may be subject to common carriage obligations." Appellant's Br. at 22. But those decisions were both superseded by the Supreme Court's decision in *Moody v. NetChoice*, which conspicuously did *not* adopt the contention that platforms like YouTube and Facebook should be viewed as common carriers, *cf.* 603 U.S. at 794 (Alito, J., concurring) (faulting the majority for failing to engage with that argument), and instead pointed to the platforms' First Amendment interests in excluding third-party speech free from government interference, *id.* at 707; *see also, e.g.*, *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1117 (E.D. Cal. 2024) (emphasizing that common carriage laws have "historically been applied to services that physically carry persons or goods" and holding that "[r]eading email into the common carrier law would implicate significant policy and Constitutional considerations").

Moreover, even if there were any question as to whether large-scale social media platforms—which "*generally* allow their users to . . . post written messages

31

. . . and comment on . . . other users' posts," barring any algorithmic restrictions, *Moody*, 603 U.S. at 788 (Alito, J., concurring)—could be considered common carriers, The Crimson, whose student editors make decisions about what specific content to keep or take down, cannot be. Indeed, in *U.S. Telecom Association v. FCC*, the D.C. Circuit expressly distinguished between newspapers and common carriers: Both might "serve as conduits for speech produced by others" in the sense that newspapers might "reprint . . . the communications of others" alongside "original content," but, while common carriers "engage[] in indiscriminate, neutral transmission of any and all users' speech," newspapers do not. 825 F.3d 674, 742 (D.C. Cir. 2016). Newspapers make "choice[s]" about the material to run—choices that "whether fair or unfair [] constitute the exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 258.

Because the Crimson is a newspaper and not a common carrier, as this Court has already held, Affleck's claim for common carrier discrimination fails.

### C. Plaintiff Has Not Plausibly Alleged A Violation Of Public Accommodations Laws

Affleck's final cause of action, for violation of public accommodations laws, similarly fails because The Crimson is not a public accommodation within the meaning of the statute.

As the court held in *Martillo*:

> Martillo has failed to state a claim under 42 U.S.C. § 2000a because the defendants' social media platforms are not places of "public accommodation." The statutory definition of a "public accommodation" cannot be interpreted to include a virtual meeting place. The definition enumerates only actual physical establishments and structures (e.g., hotels, restaurants, movie theaters, stadiums) and establishments "physically located" within the aforesaid. Read in tandem with the enumerated "places of public accommodation," the statute's reference to any "other place of exhibition or entertainment," does not include a virtual meeting place.

2021 WL 8999587, at *1. That decision, involving the same parties as here, is controlling.

Moreover, *Martillo* is no outlier. Applying the same reasoning, courts in this Circuit and elsewhere have consistently rejected public accommodation discrimination claims relating to websites and digital platforms. *See, e.g.*, *Hall*, 2023 WL 3322952, at *4 ("Companies, including Twitter, that provide only online services . . . are not places of public accommodation for the purposes of Title II of the Civil Rights Act of 1964, § 2000a."), *aff'd*, 2024 WL 3386131 (1st Cir. May 28, 2024); *Elansari v. Meta, Inc.*, 2024 WL 163080, at *2 (3d Cir. Jan. 16, 2024) ("Meta is not a 'place of public accommodation'"); *Lewis v. Google LLC,* 851 F. App'x 723, 724 (9th Cir. 2021) (YouTube is not a "place of public accommodation" within the meaning of 42 U.S.C. § 2000a); *Noah v. AOL Time Warner, Inc*., 261 F. Supp. 2d 532, 541–42 (E.D. Va. 2003) (internet chat rooms were not "public accommodations" within the meaning of 42 U.S.C. § 2000a(b), which was "limited

to actual, physical places and structures" and did not include "virtual forums for communication"), *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004) (per curiam)

Affleck's claim under Massachusetts law, M.G.L. c. 272, § 92A, fails for the same reason as his claim under 42 U.S.C. § 2000a. Section 92A defines a "place of public accommodation" as "any *place* . . . which is open to and accepts or solicits the patronage of the general public." M.G.L. c. 272, § 92A (emphasis added). Massachusetts courts have interpreted "place" within the meaning of the statute to refer to a "physical environment"—a conclusion "buttressed by the fact that all of the specifically-enumerated examples of places of public accommodation (an inn, tavern, gas station, etc.), following the general definition in G.L. c. 272, § 92A" are physical locales. *U.S. Jaycees v. Mass. Comm'n Against Discrimination*, 391 Mass. 594, 601–03 (1984).

Because The Crimson's website is not a physical space, it is not a public accommodation, and The Crimson's restriction on Affleck's ability to post online cannot support a claim for public accommodation discrimination.

## CONCLUSION

For the foregoing reasons, the District Court's Memorandum and Order of January 29, 2025 should be affirmed.

Dated: June 16, 2025

Respectfully submitted,

*/s/ Rachel Strom*

Rachel Strom, 1st Cir. No. 1205682
rachelstrom@dwt.com
Alexandra Perloff-Giles, 1st Cir. No. 1217191
alexandraperloffgiles@dwt.com
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Tel.: (212) 489-8230

*Counsel for Appellee The Harvard Crimson, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,109 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word.

*/s/ Rachel Strom*
Rachel Strom

36

## CERTIFICATE OF SERVICE

I, Alexandra Perloff-Giles, hereby certify that on June 16, 2025, I served a copy of Defendant-Appellee The Harvard Crimson Inc.'s brief on Plaintiff-Appellant Jonathan Affleck via CM/ECF and by email at Jonathan.affleck@protonmail.com at Plaintiff-Appellant's request.

*/s/ Rachel Strom*
Rachel Strom