# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellee

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### APPELLANT'S REPLY BRIEF

Respectfully submitted by the Plaintiff-Appellant

*Jonathan Affleck*
Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94702
Jonathan.Affleck@protonmail.com
(617) 276-5788
*pro se*
Signature:
Dated:

### STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. This case raises unresolved and significant questions at the intersection of contract law, common carriage doctrine, and constitutional enforcement in digital public spaces. Oral argument would assist the Court in clarifying both complex legal issues and also factual misunderstanding—particularly those involving digital infrastructure that functions as a conduit for public speech.

Because the questions presented may have implications for other courts or future higher-court review, live argument will aid the decisional process.

**Table of Contents**

APPELLANT'S REPLY BRIEF ....................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ................................. 1

TABLE OF AUTHORITIES ......................................................................... 4

CASES ........................................................................................................ 4
CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES ...................... 7
OTHER AUTHORITIES ............................................................................ 8
GLOSSARY ................................................................................................ 9

PRELIMINARY STATEMENT.................................................................. 12

STATEMENT OF ISSUES IN REPLY....................................................... 12

ARGUMENT ............................................................................................... 15

I. BREACH OF CONTRACT & PLATFORM TERMS............................. 15
II. THE CRIMSON BEARS COMMON CARRIAGE DUTIES UNDER MASSACHUSETTS LAW AS A PROVIDER OF PUBLIC MESSAGE TRANSMISSION ........................................ 16
III. NON-DISCRIMINATION DUTIES AND PUBLIC FACILITY ............................................. 23
    *Harvard Crimson's Failure to Transport a Message Can Be Litigated Under Section 202 Despite Section 230* ............................................................................. 24
    *Harvard Crimson is a Retail Establishment and a Public Communications Facility That Taints a Government Institution or a Place of Public Accommodation with Unlawful Discrimination* ............................................................................. 27
IV. FEDERAL LAW AND NON-PREEMPTION OF STATE LAW (WHEN THE FCC CLAIMS NO REGULATORY AUTHORITY) ............................................................................. 30
    *Federal Preemption Does Not Prevent Litigation Under Massachusetts Common Carriage and Telegraph Law (When the FCC Claims Regulatory Authority)* ......... 31
    *Harvard Crimson's Comment Platform Provides Common Carriage and Telegraph Service Under Massachusetts Law* ............................................................................. 32
V. STATE ACTION................................................................................. 33
    *The Government, Harvard University, and The Harvard Crimson Are Multiply Entwined* ............................................................................. 33
    *Direct and Indirect State Adverse Action Creates State Action* ............................... 34
VI. THE APPELLEE'S BRIEF DEMONSTRATES INABILITY TO DISCUSS THE TECHNOLOGY ACCURATELY WITHOUT ASSISTANCE OF EXPERT TESTIMONY OR REPORTS .................... 35

2

VII. MARTILLO V. TWITTER AND OTHER PRIOR PROCEEDINGS ARE NOT PRECLUSIVE .. 38
VIII. THE DEFENDANT ATTEMPTS TO OVERWHELM THIS COURT WITH AN AVALANCHE OF CASES WHOSE CLAIMS FOR RELIEF COME WITHIN THE SCOPE OF THE SHIELD OF SECTION 230 BUT HAVE NO SIMILARITY TO THE CLAIMS FOR RELIEF OF THE PLAINTIFF 39
*Overview of the Avalanche of Irrelevant Cases.* ..................................................... 39
*Modern Digital Platforms Qualify as Common Carriers of Messages Under California Civil Code §§ 2207–2209* ........................................................................ 40
A. The Statutes Do Not Limit Common Carriage to Telegraphy or Physical Transport ........................................................................................................... 41
B. Digital Platforms Functionally Qualify as Message Carriers .......................... 42
C. The Statutes Remain Fully Enforceable Absent Federal Preemption .............. 43
D. The RNC Court's Failure to Address §§ 2207–2209 Was Legal Error............. 43
Conclusion............................................................................................................ 44

**CONCLUSION** ................................................................................................... **45**

**ADDENDUM** ........................................................................................................ **I**

ADD. 42 U.S. CODE § 1983 – CIVIL ACTION FOR DEPRIVATION OF RIGHTS......................... I
ADD. 42 U.S. CODE § 2000A – PROHIBITION AGAINST DISCRIMINATION OR SEGREGATION IN PLACES OF PUBLIC ACCOMMODATION ................................................................... I
ADD. 42 U.S. CODE § 2000B – CIVIL ACTIONS BY THE ATTORNEY GENERAL.................. III
ADD. 42 U.S. CODE § 2000B-2 – PERSONAL SUITS FOR RELIEF AGAINST DISCRIMINATION IN PUBLIC FACILITIES ............................................................................................. IV
ADD. 47 U.S. CODE § 153 – DEFINITIONS ....................................................................... IV
ADD. 47 U.S. CODE § 201 - SERVICE AND CHARGES......................................................... V
ADD. 47 U.S. CODE § 202 – DISCRIMINATIONS AND PREFERENCES ................................ VI
ADD. 47 U.S. CODE § 207 – RECOVERY OF DAMAGES...................................................... VI
ADD. 47 U.S. CODE § 230 – PROTECTION FOR PRIVATE BLOCKING AND SCREENING OF OFFENSIVE MATERIAL ........................................................................................... VI
ADD. ARTICLE I, SECTION 10, CLAUSE 1 (CONTRACTS CLAUSE) .................................... X
ADD. FIRST AMENDMENT OF THE US CONSTITUTION ...................................................... X
ADD. FOURTEENTH AMENDMENT OF THE US CONSTITUTION ......................................... X
ADD. M.G.L. CHAPTER 159: COMMON CARRIERS (1921)................................................ XI
ADD. M.G.L. CHAPTER 166: TELEPHONE AND TELEGRAPH COMPANIES, AND LINES FOR THE TRANSMISSION OF ELECTRICITY (1921) ............................. XII
ADD. M.G.L. CHAPTER 272: CRIMES AGAINST CHASTITY, MORALITY, DECENCY AND GOOD ORDER (1921) ................................................................. XIII
ADD. REVISED LAWS CHAPTER 70: OF COMMON CARRIERS AND EXPRESS COMPANIES. (1902) ................................................................................................................. XV
ADD. REVISED LAWS CHAPTER 109: OF CERTAIN POWERS, DUTIES AND LIABILITIES OF CORPORATIONS. (1902)......................................................................................... XV

Add. Revised Laws Chapter 122: Of Companies Engaged in the Transmission of Electricity. (1902) ............................................................................ XVI

Add. Massachusetts General Statutes CHAPTER 64. OF TELEGRAPH COMPANIES. (1860) ................................................................................. XVI

Add. California Civil Code DIVISION 3 PART 4 TITLE 7 CHAPTER 5 ARTICLE 1. Common Carriers in General [[2168.] - 2178] ( Article 1 enacted 1872. )... XVII

Add. California Civil Code DIVISION 3 PART 4 TITLE 7 CHAPTER 5 ARTICLE 4. Common Carriers of Messages [2207 - 2209] (Article 4 enacted 1872.) ..... XVII

Add. Harvard Crimson Commenting Policy (2008) .......................................... XVIII

Add. Harvard Crimson Commenting Policy (2025) .......................................... XVIII

Add. Harvard Crimson's Invitation to the Public ............................................. XX

Add. Blackstone ................................................................................. XX

Add. Black's Law Dictionary (12th Ed.) .............................................. XXI

Add. Angell on Carriers (5th ed. 1877), § 75, pp. 68-69 ..................................... XXII

Add. Electronic Computer Originated Mail (ECOM), Memorandum Opinion and Order ........................................................................................ XXII

## Table of Authorities

### *Cases*

| | |
|---|---|
| *Interstate Commerce Comm'n v. Balt. & Ohio R.R.,* 145 U.S. 263, 275 (1892). | 15 |
| *Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597 (1923). | 15 |
| *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 68 (1963). | 34 |
| *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1107 (9th Cir. 2009). | 14**Error! Bookmark not defined.** |
| *Burton v. Wilmington Parking Authority,* 365 U.S. 715 (1961). | 33 |
| *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,* 545 U.S. 967 (2005). | 19, 30, 43 |

| | |
|---|---|
| *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). | 33 |
| *Denton v. Hernandez*, 504 U.S. 25, 34 (1992). | 38 |
| *Dickson v. Reuter's Telegram Co.,* (1877) 3 C.P.D. 1 (Eng.). | 22 |
| *Dwight v. Brewster*, 1 Pick. 50 (Mass. 1822). | 21 |
| *Electronic Computer Originated Mail (ECOM)***,** Memorandum Opinion and Order, 72 F.C.C.2d 766 (1979) (terminating proceeding), [FCC 79-465, CC Docket No. 79-6]. | 45, xxii |
| *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). | 25 |
| *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019). | 35, 36 |
| *Knight First Amendment Institute v. Trump*, 928 F.3d 226, 234 (2d Cir. 2019). | 29 |
| *Kreimer v. Bureau of Police for Morristown*, 958 F.2d 1242, 1259–60 (3d Cir. 1992) | 29 |
| *LiDonni, Inc. v. Hart*, 355 Mass. 580, 583 (1969). | 16 |
| *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). | 33 |
| *Mainstream Loudoun v. Board of Trustees*, 24 F. Supp. 2d 552, 563–64 (E.D. Va. 1998). | 29 |
| *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819). | 24 |
| *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). | 26 |
| *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007). | 30 |
| *Missouri Pacific Railway Co. v. Larabee Flour Mills Co.*, 211 U.S. 612, 622 (1909). | 31 |

| | |
|---|---|
| *Modernizing Common Carrier Rules, Report and Order*, 32 FCC Rcd. 968 (2017) (WC Docket No. 15-33), 2017 WL 4023987 | 26 |
| *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019). | 19 |
| *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC* (NARUC I), 525 F.2d 630, 640 (D.C. Cir. 1976). | 21, 21 |
| *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC* (NARUC II), 533 F.2d 601 (D.C. Cir. 1976). | 21 |
| *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). | 15 |
| *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 541–42 (E.D. Va. 2003). | 39 |
| *Nw. Bell Tel. Co. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999). | 43 |
| *N.Y., New Haven & Hartford R.R. Co. v. Nothnagle*, 346 U.S. 128, 131–32 (1953). | 32 |
| *N.Y. State Telecomms. Ass'n v. James*, 101 F.4th 135, 144–45 (2d Cir. 2024). | 30 |
| *O'Brien v. W. Union Tel. Co.*, 113 F.2d 539 (1st Cir. 1940). | 38 |
| *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). | 12 |
| *Peabody v. Norfolk* (98 Mass. 452, 1868). | 16 |
| *Pa. R.R. Co. v. Ewing*, 241 Pa. 581, 588, 88 A. 775, 777 (1913). | 31 |
| *Perry Educ. Ass'n v. Perry Educators' Ass'n*, 460 U.S. 37, 55 (1983). | 20 |
| *Pierce v. Drew*, 136 Mass. 75 (1883). | 18 |
| *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401–03 (2d Cir. 2004). | 15 |

| | |
|---|---|
| *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099 (E.D. Cal. 2024). | 40 |
| *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017). | 39 |
| *South Dakota v. Wayfair, Inc.*, 585 U.S. ___ (2018). | 24, 28 |
| *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710, at *3 (N.Y. Sup. Ct. May 24, 1995). | 38 |
| *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968). | 24 |
| *Vermilye v. Postal Tel. Cable Co.*, 205 Mass. 598, 91 N.E. 904 (1910). | 16, 17 |
| *Vigeant v. Postal Telegraph Cable Co.*, 260 Mass. 335 (1927). | 32 |
| *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minnesota Pub. Utils. Comm'n*, 19 FCC Rcd. 22404, ¶¶ 30–32 (2004). | 30 |
| *Western Union v. FCC*, 815 F.2d 1495 (D.C. Cir. 1987). | 26 |
| *W. Union Tel. Co. v. Call Publ'g Co.*, 181 U.S. 92, 101–02 (1901). | 31 |

**Constitutional Provisions, Statutes, and Rules**

| | |
|---|---|
| 42 U.S.C. § 1983. | 33, i |
| 42 U.S.C. §§ 2000a–2000a-2 (Title II of the Civil Rights Act of 1964). | 29, i |
| 42 U.S.C. §§ 2000b–2000b-1 (Title III of the Civil Rights Act of 1964). | 29, i |
| 47 U.S.C. § 153 (2018). | 26, iv |
| 47 U.S.C. §§ 201, 202, 207 (2018). | 24, 26, 25, 26, v, vi |

| | |
|---|---|
| 47 U.S.C. § 230 (2018). | 12, 15, 15, 24, 25, 25, 24, 25, 35, 39, 43, vi |
| U.S. Const. amend. I. | 13, 33, x |
| U.S. Const. amend. XIV. | 32, x |
| M.G.L. c. 159, §§ 1-2, 10, 12. | 16, 19, 31, 29, 42, xi |
| M.G.L. c. 166, §§ 16-19. | 32, 42, xi |
| M.G.L. c. 272, §§ 92A, 98 | 27, 28, 28, 29, 28, 29, xiii |
| R.L. c. 70, §§ 1,2 | 42, xv |
| R.L. c. 109, § 24 | 42, xv |
| R.L. c. 122, §§ 1, 9-11 | 42, xvi |
| M.G.S. c. 64, §§ 1, 10 | 42, xvi |
| CA Civ Code 2168 | 44, xvii |
| CA Civ Code 2207-2209 | **Error! Bookmark not defined.**, 18, 40, 41, 41, 43, 43, 44, xvii |

*Other Authorities*

| | |
|---|---|
| Angell, Joseph K. *A Treatise on the Law of Carriers of Goods and Passengers by Land and Water* ch. IV, § 67, at 59, § 75, at 68–69 (5th ed. 1877). | 20, 36, xxii |

| | |
|---|---|
| *Black's Law Dictionary* (12th ed. 2024). | xxi |
| Blackstone, William. *Commentaries on the Laws of England*. Vol. 3, ch. 9, 164–66. Oxford: Clarendon Press, 1768. | 14, xx |
| *The Harvard Crimson, Online Commenting Policy,* https://www.thecrimson.com/article/2008/10/5/the-harvard-crimsons-online-commenting-policy/ (last visited July 2, 2025), https://www.thecrimson.com/about/commenting-policy/ (last visited June 30, 2025). | 15, xviii |
| *Harvard Crimson's Invitation to the Public* | **Error! Bookmark not defined.**, xx |
| *U.S. Postal Serv., History of the USPS Electronic Computer Originated Mail (E-COM) System,* https://about.usps.com/who/profile/history/pdf/ecom.pdf (last visited July 3, 2025). | 45 |

### Glossary

| | |
|---|---|
| Add | Addendum. |
| App | Appendix. |
| Client | A software application—typically a web browser or mobile app—running on a user's device that initiates communication with a server to request or send information. In a web-based system, the client loads and displays HTML content, runs JavaScript, and interacts with the server to transmit messages or receive updates. Clients are the user-facing side of client-server communication architecture. |
| Dkt | District Court Docket Document. |
| HTML (HyperText Markup Language) | A standardized markup language used to create and structure content on the World Wide Web. HTML defines the layout and elements of a web page—such as text, links, images, forms, and scripts—and is interpreted by a user's web browser to render visual and interactive content. It is the foundational language for building websites and |

| | |
|---|---|
| | web applications, including message interfaces and comment platforms. |
| HTTP (Hypertext Transfer Protocol) | The foundational protocol used by the World Wide Web to request and deliver content between clients (typically browsers) and servers. HTTP operates over TCP/IP and follows a **request-response model**, where the client sends a request for a resource (such as a web page or image), and the server responds with the requested data. HTTP defines standard methods (e.g., **GET**, **POST**, **PUT**, **DELETE**) for interacting with resources, and it is critical to the functioning of interactive websites, including online forums and comment platforms. |
| ICP | Information Content Provider. |
| ICS | Interactive Computer Service. |
| IMAP (Internet Message Access Protocol) | A standard email protocol that allows a user to access and manage messages stored on a remote mail server. Unlike POP (Post Office Protocol), which downloads and may delete messages from the server, **IMAP enables real-time synchronization** between the user's email client and the server, allowing emails, folders, and message statuses (e.g., read/unread, flagged) to remain consistent across multiple devices. IMAP is commonly used by webmail and mobile email clients to maintain persistent access to server-hosted mail. |
| IP Packet | A unit of data transmitted over the Internet using the Internet Protocol (IP). Each packet contains two main parts: a **header**, which includes routing and addressing information (such as source and destination IP addresses), and a **payload**, which carries the actual content being transmitted. IP packets are **individually routed**, meaning they may travel different paths to reach the same destination, where they are reassembled into the original message. The packet-switching method underlying IP transmission is fundamental to the operation of email, websites, and other networked services. |
| ISP | Internet Service Provider. |
| JavaScript | A high-level programming language widely used in web development to add interactivity, logic, and dynamic behavior to websites. JavaScript is executed by the user's web browser and enables features such as comment submission, live message updates, and form validation without reloading the page. It is often used in conjunction with HTML to implement complex web applications. |

| | |
|---|---|
| Jonathan Affleck | Jonathan Affleck is the plaintiff before the District Court. He is the Plaintiff-Appellant before the Court of Appeals. Joachim Martillo is the professional name of Jonathan Affleck. |
| Joachim Martillo | Joachim Martillo is the professional name of Jonathan Affleck, who is the Plaintiff-Appellant. Jonathan Affleck is a member of the Harvard Class of 1978. Under the name Joachim Martillo, Jonathan Affleck made substantial contribution to the technological field of cloud computing. |
| Morse Code | A system of communication that encodes text characters as sequences of **dots and dashes** (short and long signals), typically transmitted via sound, light, or electrical pulses. Developed in the 1830s and widely used in **telegraphy**, Morse code allowed messages to be sent over long distances using electrical circuits. Each letter or numeral is represented by a unique pattern, making Morse code one of the earliest forms of **digital communication**. It laid the foundation for later message-based communication systems, including those used in modern data networks. |
| Server | A computer system or software service that provides data, functionality, or resources to other computers, typically over the Internet. In web applications, a server stores and processes user-submitted content (such as messages or comments) and responds to client requests from users' browsers or devices. |
| SMTP | Simple Mail Transfer Protocol. |
| Store-and-Forward | A method of data transmission in which a message is received by an intermediate node (such as a server), stored temporarily, and then forwarded to its destination at a later time. This mechanism is commonly used in email systems and was foundational to telegraph and early computer networks. Unlike real-time transmission, store-and-forward systems allow for delays and ensure eventual delivery, even if the recipient is not immediately available. |
| Transception | A term combining **transmission** and **reception**, used to describe the bidirectional flow of messages or data in a communication system. In modern networking, transception refers to the process by which a device or platform both **sends and receives information**, enabling interactive or conversational data exchange. The concept is foundational to protocols that support **two-way communication**, such as email, chat, or web-based comment systems. |

# PRELIMINARY STATEMENT

On the basis of Section 230 Courts have held lawful the removal of a user or a user's content from a social medium platform in many cases superficially similar to the instant litigation. Those earlier cases were flawed because the plaintiffs in those cases failed to point out the breach of implied-in-fact contract, misunderstood how to make a claim under Title 47 along with state common carriage law, and neglected entirely or fatuously argued state actor doctrine.

Congress meant for the Internet to be a "forum for a true diversity of political discourse[1]" and the Supreme Court held the internet to be the "modern public square.[2]" The failure of earlier plaintiffs to argue their cases effectively has left the Internet susceptible to being divided among controlled censored platforms—the opposite of the intention of Congress.

# STATEMENT OF ISSUES IN REPLY

The Appellee's brief mischaracterizes both the law and also the facts, and it did not waste time. The second sentence of their Preliminary statement misreports the existence of a split at the district court level regarding Section 230. (Appellant's Br. at 22.)

The next few sentences mislead the court to apply a decision that is non-precedential and non-preclusive. This misguidance is repeated later and is particularly surprising

---

[1] See Section 230 (a), (b).
[2] See *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

because this legal error was identified in the Appellant's Brief.

In regard to Harvard Crimson's invoking First Amendment for itself, that Amendment does in fact protect the Crimson in its News Section. However, as appellant already pointed out, Harvard Crimson waived that right in its comments section (only) when it created an implied in fact contract of unbiased deliverance of messages in that section.

Similarly applying a generous interpretation of a misrepresentation, it is understandable that the Crimson may fail to comprehend the Common Carriage and State Action arguments. Those arguments are complex but are explained in a more simple and clear manner below. Part of the misunderstanding of the applicability of the Common Carriage argument appears come from incorrect assumptions about the technical underpinnings of the Internet. These assumptions are common among non-experts and underscore the need for input from technical experts.

With respect to the issue of public accommodation discrimination, Harvard Crimson again misleads the court to refer to a non-precedential decision.

Harvard Crimson used the Appellee's brief newly to assert that the reason for the deletion of the plaintiff's comments was "in good faith to ensure … civility …" This statement is controverted by publicly available evidence, and its falsity can be determined during trial.

Most importantly, the Appellee's Brief fails to address the core issue of breach of implied-in-fact contract, and the precedent, which states Section 230 does not immunize from breach of contract law.[3]

Because of the many reasonable arguments against the applicability of Section 230 immunity, the circuit split on the issue, the inability of Section 230 to trump contract law, the inappropriate use of 12(b)(6) in the face of a circuit split in the context of an affirmative defense, the need for expert testimony, the inappropriate use of a non-precedential decision, and the need for fact finding particularly in regard to whether the acknowledged deletion was for the goal of "civility" or in the bad faith of breach of contract and as to the applicability of state action doctrine, the Court should reverse and remand.

Because of the centrality of the issues of implied-in-fact contract, which is the progenitor both of common carriage law and also of public accommodation law and because of intrinsic use of governmental refusal to enforce implied-in-contract in the argument for application of state action doctrine,[4] the next section will go into detail regarding how this important aspect of contract law applies in the Complaint.

---

[3] See *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009).
[4] See *Add. Blackstone*, p. xx.

# ARGUMENT

Because Section 230 provides no pass to breach an implied-in-fact contract, the Plaintiff makes no accusation that comes within the scope of Section 230 immunity.

## I. Breach of Contract & Platform Terms

The Harvard Crimson's publicly posted commenting policy created an implied-in-fact contract governing user participation on its platform. See p. xviii. By inviting comments under clear rules—e.g., profanity, impersonation, or off-topic content—Harvard Crimson offered a rule-based forum for discourse. Appellant and others accepted by commenting under those rules, providing content and engagement that benefited Harvard Crimson—akin to barter or work for carriage.[5]). (Compl. ¶ 10, Dkt. 1, at 2; App'x 30.) Courts have held that public terms, coupled with reciprocal participation, may establish mutual assent. See *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401–03 (2d Cir. 2004); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Harvard Crimson allegedly deleted Appellant's comments solely due to political or religious viewpoint, not policy violation. That conduct violates the very terms under which Appellant engaged and constitutes a breach of contract.

Courts recognize that implied-in-fact contracts arise from party conduct and expectations where services are accepted under public terms. See *Baltimore & Ohio R.*

---

[5] See *Interstate Commerce Comm'n v. Balt. & Ohio R.R.*, 145 U.S. 263, 275 (1892) (recognizing common carriage obligation where service is offered to the public "for fair compensation to the carrier"). Barter or work can be fair compensation.

*Co. v. United States,* 261 U.S. An implied-in-fact contract is 'founded upon a meeting of minds,' inferred from conduct showing a tacit understanding. 592, 597 (1923). *LiDonni, Inc. v. Hart*, 355 Mass. 580, 583 (1969). Such conduct fits the kind of mutual, platform-based relationship courts have recognized as forming enforceable digital contracts. By deleting Appellant's comments based on viewpoint, Harvard Crimson breached its published policy and the implied-in-fact contract.

## II. The Crimson Bears Common Carriage Duties Under Massachusetts Law as a Provider of Public Message Transmission

Even where the federal government has classified services as "information services," Massachusetts law recognizes that common carriage duties may still apply to entities that offer to transmit messages for the public under general terms. By operating a public comment platform that transmits user content, Harvard Crimson assumes nondiscrimination duties of a common carrier. Under Massachusetts precedent and statutory language, Harvard Crimson may be held to such duties as a common carrier of reader messages.

Massachusetts law recognizes that an entity transporting messages, which are from the standpoint of M.G.L. c. 159, § 1 intangible "other property,"[6] are subject to

---

[6] Because *Peabody v. Norfolk* (98 Mass. 452, 1868) teaches a year before the enactment M.G.L. c. 159, § 1 (App'x 60) that intangible property exists in a trade secret, the plain language of M.G.L. c. 159, § 1 makes punishable denial of common carriage of a message (intangible "other property") by a social medium platform like Harvard Crimson's comment service. M.G.L. c. 159, § 2 defines the penalty for denial of message transport. The decision in *Vermilye v. Postal Tel. Cable Co.,* 205 Mass. 598, 91

common carriage obligations because the entity holds out transport to the public for fee under standard terms.[7] These obligations apply regardless of whether the entity is a traditional telecommunications company or an internet-based platform, provided that it undertakes the role of message transmission on a non-selective basis. Harvard Crimson's operation of an online comment section—inviting public discussion contributions, publishing user-generated content, and moderating according to stated terms—mirrors the historical function of message transmission services like telegraph companies, which the Commonwealth has long classified as common carriers.

## A. Massachusetts Recognizes Message Transmission as a Common Carrier Function

Massachusetts common law and statutory law impose common carriage obligations on entities that transmit intelligence among members of the public, regardless of medium. Historically, this duty applied to telegraph companies, which were recognized as common carriers of messages. In *Vermilye v. Postal Tel. Cable Co.*, 205 Mass. 598, 91 N.E. 904 (1910*)*, the Supreme Judicial Court allowed a common law action to proceed against a telegraph company for refusing to transmit a message. The first count in the complaint sought damages under common law for the defendant's

---

N.E. 904 (1910) indicates that a Massachusetts court has long applied this law to common carriage of a message.

[7] A common carrier has an insurer's obligation in addition to the implied-in-fact contract to transport without discrimination. A government-subsidized telegraph is a common carrier that has some special duties to the government.

refusal to carry a message (intangible "other property"), and the Court found the allegations sufficient to survive demurrer. This precedent affirms that message carriers owe a duty to serve all customers without unreasonable discrimination, a core principle of common carriage and that denial of common carriage of a message is a penalizable offense in Massachusetts (and many other states).

Massachusetts General Laws are explicit that transmission of intelligence by electricity is a form of common carriage. M.G.L. c. 159, § 12 provides that "the following services, when furnished or rendered for public use within the commonwealth… [are] collectively called common carriers and severally called a common carrier: … (d) The transmission of intelligence[8] within the commonwealth by electricity, by means of telephone lines or telegraph lines or any other method or system of communication…" This broad statutory language captures not only traditional telegraphy but also analogous modern forms of communication, including a modern digital and online platform that serves a comparable function. (A legacy telegraph used

---

[8] A common carrier of messages according to California Civil Code could provide a service of transmission of intelligence by electricity according to Massachusetts General Laws. The California legislature formulated the law of common carriage of messages more generally than Massachusetts did. The California laws were intended to cover the Morse code telegraph system, pneumatic tube mail, and several electrical message transport systems that were not government-supported Morse code telegraph systems. In Massachusetts General Law, a pneumatic tube mail system probably provided common carriage of physical other property under M.G.L. c. 159, § 1. The phrase "transmission of intelligence by electricity" has been used in Massachusetts statutes and caselaw since the 1860s. See *Pierce v. Drew*, 136 Mass. 75 (1883) for an example of Massachusetts legal usage.

electrical digital transmission by wires or by wireless means just as a modern social medium platform does.)

By soliciting, transmitting, and publicly displaying user-submitted comments in real time, Harvard Crimson has operated a platform that shares essential features with legacy telegraphy: asynchronous communication among members of the public and origin-to-destination message carriage. Insofar as it provides such a message transmission service to the public, Harvard Crimson should be deemed a common carrier under both the common law and M.G.L. c. 159, § 12. Its refusal to carry Appellant's message based on viewpoint, while continuing to carry others, violates its duty to serve all on nondiscriminatory terms.

While the FCC may have reclassified some internet services as "information services" for federal regulatory purposes, that classification does not displace state common law unless preempted expressly or by clear implication.

The Supreme Court has held that the FCC may classify broadband as an "information service," see *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1002-3 (2005), but this classification alone does not immunize providers from all regulation. As the D.C. Circuit later held, the FCC's deregulatory posture does not authorize it to preempt state laws without clear statutory authority. *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019) ("[T]he Commission ignored binding precedent by failing to ground its sweeping preemption directive—which would

block all fifty States from regulating broadband internet service—in a lawful source of statutory authority.").

## B. Harvard Crimson's Comment Platform Performs the Functions of a Traditional Message Carriage Conduit or Facility

Harvard Crimson's online comment platform functions as a digital conduit or facility[9] for the public exchange of messages. By allowing users to converse among themselves by posting comments on news stories, Harvard Crimson actively facilitates communication between each reader and the broader community of readers and may thus expand the community of readers. It transmits messages from a reader to another reader or to the writer of the article, publicly and at scale. Harvard Crimson is not compensated directly with money for this transmission is irrelevant to its legal status because Harvard Crimson receives fair or reasonable compensation for transport of messages among readers[10]; common carriage duties have historically attached to message carriers that operate for public benefit, regardless of pricing models.

---

[9] See *Perry Educ. Ass'n v. Perry Educators' Ass'n*, 460 U.S. 37, 55 (1983) (mail or message carriage among employees of a school system is a facility within a government institution).

[10] See Joseph K. Angell, *A Treatise on the Law of Carriers of Goods and Passengers by Land and Water* ch. IV, § 67, at 59 (5th ed. 1877) ("It is not even necessary, to charge him as carrier, that a specific sum should be agreed upon for carriage, although he is entitled to reasonable compensation.")

Under the test established in *National Ass'n of Regulatory Utility Commissioners v. FCC* (*NARUC I*), 525 F.2d 630, 641–42 (D.C. Cir. 1976), a service qualifies as a common carrier when it holds itself out to carry for all people indifferently and transmits communications of others for hire even if the FCC rules that the service is an Information Service. Harvard Crimson's comment platform meets the NARUC I standard, which is equivalent to common carriage doctrine in the common law of every state.

Appellee argues that newspapers are not common carriers. True. But Appellant does not allege that the *newspaper itself* is a carrier—only that its **digital comment system, which is completely separable from Harvard Crimson's printed journal service and from Harvard Crimson's online news service,**[11] operates as such. See *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC* (NARUC II), 533 F.2d 601, 608 (D.C. Cir. 1976) ("It is commonplace that one may be a common carrier with regard to some activities but not others.").[12] This point can be made more concretely. While Harvard Crimson publishes both a physically printed journal and also an online journal, with

---

[11] Havard Crimson proved the separability of its online news service from its comments service. **Appellee's Br. 4** ("Until relatively recently, readers could comment on articles that they read on The Crimson's website."); **Dkt. 12, at 3; App. 51** ("Indeed, the Crimson has since removed its comment section in its entirety as a result of this incident.").

[12] Likewise, the Massachusetts Supreme Judicial Court observed in *Dwight v. Brewster*, 1 Pick. 50, 52 (Mass. 1822), "one who undertakes for hire to transport the goods of such as choose to employ him, from place to place; … might be carried on at the same time with other business."

respect to its online journal, Harvard Crimson is functionally more like a 19th, 20th, or 21st century news agency, *e.g.*, Reuters or Associated Press, than like a print newspaper because both an online journal and a news agency transmit news articles electrically by wire or by wireless means. A court has recognized since the 1870s that a news agency could provide common carriage of messages: *Dickson v. Reuter's Telegram Co.*, (1877) 3 C.P.D. 1 (Eng.), (holding that a telegraph company, which was analogous to a common carrier according to several UK judges, was not liable for innocent misdelivery of a private message to recipient). In 1877, laws, which pertained to common carriage of a message in the UK and in the USA, were similar. The UK ruling cited authorities from the USA.

## C. Discriminatory Refusal to Carry Comments Invokes State Common Carriage Protections

Massachusetts law prohibits carriers from "unjustly or unreasonably refus[ing] to receive, transmit or deliver any message," whether by statute or common law implication. When Harvard Crimson selectively deletes messages based not on content-neutral violations of stated policy, but on disfavored political or religious viewpoints, it engages in precisely the sort of arbitrary discrimination that common carriage doctrine forbids. The use of dog whistles like "vexatious and inappropriate" (Appellee's Br. 2) or "frenzy" (Appellee's Br. 17) are an attempt to gain a license to deny transport of messages that contain disfavored political or religious views in violation of fundamental

obligation of common carriage law.[13] Racists often argued that the behavior of blacks was "vexatious and inappropriate" in order to exclude blacks from a place of public accommodation or from use of a facility within a place of public accommodation.[14]

This obligation aligns with the Commonwealth's broader commitment to nondiscriminatory access in communications. Even absent direct FCC oversight, the state retains authority to protect its residents from unjust exclusion by entities offering message transmission services to the public. Just as a telegraph office could not refuse to send messages critical of powerful interests, a digital platform that solicits public comment cannot selectively silence disfavored political views while holding itself out as a neutral public conduit or facility.

## III. Non-Discrimination Duties and Public Facility

The Harvard Crimson's online comment platform satisfies the legal criteria for common carriage and functions as a facility of public accommodation under both Massachusetts law and constitutional doctrine. By inviting the general public to submit comments without individualized terms or negotiation, the platform acts as **a public**

---

[13] Harvard Crimson did not make allegation of "vexatious and inappropriate" messages before the Trial Court. Not did Harvard Crimson assert that the Plaintiff transmitted a "frenzy" of messages. In fact, Harvard Crimson denied transport of messages from practically all readers, whose messages expressed similar political or religious beliefs. Compl. ¶ 21, at 6; App. 34.

[14] Vexatious and inappropriate behavior is indefinite and defined by comparison with other users of the message facility. Harvard Crimson had no problem with other messages, for which other readers requested transmission. See Compl. ¶ 21, p. 6 (App'x 34).

**facility that provides neutral conduit for public expression**. Harvard Crimson discriminates and gives some groups preferences with respect to the use of this public facility.

### Harvard Crimson's Failure to Transport a Message Can Be Litigated Under Section 202 Despite Section 230

The mere advancement of technology does not nullify statutory obligations or render statutory language obsolete. The Supreme Court has long recognized that laws drafted in general terms remain applicable even as the technological context evolves. In *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), the Court upheld the Federal Communications Commission's authority to regulate cable service under the Communications Act of 1934, even though cable service was not envisioned in 1934. The Court affirmed that statutory powers extend to new technologies so long as the statute's language and purpose are sufficiently broad. Similarly, in *South Dakota v. Wayfair, Inc.*, 585 U.S. ___ (2018), the Court applied longstanding principles of taxation to modern e-commerce, holding that the proliferation of internet-based retail did not exempt online merchants from compliance with state sales tax regimes. These decisions affirm that the continuing relevance of a statute does not hinge on the specific technologies that existed when it was enacted. As Chief Justice Marshall explained in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819), "[w]e must never forget that it is a constitution we are expounding… intended to endure for ages to come, and

consequently, to be adapted to the various crises of human affairs,"—a principle equally applicable to enduring statutory frameworks.

Section 230 of the Communications Decency Act does not preempt federal or state common carriage law, nor does it preempt state contract law. By its own terms, Section 230 only bars claims that seek to treat an interactive computer service provider "as the publisher or speaker" of content created by third parties. See 47 U.S.C. § 230(c)(1). The statute contains an explicit savings clause preserving state laws that are "consistent with this section." *Id.* § 230(e)(3). Courts have uniformly held that contract claims are not preempted because they do not impose liability based on publication, but rather on voluntary undertakings by the service provider. See *Barnes,* 570 F.3d at 1107. Likewise, state or federal common carriage laws do not impose publisher liability but instead require neutral service provision under public-facing terms—duties that are structural, nondiscretionary and contractual[15], not editorial. If Congress had intended Section 230 to override traditional common carriage obligations, including those codified in 47 U.S.C. § 202, it would have said so explicitly. It did not. Courts must presume that Congress did not silently displace longstanding public-service duties without clear and manifest intent. See *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624

---

[15] "The maliciousness and contractual bad faith of both Harvard Crimson's denial of common carriage and also Harvard Crimson's refusal to allow Mr. Affleck to convey unpublished literary property to the public justifies assessing a higher penalty…" Compl. ¶ 31, p. 7 (App'x 31).

(2018) (Repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest); see also *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (presumption against preemption in areas of traditional state regulation).

As recently as January 2006, Western Union was still providing store-and-forward wire communication services over interstate networks.[16] These services fell under the statutory definitions in 47 U.S.C. § 153(11), (59), and had not been reclassified or exempted from regulation by the FCC.

The D.C. Circuit in *Western Union v. FCC*, 815 F.2d 1495 (D.C. Cir. 1987), affirmed that Western Union's telegraph business was subject to nondiscrimination and rate regulation under 47 U.S.C. §§ 201–202. There is no evidence of a subsequent reclassification.

The FCC formally ceased to regulate telegraph service with **Modernizing Common Carrier Rules**, Report and Order, **32 FCC Rcd. 968 (2017)** (WC Docket No. 15-33), **2017 WL 4023987** (removing obsolete telegraph-related regulations from Title II and the CFR. **This order does not indicate that the FCC no longer has regulatory authority over a modern telegraph service like a social medium platform's common carriage of messages, which is at least as subsidized as legacy telegraph systems** but

---

[16] The Internet is a store-and-forward network just like a telegraph network because the Internet is a modern version of a telegraph network.

differs from older telegraph service by using IP packets instead of Morse code. While the order indicates that the FCC refrains from regulating a modern telegraph service, a federal court still has jurisdiction over a complaint against a telegraph service and should be able to entertain a complaint under 47 U.S.C. 202.

FCC action indicates that continued regulation of a modern telegraph service like common carriage of messages by a social medium platform has been consistent with the Telecommunications Act of 1996.

## Harvard Crimson is a Retail Establishment and a Public Communications Facility That Taints a Government Institution or a Place of Public Accommodation with Unlawful Discrimination

Harvard Crimson is a place of public accommodation within the meaning of M.G.L. c. 272, § 92A. That provision defines a public accommodation as any place or service which is open to and accepts or solicits the patronage of the general public. Massachusetts courts interpret this provision broadly and remedially. Although there is no reported Massachusetts decision directly addressing Internet-based services under this statute, the statutory language and interpretive case law support the inclusion of public-facing online platforms.

Under Massachusetts law, a "retail establishment," which even before the Internet did not need to host a customer in a physical location and could operate purely by means

of mail order, is expressly included within the scope of **M.G.L. c. 272, § 98**, which prohibits discrimination in places of public accommodation. Harvard Crimson is a retail establishment and subject to this statute because Harvard Crimson integrates retail service along with its comment service into its online platform. The statute is remedial in nature and must be interpreted broadly to fulfill its purpose of preventing discrimination in all forms of public engagement, including commerce.[17]

In today's Internet-enabled environment, a brick-and-mortar places of public accommodation almost invariably integrates an Internet facility and a social medium platform facility into the experience of the place of public accommodation, and **the platform as an extension of the place of public accommodation** may not discriminate against a protected class federally or against anyone according to Massachusetts law.

Harvard Crimson eviscerates public accommodation civil rights law when it tries to defend itself from civil rights law by asserting that it is not a physical place of public accommodation even though it is now integrated into practically every place of public

---

[17] *South Dakota v. Wayfair, Inc.*, 585 U.S. ___ (2018) supports an expansive understanding of retail establishment in M.G..L c 292, s 92A. An alternative more radical argument can be made to demonstrate that an online retailer is a place of public accommodation. A circus is a temporarily assembled place of public accommodation. When a user makes a purchase over the Internet, his computing device temporarily becomes part of the retail establishment when the website of the retailer transmits an HTML document that contains a program to transform the user's computer into a cash register of the retailer. The location of the user's computing device becomes temporarily a place of public accommodation of the retailer.

accommodation[18] and into practically every governmental institution[19] because the Internet is now integrated into practically every place of public accommodation and into practically every government institution.

Federal courts recognize Internet-based facilities as integral components of public accommodations or forums. In *Mainstream Loudoun v. Board of Trustees*, 24 F. Supp. 2d 552, 563–64 (E.D. Va. 1998), and *Kreimer v. Bureau of Police for Morristown*, 958 F.2d 1242, 1259–60 (3d Cir. 1992), courts held that Internet terminals in public libraries constituted protected public facilities. In *Packingham*, 582 U.S. at 104 and *Knight First Amendment Institute v. Trump*, 928 F.3d 226, 234 (2d Cir. 2019), the judiciary acknowledged that social media platforms are vital channels for civic discourse and subject to constitutional protections.

These authorities confirm that Internet-based services, when provided as part of a civic or educational platform open to the public, are subject to nondiscrimination duties grounded in both statutory and constitutional frameworks.

While federal law restricts "places of public accommodation" to enumerated physical establishments, Massachusetts law **imposes no such limitation**. M.G.L. c. 272, § 92A defines a public accommodation as "any place… which is open to and accepts or solicits the patronage of the general public," a definition that is both **expansive and**

---

[18] See 42 U.S.C. §§ 2000a–2000a-2.
[19] See 42 U.S.C. §§ 2000b–2000b-1.

**purposefully remedial**. Although no reported Massachusetts decision squarely addresses whether **Internet-based businesses** fall within the statute, the statutory language, together with Massachusetts courts' **liberal interpretive approach**, supports the conclusion that **an online platform which solicits and accepts public participation—such as a comment forum or public-facing social medium—is a facility of public accommodation** under state law and embedded in practically every government institution and practically every place of public accommodation.. This conclusion is bolstered by analogous cases in other jurisdictions and the evolving recognition of the Internet as a vital conduit for access to services and public discourse.

### IV. Federal Law and Non-Preemption of State Law (When the FCC Claims No Regulatory Authority)

The Supreme Court in *Brand X, 545 U.S. at 981 n.1*, noted that classification as an "information service" under Title I does not preempt all regulation. In *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007), the Eighth Circuit upheld FCC preemption of state law for Vonage's VoIP service only because the FCC had expressly barred state regulation. In the absence of such an order, states retain authority.[20] See *N.Y. State Telecomms. Ass'n v. James*, 101 F.4th 135, 144–45 (2d Cir. 2024). (Appellant's Br. 23.)

---

[20] See *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minnesota Pub. Utils. Comm'n*, 19 FCC Rcd. 22404, ¶¶ 30–32 (2004).

Therefore, Massachusetts remains empowered to enforce its common carriage law, which explicitly includes services that transmit "intelligence… by telephone lines or telegraph lines or any other method or system of communication." M.G.L. c. 159, § 12. The Harvard Crimson's digital comment system meets this functional definition common carriage.

**Federal Preemption Does Not Prevent Litigation Under Massachusetts Common Carriage and Telegraph Law (When the FCC Claims Regulatory Authority)**

As courts have long recognized, state enforcement of common carriage obligations remains valid even where federal regulation exists, so long as the state law does not conflict with federal mandates. In *Missouri Pacific Railway Co. v. Larabee Flour Mills Co.*, 211 U.S. 612, 622 (1909), the Supreme Court held that "Congress has not undertaken to regulate the purely domestic commerce of a state," and that states may impose remedies upon carriers "for refusal to perform the public duties imposed by the state in respect to internal commerce." This principle applies not only to railroads but also to telegraph and message carriers. See also *W. Union Tel. Co. v. Call Publ'g Co.*, 181 U.S. 92, 101–02 (1901) (recognizing that telegraph companies as common carriers and that a state can enforce its common carriage law on a telegraph company). Pennsylvania courts have also upheld state enforcement of common carrier obligations against railroads subject to federal oversight. See *Pa. R.R. Co. v. Ewing*, 241 Pa. 581, 588, 88 A. 775, 777 (1913) (holding that state duties remain enforceable where Congress

31

has "not excluded state action in matters which are of local concern") These principles are consistent with federal jurisprudence affirming that "state regulation of local incidents of the interstate commerce may be permissible" absent conflict. *N.Y., New Haven & Hartford R.R. Co. v. Nothnagle*, 346 U.S. 128, 131–32 (1953).

Accordingly, both Massachusetts' common law penalty and also Massachusetts' statutory penalty for telegraph discrimination, M.G.L. c. 166, § 18, remain valid and enforceable. It imposes no conflict with federal law and merely reinforces the longstanding common carrier obligation of message transmission services to serve without unjust discrimination.

## Harvard Crimson's Comment Platform Provides Common Carriage and Telegraph Service Under Massachusetts Law

Harvard Crimson's comment Platform transports intelligence by electricity as a legacy telegraph did. Massachusetts courts have consistently interpreted "common carrier" in **functional terms** and apply duties of nondiscrimination to any such service, including message conduits.[21]

---

[21] The ruling in *Vigeant v. Postal Telegraph Cable Co.*, 260 Mass. 335 (1927) suggest that a more viable approach to arguing the inapplicability of Massachusetts common carriage law to Harvard Crimson's comment service would make use of the Fourteenth Amendment.

*V. State Action*

Appellee denies the presence of state action, but Appellant alleges both entwinement with a publicly subsidized and state-regulated university and also the state's failure to prevent censorship by a quasi-public platform that has as a common carrier of intangible "other property" contractually waived its First Amendment right to expression through denial of common carriage of messages. (Compl. ¶¶ 22–31, at 6–7; App. 34–35.)

### The Government, Harvard University, and The Harvard Crimson Are Multiply Entwined

Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), and *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), **state action can arise from institutional integration, function, or reliance**. Harvard Crimson's comment platform is embedded within Harvard's Internet infrastructure and serves Harvard's educational and civic mission.

Furthermore, the complaint alleges that government officials have exerted pressure on universities, including Harvard, to suppress disfavored viewpoints. Such pressure can render otherwise private decisions attributable to the state. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982).

The denial of access to Harvard Crimson's platform therefore supports claims under 42 U.S.C. § 1983, for violations of First and Fourteenth Amendment rights.

33

Where the government facilitates, allows, or compels private censorship of publicly accessible forums, courts must treat such conduct as state action under both constitutional and statutory analysis.

## Direct and Indirect State Adverse Action Creates State Action

Harvard University and the entire Harvard community is under unrelenting pressure to abridge speech as the federal and state governments want speech to be abridged. For this purpose, both the federal government and also the state government refrain from enforcing federal and state anti-discrimination law as well as state contract law. Harvard Crimson's Platform operates within state-subsidized university internet infrastructure and is embedded in Harvard's public educational environment. Harvard Crimson relies upon the nonenforcement of federal and state laws of common carriage, civil rights, and public accommodation. Both the federal government and also state government threaten a university with adverse action unless the university abridges speech the government dislikes. This pressure on Harvard University operates on Harvard Crimson through a student employee of Harvard Crimson, who can face expulsion, imprisonment, or loss of a visa because of publishing or speaking ideas that are disfavored by the government. See *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) ("People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around.").

## VI. The Appellee's Brief Demonstrates Inability to Discuss the Technology Accurately without Assistance of Expert Testimony or Reports

The Appellee's Brief indicates Harvard Crimson does not understand how its website or the Internet works. Because the structure of the Internet is confusing to Appellee (Appellee's Br. 29 n. 6.), Appellee puts mistaken reliance on *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019). In *Halleck*, the Supreme Court held that Time Warner, a private cable company, was not a state actor when it operated a public access channel. Crucially, **Time Warner owned and controlled the physical cable infrastructure**, including the access devices that connected subscriber homes to the company's proprietary transmission system. *Id*. at 1926–27.

By contrast, The Harvard Crimson's comment platform **runs atop the global Internet**—a decentralized, and publicly accessible communications infrastructure "owned" collectively by governmental, educational, and private entities around the world. See 47 U.S.C. § 230(f)(1) (defining "Internet" as the "international computer network of both Federal and non-Federal interoperable packet switched data networks").

Moreover, Harvard Crimson does not merely host news articles on its own infrastructure; rather, it **invokes the computing resources of the user's own device**—the reader's smartphone or computer—to execute code (typically JavaScript), transmit comments, and retrieve messages. In so doing, Harvard Crimson transforms the user's device into an **end-station for message transmission and reception**, while **discriminating against that same user** in violation of nondiscrimination norms.

Unlike in *Halleck*, where the company could lawfully exclude speakers from its own cable channel, The Crimson's use of **publicly routed infrastructure** and the user's own **client-side computing** to enable and then suppress speech implicates distinct legal obligations—including those associated with **common carriage, public facilities,** and **state action** under Massachusetts law and federal doctrine.

Appellee claims that Appellant is attempting to "force The Crimson to host his comments on its website." (Appellee's Br. at 3.) The assertion is false. A comment is not hosted anywhere on a Harvard Crimson infrastructure. After a reader enters a comment on his computing device so that it can be transported to readers of the Harvard Crimson, the comment is stored in a comment warehouse (Disqus[22]) until Harvard Crimson's software can transport it from the comment warehouse to the display of a reader's computing device. See p. xviii.

Harvard Crimson expresses even more confusion when Harvard Crimson states, "To be clear, The Crimson operates a website; it does not provide software that runs on computers," Appellee's Br. 29 n.5. A modern comment system often relies on client-side

---

[22] See Joseph K. Angell, *A Treatise on the Law of Carriers of Goods and Passengers by Land and Water* § 75, at 68–69 (5th ed. 1877) (explaining that a person may act as a common carrier in one capacity and merely as a forwarding agent or warehouseman in another, depending on whether they exercise control over the transport and assume the carrier's duty of nondiscriminatory carriage). Disqus is a forwarding agent for Harvard Crimson, which as the common carrier has an implied-in-fact contract with a reader. https://play.google.com/books/reader?id=PrYzAQAAMAAJ&pg=GBS.PA68&hl=en (See p. xxii.)

execution of code supplied by the website. This code is a software program or program script that is embedded in the HTML (.html) document, which a server sends to the client device and which also describes the page, which appears on the client computing device. This software transforms the user's browser into a message transception interface. The comments themselves are transmitted to and stored on a third-party message server—not on Harvard Crimson's web infrastructure. In this respect, the platform functions as a common carrier of messages between readers, rather than as a curated editorial space. Appellee's mischaracterization directly implicates Appellant's claims under common carriage law or public accommodation frameworks, and therefore must be clarified in detail. Harvard Crimson's server transports an HTML program via HTTP to a user's computing device, and this software transforms the user's computing device into a modern evolved telegraph end station. (Today, in the case of a modern telegraph system/social medium platform, the operator, who entered a proffered messaged into the telegraph system, is no longer needed.)

Harvard Crimson's material falsehoods or confusion is not limited to its two erroneous foregoing assertions. Expert testimony and an expert report is needed to present the facts in the Trial Court. If such misunderstanding can be corrected in a trial,

the controversies and circuit splits over a social medium platform can probably be resolved equitably and fairly.[23]

## VII. Martillo v. Twitter and Other Prior Proceedings Are Not Preclusive

Appellee repeatedly cites *Martillo v. Twitter*, 2022 WL 18862030 (1st Cir. 2022), to suggest that this instant case is foreclosed. But the earlier case involved **different claims**, **a different defendant**, and was dismissed **without prejudice under § 1915(e)**. The Supreme Court in *Denton v. Hernandez*, 504 U.S. 25, 34 (1992), held that such dismissals are **not preclusive**.

---

[23] Confusion about the message transport function of the Internet has existed since the New York Supreme Court issued *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710, at *3 (N.Y. Sup. Ct. May 24, 1995). Prodigy was both an ICS and an early type of ISP. In addition, Prodigy was an ICP and implemented an elementary virtual reality system called Money Talk. In physical reality Prodigy provided common carriage of messages among users of Money Talk. As a common carrier of messages, Prodigy had the right to exercise nondiscriminatory denial of transport of an unfit message. Because of the N.Y. Supreme Court's confusion between virtual and physical reality, Congress enacted Section 230 to underscore that Prodigy and even a social medium platform, which like Harvard Crimson is not an ISP, has rights and immunity of a common carrier of messages. *O'Brien v. W. Union Tel. Co.*, 113 F.2d 539, 541 (1st Cir. 1940) ("The telegraph company is a common carrier and not a publisher."). In 1940 an employee of Western Union Telegraph Co. read a message entered into its system and could remove an unfit message from transport. Yet, Western Union was not liable for failure to remove an unfit message. Prodigy was likewise not liable for failing to deny transport to an unfit message even if Prodigy had previously denied transport to an unfit message. But for the confusion between virtual reality and physical reality, Section 230 would be unnecessary. Section 230, in fact, underscores that an entity like the Money Talk service or the Harvard Crimson comments service provides common carriage and must fulfil the terms of the implied-in-fact contract of common carriage.

The instant appeal involves a paid filing, new legal theories (e.g., contract and common carriage), and a distinct factual record. There is no bar to adjudicating these claims on their merits.

### VIII. The Defendant Attempts to Overwhelm this Court with an Avalanche of Cases Whose Claims for Relief Come Within the Scope of the Shield of Section 230 but Have No Similarity to the Claims for Relief of the Plaintiff

#### Overview of the Avalanche of Irrelevant Cases.

The Defendant's Authorities demonstrate that the Plaintiff's legal theory is novel, while a few cases may indirectly involve adjacent legal principles, not one listed case explicitly refers either to a social medium platform's implied-in-fact contract for common carriage or to discrimination in a public facility which is today almost universally embedded within a government institution or within a place of public accommodation. Appellant has addressed the problematic nature of precedents like *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 541–42 (E.D. Va. 2003) and *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) elsewhere. See Dkt. 14 n.5 at 4 (App. 74); Dkt. 30 § 3 at 10 (App. 132). As the Plaintiff has pointed out, today the Internet and a discriminatory social medium platform like Harvard Crimson's comment service is embedded in practically every governmental institution and every place of public accommodation.

Because the Appellant asserts, "A 2024 social medium platform provides an email service that has a niftier user interface than an ordinary Internet email service (Compl. ¶

13 & n.4, at 3; App. 31),” the Appellee’s most on-point authority is *Republican Nat’l Comm. v. Google LLC*, 742 F. Supp. 3d 1099 (E.D. Cal. 2024).

**Modern Digital Platforms Qualify as Common Carriers of Messages Under California Civil Code §§ 2207–2209**

In *RNC v. Google*, No. 2:22-cv-01904-DJC-JDP, Dkt. 53, at 11, the district court’s description of email transmission misapprehends how messages are routed and delivered. The court stated that “it is not Google that transports the messages, but rather the various computers that comprise the network.” This statement is factually incorrect. By similar logic the court could assert that AT&T does not transport a voice call but rather the various switches (computers) that comprise the network. Google’s servers receive the message directly from a downstream network source and store it until the user retrieves it using IMAP or a webmail interface, which requests the Google server to transmit the message to the user.

**Google’s mail servers are not passive endpoints**, but **integral transport agents** that **receive**, **route**, **filter**, **store, and transmit** the email. Google both **accepts and then carries messages either to an intermediate destination or to a final destination**— functionally indistinguishable from message carriage duties traditionally imposed on telegraph companies. Google is therefore a **carrier of messages**, not merely a passive terminal.

California's Civil Code imposes binding duties on "common carriers of messages," a public calling that encompasses not only 19th-century telegraphy but **any enterprise that undertakes to transmit messages from one person to another for hire**. **California Civil Code §§ 2207–2209**, enacted in 1872 and still in force, codify affirmative duties of nondiscrimination and neutrality, enforceable through a statutory private right of action. These duties apply to **all message carriers**, regardless of medium or transmission method, and logically extend to digital platforms that carry user messages for compensation.

## A. The Statutes Do Not Limit Common Carriage to Telegraphy or Physical Transport

Section 2207 governs "carriers of messages by telegraph," requiring immediate or prioritized transmission. Section 2208, by contrast, regulates "common carriers of messages, otherwise than by telegraph," mandating that messages be transmitted (not physically transported) in the order received, subject only to narrow governmental exceptions. Section 2209 establishes a statutory remedy: recovery of actual damages and a $50 penalty for unjustified refusal or delay.

Critically, these provisions:

- Do **not restrict "message"** to any specific format—digital, printed, or Morse-coded;

- Do **not confine "transmit"** to physical carriage;

41

- And explicitly distinguish (government-subsidized) **telegraphy from all other modes of message transmission**, confirming the legislature's intent to govern both present and future technologies.

That intent is reinforced by the statutes' **deliberate generality**, enacted during a period of technological flux. The California Legislature's approach mirrors that of **Massachusetts**, which as early as 1851 acknowledged common carriage of **"intelligence transmitted by electricity"** and applied nondiscrimination principles to telegraph services and message-based carriers. See pp. xi, xii, xv, xvi.

## B. Digital Platforms Functionally Qualify as Message Carriers

Modern messaging platforms—email providers, social networks, and comment systems—routinely:

- Accept user-generated messages for delivery to other users;

- Transmit those messages across private and public networks within the Internet; and

- Hold themselves out as facilitators of public or user-directed communication.

This is not editorial discretion or passive publication. These services operate as **conduits** for directed, person-to-person messaging. Accordingly, they fall squarely

within the meaning of **§ 2208** as **"carriers of messages, otherwise than by telegraph.[24]"**

California law anticipates and prohibits **arbitrary discrimination** once a service has undertaken the public duty of message transmission.

### C. The Statutes Remain Fully Enforceable Absent Federal Preemption

Sections 2207–2209 remain in force, are self-executing, and provide a **statutory cause of action** under California law. Nothing in the **Communications Act of 1934, as Amended by the Telecommunications Act, Section 230**, or any other federal statute expressly or impliedly preempts the enforcement of neutral, non-content-based common carriage obligations applicable to message carriers.

Absent a clear federal conflict, states retain longstanding authority to regulate **public-facing service relationships** under **contract, tort, and common carriage law**. See *Nw. Bell Tel. Co. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999). The Supreme Court in *Brand X,* 545 U.S. at 981–82 likewise emphasized that "information services" are not *per se* immune from state law.

### D. The RNC Court's Failure to Address §§ 2207–2209 Was Legal Error

Appellee relies on *Republican Nat'l Comm. v. Google LLC*, 2023 WL 6215295 (E.D. Cal. 2023), to argue that email or messaging platforms are not common carriers

---

[24] The assumption, which alleges a modern social medium platform receives no government subsidy, is questionable.

under California law. But that decision rests on an **incomplete and erroneous reading** of the statutory framework. The RNC court relied **exclusively** on § 2168, which excludes **telegraph messages**,[25] while **ignoring Article 4 entirely**—including **§§ 2207–2209**, which specifically regulate **carriers of messages by other means**.

That oversight is not a reasoned distinction—it is a **legal omission**. These provisions were enacted **as part of the same 1872 Civil Code** and reflect the California Legislature's intent to distinguish among types of message carriers, not to narrow the doctrine. A court's failure to analyze controlling law is not binding precedent; nor should it immunize modern message platforms from **well-settled duties of nondiscrimination**.

Just as Massachusetts imposed common carriage duties on **message carriers using electric transmission**, California's Civil Code **affirmatively extends those duties** to message services operating outside of traditional telegraphy. The statutory text could not be clearer: digital platforms that undertake to carry user messages are "common carriers of messages" under § 2208.

### Conclusion

**California Civil Code §§ 2207–2209** establish enduring, technology-neutral duties for common carriers of messages. These duties apply to any entity that offers

---

[25] In California law telegraph systems were special because they were government subsidized and owed special obligation to the government. Other common carriers of messages of the time period were not so subsidized and did not owe the government special service.

message transmission to the public for value. Digital platforms that accept user communications for delivery—whether in exchange for money, labor, content, or attention—are functional message carriers and subject to nondiscrimination obligations under California law. Judicial rulings that overlook these provisions lack legal authority and should not be followed. Properly construed, California's statutory scheme is consistent with Massachusetts common and statutory law and provides a robust foundation for holding modern platforms to account when they suppress, delay, or deny carriage in violation of public duty. In 1979, the FCC agreed when it held that the computer communications message transport component of E-Com[26] (an early form of email) came under its regulatory authority because this email service was common carriage by wire.[27]

## CONCLUSION

On the basis of the foregoing analysis of the application of implied-in-fact contract in the context of the Complaint, Appellant respectfully requests that this Court reverse the district court's dismissal and remand for further proceedings.

Respectfully submitted by the Plaintiff-Appellant

---

[26] See *U.S. Postal Serv., History of the USPS Electronic Computer Originated Mail (E-COM) System,* https://about.usps.com/who/profile/history/pdf/ecom.pdf (last visited July 3, 2025).
[27] See *Electronic Computer Originated Mail (ECOM)***,** Memorandum Opinion and Order, 72 F.C.C.2d 766 (1979) (terminating proceeding), [FCC 79-465, CC Docket No. 79-6]. See also p. xxii.

*Jonathan Affleck*

Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94702
Jonathan.Affleck@protonmail.com
(617) 276-5788
*pro se*

Signature:

Dated:

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellee

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
### ADDENDUM

### *Add. 42 U.S. Code § 1983 – Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### *Add. 42 U.S. Code § 2000a – Prohibition against discrimination or segregation in places of public accommodation*

**(a) EQUAL ACCESS**
All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

**(b) ESTABLISHMENTS AFFECTING INTERSTATE COMMERCE OR SUPPORTED IN THEIR ACTIVITIES BY STATE ACTION AS PLACES OF PUBLIC ACCOMMODATION; LODGINGS; FACILITIES PRINCIPALLY ENGAGED IN SELLING FOOD FOR CONSUMPTION ON THE PREMISES; GASOLINE STATIONS; PLACES OF EXHIBITION OR ENTERTAINMENT; OTHER COVERED ESTABLISHMENTS**

Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

(1)

any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2)

any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(3)

any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4)

any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

**(c) OPERATIONS AFFECTING COMMERCE; CRITERIA; "COMMERCE" DEFINED**

The operations of an establishment affect commerce within the meaning of this subchapter if (1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers of a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b), it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

**(d) SUPPORT BY STATE ACTION**

Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

**(e) PRIVATE ESTABLISHMENTS**

The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b).

## *Add. 42 U.S. Code § 2000b – Civil actions by the Attorney General*

**(a) COMPLAINT; CERTIFICATION; INSTITUTION OF CIVIL ACTION; RELIEF REQUESTED; JURISDICTION; IMPLEADING ADDITIONAL PARTIES AS DEFENDANTS**

Whenever the Attorney General receives a complaint in writing signed by an individual to the effect that he is being deprived of or threatened with the loss of his right to the equal protection of the laws, on account of his race, color, religion, or national origin, by being denied equal utilization of any public facility which is owned, operated, or managed by or on behalf of any State or subdivision thereof, other than a public school or public college as defined in section 2000c of this title, and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly progress of desegregation in public facilities, the Attorney General is authorized to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section. The Attorney General may implead as defendants such additional parties as are or become necessary to the grant of effective relief hereunder.

**(b) PERSONS UNABLE TO INITIATE AND MAINTAIN LEGAL PROCEEDINGS**

The Attorney General may deem a person or persons unable to initiate and maintain appropriate legal proceedings within the meaning of subsection (a) of this section when such person or persons are unable, either directly or through other interested persons or organizations, to bear the expense of the litigation or to obtain effective legal representation; or whenever he is satisfied that the institution of such litigation would jeopardize the personal safety, employment, or economic standing of such person or persons, their families, or their property.

### *Add. 42 U.S. Code § 2000b-2 – Personal suits for relief against discrimination in public facilities*

Nothing in this subchapter shall affect adversely the right of any person to sue for or obtain relief in any court against discrimination in any facility covered by this subchapter.

### *Add. 47 U.S. Code § 153 – Definitions*

For the purposes of this chapter, unless the context otherwise requires—

…

**(11) Common carrier**
The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

…

**(24) Information service**
The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

…

**(50) Telecommunications**
The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

**(51) Telecommunications carrier**
The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

**(52) Telecommunications equipment**

The term "telecommunications equipment" means equipment, other than customer premises equipment, used by a carrier to provide telecommunications services, and includes software integral to such equipment (including upgrades).

**(53) Telecommunications service**
The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.
…
**(59) Wire communication**
The term "wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

## *Add. 47 U.S. Code § 201 - Service and charges*

**(a)** It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
**(b)** All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is

displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

### Add. 47 U.S. Code § 202 – Discriminations and preferences

**(a) Charges, services, etc.**
It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

**(b) Charges or services included**
Charges or services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

**(c) Penalty**
Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

### Add. 47 U.S. Code § 207 – Recovery of damages

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

### Add. 47 U.S. Code § 230 – Protection for private blocking and screening of offensive material

**(a) FINDINGS** The Congress finds the following:

**(1)**

The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)**

These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)**

The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)**

The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)**

Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) POLICY** It is the policy of the United States—

**(1)**

to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)**

to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)**

to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)**

to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)**

to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**

**(1) TREATMENT OF PUBLISHER OR SPEAKER**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) CIVIL LIABILITY** No provider or user of an interactive computer service shall be held liable on account of—

**(A)**

any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)**

any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d) OBLIGATIONS OF INTERACTIVE COMPUTER SERVICE**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) EFFECT ON OTHER LAWS**

**(1) NO EFFECT ON CRIMINAL LAW**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2) NO EFFECT ON INTELLECTUAL PROPERTY LAW**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) STATE LAW**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) NO EFFECT ON COMMUNICATIONS PRIVACY LAW**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5)** N**O EFFECT ON SEX TRAFFICKING LAW**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

**(A)** any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f)** D**EFINITIONS** As used in this section:

**(1)** I**NTERNET**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2)** I**NTERACTIVE COMPUTER SERVICE**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3)** I**NFORMATION CONTENT PROVIDER**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4)** A**CCESS SOFTWARE PROVIDER** The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

**(A)** filter, screen, allow, or disallow content;

**(B)** pick, choose, analyze, or digest content; or

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

## *Add. Article I, Section 10, Clause 1 (Contracts Clause)*

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

## *Add. First Amendment of the US Constitution*

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

## *Add. Fourteenth Amendment of the US Constitution*

### Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

### Section 2.

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

### Section 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of

the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.**
The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.**
The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

### *Add. M.G.L. Chapter 159: COMMON CARRIERS (1921)*

Section 1. Every common carrier of merchandise or other property shall receive, transport and forward all property offered for such purposes by other such carriers as promptly, faithfully and impartially, at as low rates of charge, and in a manner and on terms and conditions as favorable to the carrier offering such property, as he on the same day and at the same place receives, forwards and transports, in the ordinary course of business, property of a like description offered by persons other than such carriers. Such carrier shall not discriminate against any particular person or subject him to any undue or unreasonable prejudice or disadvantage. The supreme judicial or superior court shall have jurisdiction in equity to enforce this section.

Section 2. Every such carrier who wilfully neglects or refuses to comply with the preceding section shall forfeit not less than fifty nor more than five hundred dollars, to the person offering the property for transportation.

Section 10. The department of telecommunications and cable shall enforce this chapter to the extent that it relates to telecommunications. The department of public utilities shall enforce all other provisions.

Section 12. The department shall, so far as may be necessary for the purpose of carrying out the provisions of law relative thereto, have general supervision and regulation of, and jurisdiction and control over, the following services, when furnished or rendered for

public use within the commonwealth, except when such services are provided by a municipal lighting plant or cooperative public corporation which provides telecommunications services pursuant to section 47E of chapter 164, and in the exercise thereof, the department shall take cognizance of all applicable transportation plans and programs adopted by the public works commission pursuant to section five A of chapter sixteen, and all persons, firms, corporations, associations and joint stock associations or companies furnishing or rendering any such service or services, in sections ten to forty-four, inclusive, collectively called common carriers and severally called a common carrier:

(a) The transportation or carriage of persons or property, or both, between points within the commonwealth by railroads, street railways, in this chapter called railways, electric railroads, trackless trolleys and ships or vessels in excess of one hundred gross tons using steam or Diesel engine as means of propulsion, including express service and car service carried on, upon or rendered in connection with such railroads, railways, electric railroads, trackless trolleys or ships or vessels in excess of one hundred gross tons using steam or Diesel engine as means of propulsion.

(b) The carriage of passengers for hire upon motor vehicles as provided in chapter one hundred and fifty-nine A, in section seventy A of chapter one hundred and sixty and in section forty-four of chapter one hundred and sixty-one, but only to the extent therein provided.

(c) The operation of all conveniences, appliances, facilities or equipment utilized in connection with, or appertaining to, such transportation or carriage of persons or property or such express service or car service, by whomsoever owned or provided, whether the service be common carriage or merely in facilitation of common carriage.

(d) The <u>transmission of intelligence within the commonwealth by electricity</u>, by means of telephone lines or telegraph lines or any other method or system of communication, including the operation of all conveniences, appliances, instrumentalities, or equipment appertaining thereto, or utilized in connection therewith. The provision of such services by a telecommunications system established and operated pursuant to section 47E of chapter 164 shall be subject to this chapter with respect to customer billing notification and termination, filing of tariffs, interconnection agreements, number pooling and filing of annual reports, to the same extent as privately owned and operated telecommunications systems.

## *Add. M.G.L. Chapter 166: TELEPHONE AND TELEGRAPH COMPANIES, AND LINES FOR THE TRANSMISSION OF ELECTRICITY (1921)*

Section 16. A telegraph company shall receive despatches from and for other telegraph companies and associations, and from and for any person; and, upon payment of the usual charges for transmitting despatches according to the regulations of the company, shall transmit them faithfully and impartially.

Section 17. A telegraph company shall receive, compute and transmit despatches received at its offices from another telegraph company or by mail, at the same rates of charge as for despatches received for transmission from individuals on the same day and at the same place.

Section 18. A telegraph company which wilfully neglects or refuses to comply with any provision of the two preceding sections shall forfeit not more than one hundred dollars to the company or person who sends or desires to send the despatch.

Section 19. A telegraph company shall be liable for damages to the amount of one hundred dollars actually caused by its negligence, or that of its agents, in transmitting, receiving or delivering telegraphic messages, and any limit of such liability by contract or regulation shall apply only to the damages in each case in excess of one hundred dollars; but no action therefor shall be maintained unless a written claim is presented to such company or its agent within sixty days after such right of action accrues. This section shall not apply to negligence occurring in a telegraph office established for the convenience and safety of a railroad corporation in the running of its trains, and transacting a public telegraph business only as incidental thereto, nor to negligence in the delivery of messages received at such office.

## *Add. M.G.L. Chapter 272: CRIMES AGAINST CHASTITY, MORALITY, DECENCY AND GOOD ORDER (1921)*

Section 92A. No owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement shall, directly or indirectly, by himself or another, publish, issue, circulate, distribute or display, or cause to be published, issued, circulated, distributed or displayed, in any way, any advertisement, circular, folder, book, pamphlet, written or painted or printed notice or sign, of any kind or description, intended to discriminate against or actually discriminating against persons of any religious sect, creed, class, race, color, denomination, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, nationality, or because of deafness or blindness, or any physical or mental disability, in the full enjoyment of the accommodations, advantages, facilities or privileges offered to the general public by such places of public accommodation, resort or amusement.

A place of public accommodation, resort or amusement within the meaning hereof shall be defined as and shall be deemed to include any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public and, without limiting the generality of this definition, whether or not it be (1) an inn, tavern, hotel,

shelter, roadhouse, motel, trailer camp or resort for transient or permanent guests or patrons seeking housing or lodging, food, drink, entertainment, health, recreation or rest; (2) a carrier, conveyance or elevator for the transportation of persons, whether operated on land, water or in the air, and the stations, terminals and facilities appurtenant thereto; (3) a gas station, garage, <u>retail store or establishment</u>, including those dispensing personal services; (4) a restaurant, bar or eating place, where food, beverages, confections or their derivatives are sold for consumption on or off the premises; (5) a rest room, barber shop, beauty parlor, bathhouse, seashore facilities or swimming pool, except such rest room, bathhouse or seashore facility as may be segregated on the basis of sex; (6) a boardwalk or other public highway; (7) an auditorium, theatre, music hall, meeting place or hall, including the common halls of buildings; (8) a place of public amusement, recreation, sport, exercise or entertainment; (9) a public library, museum or planetarium; or (10) a hospital, dispensary or clinic operating for profit; provided, however, that with regard to the prohibition on sex discrimination, this section shall not apply to a place of exercise for the exclusive use of persons of the same sex which is a bona fide fitness facility established for the sole purpose of promoting and maintaining physical and mental health through physical exercise and instruction, if such facility does not receive funds from a government source, nor to any corporation or entity authorized, created or chartered by federal law for the express purpose of promoting the health, social, educational vocational, and character development of a single sex; provided, further, that with regard to the prohibition of sex discrimination, those establishments which rent rooms on a temporary or permanent basis for the exclusive use of persons of the same sex shall not be considered places of public accommodation and shall not apply to any other part of such an establishment. An owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement that lawfully segregates or separates access to such place of public accommodation, or a portion of such place of public accommodation, based on a person's sex shall grant all persons admission to, and the full enjoyment of, such place of public accommodation or portion thereof consistent with the person's gender identity.

Any person who shall violate any provision of this section, or who shall aid in or incite, cause or bring about, in whole or in part, such a violation shall be punished by a fine of not more than one hundred dollars, or by imprisonment for not more than thirty days, or both.

Section 98. Whoever makes any distinction, discrimination or restriction on account of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, deafness, blindness or any physical or mental disability or ancestry relative to the admission of any person to, or his treatment in any place of public accommodation,

resort or amusement, as defined in section ninety-two A, or whoever aids or incites such distinction, discrimination or restriction, shall be punished by a fine of not more than twenty-five hundred dollars or by imprisonment for not more than one year, or both, and shall be liable to any person aggrieved thereby for such damages as are enumerated in section five of chapter one hundred and fifty-one B; provided, however, that such civil forfeiture shall be of an amount not less than three hundred dollars; but such person so aggrieved shall not recover against more than one person by reason of any one act of distinction, discrimination or restriction. All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, resort or amusement subject only to the conditions and limitations established by law and applicable to all persons. This right is recognized and declared to be a civil right.

## *Add. Revised Laws Chapter 70: Of Common Carriers and Express Companies. (1902)*

Section 1. Every common carrier of merchandise or other property shall receive, transport and forward all property offered for such purposes by other such carriers as promptly, faithfully and impartially, at as low rates of charge, and in a manner and on terms and conditions as favorable to the carrier offering such property, as he on the same day and at the same place receives, for wards and transports, in the ordinary course of business, property of a like description offered by persons other than such carriers. Such carrier shall not discriminate against any particular person or corporation or subject him or it to any undue or unreasonable prejudice or disadvantage. The supreme judicial court or the superior court shall have jurisdiction in equity to enforce the provisions of this section.

Section 2. Every such carrier who wilfully neglects or refuses to comply with the provisions of the preceding section shall forfeit for every offence not less than fifty nor more than five hundred dollars, to the person offering the property for transportation.

## *Add. Revised Laws Chapter 109: Of Certain Powers, Duties and Liabilities of Corporations. (1902)*

Section 24. Railroad corporations and street railway companies shall issue only such amounts of stock and bonds coupon notes and other evidences of indebtedness payable at periods of more than
twelve months after the date thereof, and gas and electric light companies, corporations, established for and engaged in the business of transmitting intelligence by electricity…

### Add. Revised Laws Chapter 122: Of Companies Engaged in the Transmission of Electricity. (1902)

Section 1. A company which is incorporated for the <u>transmission of intelligence by electricity, or by telephone,</u> whether by electricity or otherwise, or for the transmission of electricity for lighting, heating or power, except lines for heat or power by a street railway company, may, under the provisions of the following sections, construct lines for such transmission upon and along the public ways and across any waters within the commonwealth, by the erection of the poles, piers, abutments and other fixtures, except bridges, which may be necessary to sustain the wires of its lines; but shall not incommode the public use of public ways nor endanger or interrupt navigation.

Section 9. A telegraph company shall receive despatches from and for other telegraph companies and associations, and from and for any person; and, upon payment of the usual charges for transmitting despatches according to the regulations of the company, shall transmit them faithfully and impartially.

Section 10. A telegraph company shall receive, compute and transmit despatches which may be received at its offices from another telegraph company or by mail, at the same rates of charge as for despatches which may be received for transmission from individuals on the same day and at the same place. A telegraph company which wilfully neglects or refuses to comply with the provisions of this or the preceding section shall forfeit not more than one hundred dollars to the company or person who sends or desires to send the despatch.

Section 11. A telegraph company shall be liable for damages to the amount of one hundred dollars actually caused by its negligence, or that of its agents, in transmitting, receiving or delivering telegraphic messages, and any limit of such liability by contract or regulation shall apply only to the damages in each case in excess of one hundred dollars; but no action therefor shall be maintained unless a claim is presented in ·writing to such company or its agent within sixty days after such right of action accrues. The provisions of this section shall not apply to negligence occurring in a telegraph office which is established for the convenience and safety of a railroad corporation in the running of its trains, and transacting a public telegraph business only as incidental thereto, nor to negligence in the delivery of messages received at such office.

### Add. Massachusetts General Statutes CHAPTER 64. OF TELEGRAPH COMPANIES. (1860)

Section 1. Every company incorporated for the <u>transmission of intelligence by electricity</u> shall possess the powers and privileges, and be subject to the duties, restrictions, and liabilities, prescribed in this chapter.

Sect. 10. Every company shall receive despatches from and for other telegraph lines, companies, and associations, and from and for any person; and on payment of the usual charges for transmitting despatches according to the regulations of the company, shall transmit the same faithfully and impartially. For every wilful neglect or refusal so to do the company shall forfeit a sum not exceeding one hundred dollars, to be recovered in an action of tort by the person, association, or company, sending or desiring to send the despatch.

### *Add. California Civil Code DIVISION 3 PART 4 TITLE 7 CHAPTER 5 ARTICLE 1. Common Carriers in General [[2168.] - 2178] ( Article 1 enacted 1872. )*

**[2168.]** Section Twenty-one Hundred and Sixty-eight. Every one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry.
*(Amended by Code Amendments 1873-74, Ch. 612.)*

### *Add. California Civil Code DIVISION 3 PART 4 TITLE 7 CHAPTER 5 ARTICLE 4. Common Carriers of Messages [2207 - 2209] (Article 4 enacted 1872.)*

**2207.** A carrier of messages by telegraph must, if it is practicable, transmit every such message immediately upon its receipt. But if this is not practicable, and several messages accumulate upon his hands, he must transmit them in the following order:
  1. Messages from public agents of the United States or of this State, on public business;
  2. Messages intended in good faith for immediate publication in newspapers, and not for any secret use;
  3. Messages giving information relating to the sickness or death of any person;
  4. Other messages in the order in which they were received.

(Enacted 1872.)

**2208.** A common carrier of messages, otherwise than by telegraph, must transmit messages in the order in which he receives them, except messages from agents of the United States or of this State, on public business, to which he must always give priority. But he may fix upon certain times for the simultaneous transmission of messages previously received.

(Enacted 1872.)

**2209.** Every person whose message is refused or postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his actual damages, and fifty dollars in addition thereto.

(Enacted 1872.)

### *Add. Harvard Crimson Commenting Policy (2008)*

The Harvard Crimson's Online Commenting Policy
By [The Crimson Staff](#), None
October 5, 2008
As of October 5, 2008, readers of The Crimson may comment on any article published on The Crimson's Web site.

Comments are manually approved by Crimson editors. Please be patient--your comment may not be published immediately.

The Crimson will always approve comments, critical or supportive, that respond to the substance of the article in question and contribute to a constructive online dialog.

The Crimson will not approve comments that include profanity, hate speech, or spam.

The Crimson will not approve criticism directed specifically and personally at the author of the article in question, except in the cases of Arts reviews and signed editorial pieces.

If you create an account at Disqus.com, your comments will be automatically approved. The Crimson reserves the right to revoke your registration and/or delete offending comments at any time, based on the criteria above.

Crimson staff members will not comment on articles without identifying themselves, nor will they comment on articles if doing so would pose a conflict of interest.

### *Add. Harvard Crimson Commenting Policy (2025)*


The Harvard Crimson is a student-run nonprofit.
Please support us by disabling AdBlock for our site. Thank you.

Online Commenting Policy
A comment may be removed, without notice to the commenter, if any of its content meets one or more of the following criteria:

- Comments that are excessively long, irrelevant, or off-topic. Examples include, but are not limited to, spam, advertisements, and gibberish.
- Excessive or unnecessary profanity, obscenity, or words that are racist, sexist, homophobic, or hateful in some other way.
- Threats or encouragement of violence and/or other illegal behavior.
- Disclosure of personal and private information about any individual, including (but not limited to) the writer of the piece or the writer of another comment.
- The comment is written under the name or username of an individual other than the author of the comment.

If the comment policy is repeatedly violated on a single article, discussions on that article may be closed. If a commenter repeatedly violates the policy, whether on one or multiple articles, that commenter may be banned from making further comments on thecrimson.com. The application of this policy, including decisions to delete comments, close commenting, or ban commenters, is at the discretion of the moderator.

*Add. Harvard Crimson's Invitation to the Public*



**29 Comments**                    ▼ **Atallah Aflaq (عطا الله عفلق)**

Join the discussion...

♡   • **Share**                                    **Best**   **Newest**   **Oldest**

**G**   **Gilbert** 👤⁺                                        —   •••
21 hours ago

"As a technical matter, there is no question that the PSC did break the rules, and it was given several weeks of notice that it was doing so. But the College has discretion to enforce these rules, and in this case, it obviously shouldn't have."

This is where the argument falls apart. Your entire claim is that they should be exempt from the rules for an amorphous "good of the campus". However, I don't see how violent, hateful speech and the potential for campus life to grid to a halt is promoting the "good of the campus".

👍 0    👎 0    Reply   ↪

**S**   **sasboy**                                            —   •••
a day ago   edited

Any University which silences or harasses Palestine solidarity movements should be sued. The Palestine ralliers are doing a phenomenal job of demanding an end to Israel's hideous atrocites.

👍 0    👎 4    Reply   ↪

**M**   **mark** 👤⁺                                           —   •••
a day ago

When was the last time rabid pro-Palestinian students wanted to engage with anyone constructively.?

👍 2    👎 0    Reply   ↪

*Add. Blackstone*

There is also in law always an implied contract with a common inn-keeper, to secure his guest's goods in his inn; with a common carrier or bargemaster, to be answerable for the

goods he carries; with a common farrier, that he shoes a horse well, without laming him; with a common tailor, or other workman, that he performs his business in a workmanlike manner: in which if they fail, an action on the case lies to recover damages for such breach of their general undertaking. But if I employ a person to transact any of these concerns, whose common profession and business it is not, the law implies no such general undertaking; but in order to charge him with damages, a special agreement is required. Also if an inn-keeper, or other victualer, hangs out a sign and opens his house for travelers, it is an implied engagement to entertain all persons who travel that way; and upon this universal assumpsit an action on the case will lie against him for damages, if he without good reason refuses to admit a traveler.

### Add. *Black's Law Dictionary (12th Ed.)*

**common carrier**. (15c) A commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee. A common carrier is generally required by law to transport freight or passengers without refusal if the approved fare or charge is paid. - Also termed *public carrier*.

> "The Law has avowedly given the privilege of its special protection, in respect of the trader, and not of the carrier. On this ground therefore it has been determined that any person undertaking for hire to carry the goods of all persons indifferently is, as to the liability imposed, to be considered a common carrier." Henry Jeremy, *The Law of Carriers, Inn Keepers, Warehousemen, and other Depositaries of Goods for Hire* 4 (1815).

> "A common or public carrier is one who undertakes as a business, for hire or reward, to carry from one place to another, the goods of all persons who may apply for such carriage, provided the goods be of the kind which he professes to carry, and the person so applying will agree to have them carried upon the lawful terms prescribed by the carrier; and who, if he refuses to carry such goods for those who are willing to comply with his terms, becomes liable to an action by the aggrieved party for such refusal. To bring a person therefore within the description of a common carrier, he must be engaged in the business of carrying goods for others as a public employment, he must undertake to carry goods of the kind to which his business is confined, for persons generally, and he must hold himself ready to engage in the transportation of goods for hire as a business and not as a casual occupation. And this duty or obligation to the public by reason of the public nature of the employment and the increased responsibility imposed upon him by the law upon the grounds of public policy, mainly distinguish the common from the private carrier for hire." Robert Hutchinson, *A Treatise the Law of Carriers* 30 31 (1882).

"[A] 'common carrier' is bound to take all goods of the kind which he usually carries, unless his conveyance is full, or the goods be specially dangerous; but may charge different rates to different customers." Thomas E. Holland, *The Elements of Jurisprudence* 299 (13th ed. 1924).

### *Add. Angell on Carriers (5th ed. 1877), § 75, pp. 68-69*

§ 75. There is a class of persons well known in this country, who are called "forwarding merchants," and who usually combine in their business the double character of warehousemen and agents for a compensation, to forward goods to their destination. This class of persons is especially employed upon our canals and railroads, and in our coasting navigation by steam vessels and other packets. The law is, that persons so employed, if they have no concern in the vehicle by which the goods are sent, and have no interest in the freight, are not liable as common carriers, but are of course liable, like warehousemen and common agents, that is, for ordinary diligence, and for that only. They are responsible only for want of good faith and reasonable and ordinary diligence; but one of their first duties, as consignees for transmission, undoubtedly is, to obey the instructions of the consignor, either express or fairly implied; and when they undertake to vary from the instructions, from whatever motive, and a loss is thereby occasioned, they are clearly liable to the owners of the goods. Sometimes a person is both a common carrier and a forwarding merchant, and receives goods into his warehouse to be forwarded in obedience to the future orders of the owner; and if, in such case, the goods are lost by fire before such orders are received, or the goods sent forward, he is not chargeable as common carrier, but only as warehouseman. His duty as carrier ends also when the goods have arrived at the place of their fixed destination, and are deposited in the carrier's warehouse, when his duty as warehouseman again commences. But if the deposit in the warehouse of the carrier be at some intermediate place in the course of his route; or if, after the arrival at the place of destination, he is still under obligation to deliver the goods to the owner; and before such delivery he has put them into his own warehouse, where they are consumed by fire, he will be liable for the loss, his duty as carrier not being ended.

### *Add. Electronic Computer Originated Mail (ECOM), Memorandum Opinion and Order*

16. It is undisputed that ECOM is designed to offer consumers a service whereby information can be transmitted from a point of origination to one or more points of termination by means of electronic communications facilities. We therefore conclude that ECOM will be a communications service, pursuant to the statutory definition in Sections 3(a) and 3(b) of the Act. We also believe that the "including all instrumentalities" aspect of the statutory definitions ensures that, once an entity is

regulated because it is engaged in transmission, its activities incidental to that transmission will also be subject to our regulatory authority. Thus, we find that both the electronic transmission and physical delivery portions of ECOM incidental thereto constitute a communications service within the terms of Sections 3(a) and 3(b) of the Act.

17. Not only is the proposed service "communications by wire or radio;" it is also a common carrier activity. As has often been noted, the statutory definition of common carrier is not helpful: " 'common carrier' or 'carrier' means any person engaged as a common carrier for hire * * * " 47 U.S.C. 153(h). Our Rules shed little additional light on the issue: " * * * any person engaged in rendering communication service for hire to the public." 47 CFR-21.1 Like our Rules and the language of the Act, Legislative history is also less than illuminating: the term was not intended to include " * * * any person not a common carrier in the ordinary sense of the term." Thus, whatever guidance we are to receive on the meaning of communications common carriage must come from judicial interpretations and comparisons of ECOM with existing communications common carrier services already regulated under the Act.

18. With respect to the relevant judicial decisions defining the nature of common carriage, we note that none of the parties to this proceeding appears to dispute that ECOM service would constitute a common carrier offering if it were to be provided by an entity other than the Postal Service. We also conclude independently that ECOM is a quasi-public offering of a for-profit service which affords the public an opportunity to transmit messages of its own design and choosing. Based on those judicially defined criteria, we find that, in offering ECOM, the Postal Service is engaging in a common carrier activity.

19. Uncontroverted evidence that ECOM service would be virtually identical to Western Union's tariffed Mailgram offering in scope, service, operation, and facilities, also leads us to conclude that ECOM is a common carrier communications service subject to our jurisdiction. Western Union has tariffed the electronic communications segment of Mailgram with this Commission in clear recognition that it is the type of interstate communications common carrier service subject to the Communications Act of 1934.

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) and the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).

1. **Type-Volume**: This brief contains **7,970 words**, including footnotes, as counted by a word processing system, excluding the parts of the brief exempted by Rule 32(f).

2. **Typeface and Style**: This brief has been prepared in a proportionally spaced typeface using **Microsoft Word** in **14-point Times New Roman** font.

Name: Jonathan Affleck

*Jonathan Affleck, pro se*

Dated: _____

Case No. 25-1223

Jonathan Affleck,
Plaintiff-Appellant
v.
Harvard Crimson Inc
Defendant-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**Certificate of Service**
(submitted _____)

I hereby certify that a copy of the *APPELLANT'S BRIEF FOR PLAINTIFF-APPELLANT JONATHAN AFFLECK* has been served in the above captioned proceeding on _____.

Dated: _____

Respectfully submitted by

*Jonathan Affleck*
_____
Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94702
Jonathan.Affleck@protonmail.com
(617) 276-5788
*pro se*